# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

JACKIE WILLIAMS SIMPSON, *et al.*,                                                    PLAINTIFFS,

v.                                Case No. 4:22-cv-00213-JM (three-judge court)

ASA HUTCHINSON, *et al.*,                                                             DEFENDANTS.

### Defendants' Brief in Support of Motion to Dismiss

## TABLE OF CONTENTS

Introduction ........................................................................................................ 1

Background ......................................................................................................... 2

Legal Standard ................................................................................................... 6

Argument ............................................................................................................ 7

   I.   Sovereign immunity bars Plaintiffs' claims against Arkansas and the
       Governor. ................................................................................................. 7

      A.   Sovereign immunity bars Plaintiffs' claims against Arkansas. ...................7

      B.   The Governor is not a proper *Ex parte Young* Defendant. ............................11

  II.   Plaintiffs fail to state a claim under federal or Arkansas law. ........................... 13

      A.   Plaintiffs' Article I, section 2 challenge fails because Arkansas's
          congressional map satisfies the "one person, one vote" rule. ........................14

      B.   Plaintiffs' First Amendment claim fails because that Amendment does
          not regulate redistricting. ............................................................................15

      C.   Plaintiffs' Privileges or Immunities Cause claim is frivolous. ......................16

      D.   Plaintiffs' equal protection claims fail because they have not plausibly
          alleged intentional discrimination. ..............................................................17

      E.   The Fifteenth Amendment does not support Plaintiffs' vote-dilution
          claim. ...........................................................................................................21

      F.   Plaintiffs' allegations demonstrate that their Voting Rights Act claim
          must be dismissed. ......................................................................................22

Conclusion ....................................................................................................... 32

## INTRODUCTION

Redistricting is "a most difficult subject." *Miller v. Johnson*, 515 U.S. 900, 915 (1995).

It "is the politics of politics," and it rarely leaves everyone (or perhaps anyone) happy. *Thomas

v. Bryant*, 938 F.3d 134, 175 (5th Cir. 2019), *on reh'g en banc sub nom. Thomas v. Reeves*, 961

F.3d 800 (5th Cir. 2020) (Willett, J. dissenting). It is because districting decisions are so steeped

in politics and intensely local considerations that it "is primarily the duty and responsibility of

the State through its legislature or other body, rather than a federal court." *Chapman v. Meier*,

420 U.S. 1, 27 (1975).

The Plaintiffs here fought a political battle and lost. They are dissatisfied with the results

of the Arkansas General Assembly's redrawing of the State's congressional districts following

the 2020 Census. But neither state nor federal law provides a vehicle for Plaintiffs to transform

their political dissatisfaction—and preference for a more Democrat-friendly map—into a valid

legal claim. And while Plaintiffs attempt to frame their political gerrymandering arguments as

an implausible allegation of 21st-century intentional race discrimination, that attempt fails for

several reasons.

To start, it fails for procedural reasons. Plaintiffs' claims against the State of Arkansas

and Arkansas Governor Asa Hutchinson fail as a matter of law because both are immune from

suit. Likewise, Plaintiffs' Voting Rights Act claim also fails as a matter of law because—as an-

other court in the district recently explained in dismissing a similar claim—there is no private

right of action under Section 2.

Plaintiffs' claims also fail on the merits. Indeed, Plaintiffs have alleged a number of legal

theories that are entirely meritless. In particular, Plaintiffs' claims under Article I, section 2, the

First Amendment, the Privileges or Immunities Clause of the Fourteenth Amendment, and the

Fifteenth Amendment can be dismissed out of hand because they are either foreclosed by precedent or so beyond the pale that no court has ever entertained such theories. And Plaintiffs' other claims fare little better. For instance, Plaintiffs' equal protection claims fail because though they claim that the General Assembly engaged in intentional race discrimination, they don't actually allege facts showing that the General Assembly did anything other than apply traditional, race-neutral redistricting principles. Likewise, even assuming Plaintiffs could bring a private Section 2 claim, that claim would still fail because Plaintiffs cannot—in fact, concede they cannot—establish two of the three *Gingles* preconditions necessary to prevail on such a claim.

Plaintiffs' Complaint should be dismissed with prejudice.

## BACKGROUND

This case involves challenges to modest revisions to Arkansas's four congressional districts. State law provides that the General Assembly is responsible for reapportioning congressional districts after the Census. *See* Ark. Code Ann. 7-2-101 *et seq.* Following the receipt of official census data last fall, the General Assembly reconvened in September to consider reapportionment legislation. (Compl. ¶¶ 16-17.)

Reapportionment is required to comply with the constitutional requirement that the populations of a state's congressional districts be as equal "as is practicable." *Wesberry v. Sanders*, 376 U.S. 1, 8 (1964). This is sometimes referred to as the "one person, one vote" rule. "The 2020 Census showed that the total population of Arkansas was 3,011,524, and, divided among four (4) congressional districts, the ideal population of each district would be 752,881." (Compl. ¶ 22.) Due to population growth in Districts 2 and 3, the General Assembly was required to rebalance the population between Arkansas's existing districts in order to comply with the one person, one vote rule. *Id.* This meant redrawing boundaries to significantly reduce the population of District 3; substantially reduce the population of District 2; and increase the populations of

Districts 1 and 4.  In addition to drawing districts that met the one person, one vote requirement, the General Assembly also aimed—consistent with judicial precedent—to draw districts that were compact, contiguous, minimized splits between political subdivisions (like counties), preserved communities of interest, avoided pairing incumbents, and otherwise complied with federal law.  (Compl. ¶ 21.)

In that process, the General Assembly considered a number of maps and eventually settled on House Bill 1982 and Senate Bill 743, which were numbered as Acts 1114 and 1116. (Compl. ¶ 25).  The Acts were adopted on October 6, 2021, and the new congressional map became effective on October 13, 2021.

As Plaintiffs concede, the new districts adopted by the General Assembly "differed little geographically from the districts formulated by the [Democrat-dominated] General Assembly and signed by Governor Mike Beebe in 2011 . . . ."  (Compl. ¶ 26.)  In both maps, District 1 comprises the counties in the eastern and northern part of the state; District 2 is made up of central Arkansas counties; District 3 is toward the northwest; and District 4 comprises the remaining counties, mostly in the southern and western parts of the state.  (*See* Compl., Exs. 1-4.)  This is how Arkansas's congressional maps have looked for decades.

The only substantial difference between the current and prior maps is that the General Assembly reduced the number of county splits.  Minimizing splits of political subdivision boundaries—such as counties—is an important redistricting criterion for a number of reasons, including lessening the burden on election officials creating ballots and keeping together communities of shared interests.  The pre-existing 2011 congressional map split a total of five counties: Crawford, Newton, Searcy, and Sebastian, all of which are in the northwest portion of the state, and Jefferson County, one of the State's minority population centers.  *Id.*  By contrast, the current

map splits only two counties.  Sebastian County remains split between Districts 3 and 4, with slightly different boundaries, and Pulaski County is split between Districts 1, 2, and 4.  Pulaski and Sebastian are the State's largest and fourth-largest counties by population, respectively.  *Id.* Pulaski County, in addition to being the State's most populous county, is located in the center of Arkansas and shares a boundary with six other counties.  *Id.*  Sebastian County is located along the western edge of the state, less than one hundred miles from Benton and Washington Counties, Arkansas's second and third most populous counties.  *Id.*  These factors make it difficult for a map drawer to avoid splitting Sebastian or Pulaski Counties without incurring a substantial number of splits elsewhere, as was the case with the 2011 congressional map.

Particularly relevant here, however, those adjustments barely changed the district's racial demographics.  Plaintiffs' complaint concedes those changes are insignificant.  (*See* Compl. ¶ 29 (Governor Hutchinson acknowledging that "three of the four congressional districts do not differ that much from the current percentages").)  And the current map—aside from splitting fewer counties—is also significantly more compact.  (Compl., Exs. 1-4.)  Indeed, it eliminated the elongated and oddly shaped upside-down "U" that previously constituted District 3.  *See id*.

*Procedural History*

Despite much press attention and rigamarole from various interested parties, (*e.g.*, Compl. ¶ 39), no plaintiff sued to block the use of the current maps for the 2022 election cycle. In fact, Plaintiffs did not file this lawsuit until March 7, 2022, nearly five months after the congressional map became effective, long after any relief would have been possible for the next election. *See Merrill v. Milligan,* 142 S. Ct. 879, 881 (2022) (staying injunction of Alabama's congressional districts on the ground that the election was too close for court intervention on February 7, 2022).

4

Plaintiffs' Complaint purports to state seven claims under federal and state law.[1]  The factual basis for those various claims is the same.  They allege that the General Assembly's decision to split portions of Pulaski County into different districts—a decision that resulted in near-perfect population equality as well as a reduction in the total number of county splits—was motivated by race.  Yet Plaintiffs don't dispute that District 2 didn't really change that much from the 2011 map drawn by a Democrat-dominated legislature and that District 2 had to be redrawn because the Census showed that it was overpopulated by more than 16,000.  (Compl. ¶ 21.)  Indeed, Plaintiffs don't deny that the General Assembly's splitting portions of Pulaski County into the underpopulated Districts 1 and 4 was critical to achieving population equality and that those changes resulted in no more than a negligible, couple-percentage-point difference in the racial demographics of District 2 as compared to the 2011 plan.  (*See* Compl. ¶ 29.)  Nor for that matter do Plaintiffs dispute that the 2011 map didn't contain a majority-minority district or that—even if Pulaski County had remained whole—it still wouldn't be possible to draw a majority-minority congressional district.

Yet Plaintiffs nevertheless claim that the General Assembly's congressional map had the purpose and effect of diluting black voting strength.  They bring a total of seven claims (six federal; one state) against three defendants (the State of Arkansas, the Governor, and the Secretary of State).  The vast majority of those claims amount to little more than novel assertions about the scope of Article I, section 2, the First Amendment, the Privileges or Immunities Clause of the Fourteenth Amendment, and the Fifteenth Amendment, and they can be dismissed out of hand.

---

[1] Plaintiffs' claim under Section 2 of the Voting Rights Act and their sole claim under the Arkansas Constitution are both erroneously labeled "Count VI."

Plaintiffs' Section 2 claim fares little better since there is no private right to enforce that provision and, in any event, Plaintiffs don't allege that they meet—in fact, concede they cannot show—the three *Gingles* preconditions.  And Plaintiffs' equal protection claims fail because they don't even bother to dispute the valid, non-racial reasons why the General Assembly could have had—in fact, did—for drawing the district at issue.  Thus, Defendants now ask the Court to dismiss Plaintiffs' Complaint.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of claims that "fail[] to state a claim upon which relief can be granted" by motion.  Under that rule, a complaint's factual allegations are accepted as true and viewed in the light most favorable to the plaintiff.  *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999) (citing *Gordon v. Hansen*, 168 F.3d 1109, 1113 (8th Cir. 1999)).  "At a minimum, however, a complaint must contain facts sufficient to state a claim as a matter of law and must not be merely conclusory in its allegations."  *Id.* (quoting *Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir. 1998)).  Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  And, as here, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

Rule 12(b)(6) dismissals are an "important mechanism for weeding out meritless claims." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  In other words, if "the well-pleaded facts do not permit the court to infer more than the mere possibility of

6

misconduct," then the complaint fails to "show[] that the pleader is entitled to relief" under Federal Rule of Civil Procedure 8(a)(2) and must be dismissed.  *Id.* at 679.

Likewise, a court should dismiss when, based on the plaintiff's own allegations, he has no cognizable claims.  "[D]ismissal under Rule 12(b)(6) serves to eliminate actions which are fatally flawed in their legal premises and designed to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity."  *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001).

Applying that standard, this Court should dismiss Plaintiffs' Complaint with prejudice

## ARGUMENT

## I.  Sovereign immunity bars Plaintiffs' claims against Arkansas and the Governor.

This Court lacks jurisdiction as to the State of Arkansas and the Governor because they are immune from suit.  Plaintiffs' claims against those defendants should therefore be dismissed.

### A.   Sovereign immunity bars Plaintiffs' claims against Arkansas.

Plaintiffs seek injunctive relief against not only the Governor and Secretary of State, but also against the State of Arkansas itself.  (Compl. ¶ 11.)  Their claims against the State are barred by sovereign immunity under the Eleventh Amendment and the Arkansas Constitution.

#### 1.   Federal claims

It is well-settled that sovereign immunity generally bars suits against a State unless the State has consented to suit or Congress has abrogated the immunity.  *See Alden v. Maine*, 527 U.S. 706, 727-28 (1999); *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007) ("While under the doctrine set forth in *Ex parte Young*, state officials may be sued in their official capacities for prospective injunctive relief without violating the Eleventh Amendment, the same doctrine does not extend to states or state agencies.") (citation omitted).  This rule is not without exceptions.  Relevant here, "Congress has the power to abrogate unilaterally the States' immunity from suit" when enacting legislation "pursuant to a constitutional provision granting Congress

[that] power." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 59 (1996). "Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute." *Dellmuth v. Muth*, 491 U.S. 223, 228 (1989) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)).

Congress did not abrogate state sovereign immunity when it enacted Section 1983, the federal cause of action for Plaintiffs' constitutional claims. *See Burk v. Beene*, 948 F.2d 489, 493 (8th Cir. 1991). So Plaintiffs' federal constitutional claims against Arkansas must be dismissed.

Plaintiffs' remaining federal claim against Arkansas under Section 2 of the Voting Rights Act must similarly be dismissed due to sovereign immunity. Congress neither had the constitutional authority to abrogate states' sovereign immunity in enacting Section 2 and, in any event, didn't "unmistakably" intend to do so. *Dellmuth*, 491 U.S. at 228. To the contrary, neither the Supreme Court nor the Eighth Circuit has held that the Fifteenth Amendment grants Congress the power to abrogate sovereign immunity. *See Mixon v. Ohio*, 193 F.3d 389, 399 (6th Cir. 1999) (noting that "the Supreme Court has not held" whether the Fifteenth Amendment grants the power to abrogate immunity). Sovereign immunity thus bars Plaintiffs' Voting Rights Act claim against Arkansas.

Yet even if Congress could have abrogated states' sovereign immunity, it did not in fact do so when it enacted Section 2 of the Voting Rights Act. This Court held so recently. *Christian Ministerial All. v. Arkansas*, No. 4:19-CV-402, 2020 WL 12968240, at *5 (E.D. Ark. Feb. 21, 2020) (Moody, J.) (holding that the "[Voting Rights] Act" did not "abrogate[] the states' sovereign immunity under the Eleventh Amendment" and granting Arkansas's motion to dismiss); *Smith v. Ark. Bd. of Election Comm'rs*, Case No. 4:15-CV-521-JM-BD, 2016 WL 1367771, at *4

(E.D. Ark. Mar. 18, 2016) (holding that the Board of Election Commissioners "is an agency of the State of Arkansas" and is "immune from suit"), *adopted*, 2016 WL 1357761 (Apr. 5, 2016) (Moody, J.).  It should do so again here.

The Supreme Court has held that "evidence of congressional intent" to abrogate sovereign immunity "must be both unequivocal and textual." *Dellmuth*, 491 U.S. at 230.  The requirement that congressional intent be "unmistakably clear" in the text of the statute is "simple but stringent." *Blatchford v. Native Vill. of Noatak & Circle Vill.*, 501 U.S. 775, 786 (1991) (quoting *Dellmuth*, 491 U.S. at 228).  Section 2 falls far short of the unmistakable clarity required to abrogate the States' sovereign immunity from private-party suits.

Section 2 simply prohibits "any State or political subdivision" from imposing certain "voting qualification[s] or prerequisite[s] to voting or standard[s], practice[s], or procedure[s]." 52 U.S.C. 10301(a).  Although it specifies the circumstances in which a "violation of [that prohibition] is established," it does not provide private parties with a cause of action based on Section 2 violations. *Id.* 10301(b).  And the Voting Rights Act's general enforcement provision does not mention private parties.  It expressly empowers only the federal government to bring a cause of action based on violations of the Act's provisions. *See id.* 10308(d); *see also Alden*, 527 U.S. at 755 (noting that States lack sovereign immunity from suits brought by federal government).

Courts have acknowledged that Congress did not expressly create a private cause of action for Section 2 violations.  For its part, the Supreme Court has said that Section 2 "provides no right to sue on its face" and "lack[s] . . . express authorizing language" for private suits. *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (plurality opinion).  Because Section 2 lacks an unmistakably clear private cause of action against *any* defendant, it certainly does not "unequivocally express [Congress's] intention to abrogate the Eleventh Amendment bar to suits

against the States in federal court." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985).

Had Congress instead expressly created a private cause of action to enforce Section 2, that still would not abrogate the states' sovereign immunity. *Dellmuth* illustrates why. In that case Congress enacted a statutory program for educating children with disabilities that "mandate[d] certain procedural requirements for participating state and local educational agencies." 491 U.S. at 225. Like Section 2, the statute in *Dellmuth* made "frequent reference to the States." *Id.* at 232. But unlike Section 2, that statute expressly created a private cause of action for violations of its provisions. *Id.* at 228. Those facts, said the *Dellmuth* Court, created "a permissible inference" that Congress intended the states "to be subject to damages actions for violations" of that statute. *Id.* at 232. "But such a permissible inference, whatever its logical force," would not be an "unequivocal declaration . . . that Congress intended to exercise its powers of abrogation." *Id.* What was lacking was an express statement that specifically said *states* could be sued under the statute's cause of action. Therefore, the *Dellmuth* Court held that Congress had not abrogated the states' sovereign immunity. *Id.*

Regulation of state conduct does not, even when combined with an express cause of action, unequivocally declare that Congress intended for private individuals to enforce that regulation by suing states themselves. Thus, even if Section 2 expressly created a private cause of action, its "frequent reference[s] to the States" would not amount to an "unequivocal declaration" that Congress intended to abrogate the states' sovereign immunity from such a hypothetical, express private cause of action. *Id.*

But Section 2 does not expressly create a private cause of action. (In fact, it does not create a private right action at all, *see infra* at II.F.1.) As a result, Congress has not "made plain 'in

the language of the statute'" that Section 2 abrogates the states' sovereign immunity from a cause of action based on alleged Section 2 violations. *Blatchford*, 501 U.S. at 786. For a statute that does not even state that private individuals have a right to sue *anyone* cannot make it "unmistakably clear" that private individuals have a right to sue states. *Id.* Therefore, sovereign immunity bars Plaintiffs' claim against Arkansas.

### 2.    State claim

Plaintiffs' equal-protection claim against the State under the Arkansas Constitution is likewise barred by sovereign immunity. The Arkansas Constitution provides that "[t]he State of Arkansas shall never be made defendant in any of her courts." Ark. Const. Art. 5, sec. 20. That bars consideration of state-law claims under this Court's supplemental jurisdiction. *See Reddix v. Arkansas Dep't of Workforce Servs*., No. 2:17-CV-00029 KGB, 2019 WL 1449613, at *6 (E.D. Ark. Mar. 31, 2019) (dismissing state-law claim against state agency on sovereign-immunity grounds).

The Arkansas Supreme Court has recognized an exception similar to *Ex parte Young* as to plaintiffs seeking injunctive relief where "a state agency is acting illegally or if a state-agency officer refuses to do a purely ministerial action required by statute." *Bd. of Trs. of Univ. of Ark. v. Burcham*, 2014 Ark. 61, at 3. But that exception does not allow suits against the State itself. Plaintiffs' claims against Arkansas must therefore be dismissed.

### B.    The Governor is not a proper *Ex parte Young* Defendant.

The Governor also enjoys Eleventh Amendment immunity from all of Plaintiffs' requests for relief because he has no connection to the enforcement of state law establishing Arkansas's congressional districts. Plaintiffs' claims against him must be dismissed.

Under *Ex parte Young*, a "state official is amenable to suit to enjoin the enforcement of an unconstitutional state statute only if the officer has 'some connection with the enforcement of

the act.'" *Dig. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 960 (8th Cir. 2015) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)); *see also Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017) (requiring "some connection to the enforcement of the challenged laws"). "Without that connection, the officer would be sued merely 'as a representative of the state' in an impermissible attempt 'to make the state a party.'" *Dig. Recognition Network*, 803 F.3d at 960 (quoting *Ex parte Young*, 209 U.S. at 157).

Plaintiffs do not allege that the Governor has any specific role in administering Arkansas's elections or enforcing the use of the congressional districts approved by the General Assembly. Instead, as Plaintiffs admit, "Secretary Thurston is Arkansas's chief election official and is responsible for administering and overseeing the state's elections and implementing election laws and regulations, including Arkansas's congressional plan." (Compl. ¶ 10.) The responsibility of conducting elections using the congressional maps approved by the General Assembly thus falls to the Secretary of State, not the Governor.

As to the Governor, Plaintiffs merely allege that he "is Arkansas's chief executive official and is responsible for administering and enforcing the state's laws and Constitution, including those related to elections, and including the rights of citizens of the State to vote and to equal protection of the laws." (Compl. ¶ 9.) To be sure, the Arkansas Constitution makes the Governor the State's chief executive. Ark. Const. art. 6, sec. 2. But whatever general authority that provision imparts to the Governor does not satisfy the requirement of creating "some connection" to the enforcement of the statutes establishing Arkansas's congressional districts so as to make the Governor a proper defendant for purposes of *Ex parte Young*. Very much to the contrary, as the Eighth Circuit has specifically held, that general "executive authority of the [Arkansas] governor" under the Arkansas Constitution is not the sort of connection to a challenged

state law or policy that *Ex parte Young* requires.  *Dig. Recognition Network*, 803 F.3d at 960 (citing Ark. Const. art VI, secs. 2, 7).

Indeed, it is well-settled that an executive official's general-enforcement authority is "'some connection' [only] if that authority gives the [official] *methods* of enforcement." *Church v. Missouri*, 913 F.3d 736, 749 (8th Cir. 2019).  And applying that standard here, Plaintiffs' claims fail as a matter of law because—as Plaintiffs don't dispute—the Governor doesn't enforce Acts 1114 and 1116, the acts which adopted the current congressional districts.  And neither "a broad duty to uphold state law," *id.* (quoting *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 517 (5th Cir. 2017)), nor "general supervisory power over the persons responsible for enforcing the challenged provision will . . . subject an official to suit," *id.* (quoting *L.A. Cty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992)).  Thus, the Eleventh Amendment requires that the Court dismiss Plaintiffs' claims against the Governor.

Further, state-law sovereign immunity bars Plaintiffs' state-law claim against the Governor.  *See* Ark. Const. Art. 5, sec. 20 (providing that the State and its officers shall shall never be made defendant in any of her courts").  While the Arkansas Supreme Court has recognized an exception similar to *Ex parte Young* as to plaintiffs seeking injunctive relief where a state officer "is acting illegally or if a state-agency officer refuses to do a purely ministerial action required by statute," *Bd. of Trs. of Univ. of Ark.*, 2014 Ark. at 3, the Governor cannot be "acting illegally" so as fall under an exception to sovereign immunity because, as far as Arkansas's congressional districts are concerned, he does not act at all.  Plaintiffs' state-law claim should likewise be dismissed.

## II.    Plaintiffs fail to state a claim under federal or Arkansas law.

Plaintiffs assert seven different theories to argue that this Court should overturn the General Assembly's adoption of the 2021 congressional map.  None are availing.

Four of their seven federal constitutional claims (those under Article I, section 2; the First Amendment; the Privileges or Immunities Clause of the Fourteenth Amendment; and the Fifteenth Amendment) have no basis in precedent and easily fail.  Plaintiffs' equal protection challenges (under both federal and state law) fail because they do not plausibly allege that the General Assembly engaged in intentional discrimination.  And—even assuming there is a private right to enforce Section 2—Plaintiffs' Section 2 claim fails because they concede that they cannot satisfy either the first or third *Gingles* precondition.  This Court should dismiss Plaintiffs' Complaint with prejudice.

### A.    Plaintiffs' Article I, section 2 challenge fails because Arkansas's congressional map satisfies the "one person, one vote" rule.

Count I of Plaintiffs' Complaint alleges that Arkansas's congressional districts violate Article I, section 2 of the Constitution.  That provision provides that, "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States[.]"  The Supreme Court has held that language establishes a "one person, one vote" requirement.  *See, e.g.*, *Wesberry v. Sanders*, 376 U.S. 1 (1964).  That simply requires that States "make a good-faith effort to achieve precise mathematical equality" in drawing their congressional districts.  *Kirkpatrick v. Preisler*, 394 U.S. 526, 530-31 (1969).  The challenged map easily meets that requirement because—by Plaintiffs' own admission—the populations of Arkansas's congressional districts vary by just 0.09%.  (Compl. Ex. 2.)

Instead, Plaintiffs argue that racial gerrymandering violates Article I, section 2 because "districts may not be drawn to achieve an unconstitutional result."  (Compl. ¶ 109.)  But the Supreme Court has already rejected the argument that Article I, section 2 regulates anything other than population equality between districts.  Indeed, it considered a similar claim that partisan gerrymandering violated that provision in *Rucho v. Common Cause* and was "unconvinced by

14

that novel approach."  139 S. Ct. 2484, 2506 (2019).  Plaintiffs cite no authority for the proposition that an alleged racial gerrymander runs afoul of Article I, section 2.  This Court should follow the Supreme Court's lead, reject this "novel approach," and dismiss for failure to state a claim.

### B.    Plaintiffs' First Amendment claim fails because that Amendment does not regulate redistricting.

Count II of Plaintiffs' Complaint alleges that Arkansas's congressional map violates the First Amendment because it is allegedly racially gerrymandered.  (Compl. ¶ 120 (alleging that "racial gerrymandering, or 'cracking,' is a violation of the 'Assembly Clause' and the 'Petition Clause' of the First Amendment").)  That claim fails both because the First Amendment doesn't regulate redistricting and because Plaintiffs' purported racial gerrymandering claim is really a non-justiciable partisan gerrymandering claim.

Plaintiffs cite no authority for the proposition that the First Amendment has anything to say about racial gerrymandering or, indeed, redistricting generally.  So far as Arkansas can tell, no court has entertained a challenge that racial gerrymandering itself violates the First Amendment.  If that is actually Plaintiffs' claim, it should be dismissed.

But that doesn't appear to be what Plaintiffs actually argue.  Their claim is really about partisan gerrymandering.  They allege that the Republicans in the Arkansas General Assembly "racially gerrymandered portions of the Second Congressional District from the Second Congressional District to the First and Fourth Congressional Districts in order to dilute the Black vote in the Second District and to 'dictate electoral outcomes by favoring *candidates of one party and disfavoring candidates of another*.'"  (Compl. ¶ 119 (emphasis added); *see also id.* ¶ 118 (defining "partisan gerrymandering" as an "effort to dictate electoral outcomes by favoring candidates of one party and disfavoring candidates of another")).  Thus, Plaintiffs' theory appears to

be that the General Assembly engaged in racial gerrymandering to accomplish a partisan gerrymander.

That claim fails for two major reasons.  First, to the extent Plaintiffs mean to allege intentional race discrimination, it simply repeats their equal protection claims and fails for the same reasons.  *See infra* at II.D.  Second and more importantly, to the extent Plaintiffs really do mean to make a partisan gerrymandering claim under the First Amendment, that claim too fails.  That's because *Rucho v. Common Cause* holds that partisan gerrymandering claims are nonjusticiable political questions and federal courts lack jurisdiction to entertain them.  139 S. Ct. at 2508.  Indeed, *Rucho* specifically rejected Plaintiffs' claim that the First Amendment is an avenue for federal-court review of partisan gerrymandering claims, holding that partisan gerrymandering doesn't restrict "speech, association, or any other First Amendment activities . . . ."  *Id.* at 2504.  Count II of Plaintiffs' Complaint is foreclosed by precedent and must be dismissed.

### C.    Plaintiffs' Privileges or Immunities Cause claim is frivolous.

Count III of Plaintiffs' Complaint asserts the novel argument that racial gerrymandering is a violation of the Fourteenth Amendment's "privileges or immunities" clause.  They cite no authority for the proposition that this provision has anything to say about congressional apportionment; nor is there any such authority.  *See, e.g.*, *Pope v. Blue*, 809 F. Supp. 392, 399 (W.D.N.C.), *aff'd*, 506 U.S. 801 (1992) (considering allegations of gerrymandering and "find[ing] no precedent to suggest that the Privileges or Immunities Clause protects such a right"); *O'Lear v. Miller*, 222 F. Supp. 2d 850, 860 (E.D. Mich. 2002) ("We can find no overt support for the proposition that the Privileges and Immunities Clause protects the right to fair representation or the right to an effective vote.").  This claim is baseless and should be dismissed.

**D.      Plaintiffs' equal protection claims fail because they have not plausibly alleged intentional discrimination.**

Plaintiffs' state and federal equal protection claims fail as a matter of law because they have failed to allege that Arkansas's congressional map was predominantly motivated by race.

1. "Proof of racially discriminatory intent or purpose is required to show a violation of the [federal] Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Where plaintiffs allege racial gerrymandering, "the burden of proof on the plaintiffs . . . is a demanding one." *Easley v. Cromartie*, 532 U.S. 234, 241 (2001). To prevail, a plaintiff must prove that race was not simply "*a* motivation for the drawing of a majority-minority district, but the *predominant* factor motivating the legislature's districting decision." *Id.* (citation and internal quotation marks omitted). Because of (1) the "evidentiary difficulty" of distinguishing "between being aware of racial considerations and being motivated by them," (2) "the sensitive nature of redistricting," and (3) "the presumption of good faith that must be accorded legislative enactments," courts must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Id.* at 916.

Applying that standard, Plaintiffs fail to plausibly allege an equal protection violation. To be sure, Plaintiffs make conclusory statements throughout their Complaint that the General Assembly intended to racially gerrymander or "crack" "communities of Black voters" by adopting the challenged map. *Cf. McDonough v. Anoka Cnty.*, 799 F.3d 931, 946 (8th Cir. 2015) (holding that allegation that law enforcement agencies obtained driver information "for a purpose not permitted under" federal privacy law was a legal conclusion).

Yet they do not allege, as required to prevail on such a claim, that race was the "predominant factor motivating" the legislature's decision. *Easley*, 532 U.S. at 241. Nor for that

matter do Plaintiffs allege that the General Assembly "'subordinated' other factors—compact-ness, county splits, partisan advantage, etc.—to 'racial considerations,'" *Cooper v. Harris*, 137 S. Ct. 1455, 1464 (2017).  To the contrary, as discussed above, Plaintiffs attempt to argue that the General Assembly was motivated by a desire to draw partisan lines, not race.  *Cf. supra* at II.B. (discussing Plaintiffs' allegations that the General Assembly intended to draw partisan lines and why this Court lacks jurisdiction to entertain such claims).  All this is fatal to Plaintiffs' chal-lenge.

Far making plausible allegations of racial motivations on the part of the General Assem-bly, Plaintiffs do not dispute the "obvious alternative explanation" for the adoption of the con-gressional map—that it adheres to traditional redistricting principles, including minimizing county splits, while also reaching the required population equivalence.  *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009).  At most, Plaintiffs suggest that the General Assembly could have adopted one of the maps proposed by other legislators.  These, they claim, "are examples of the easiness with which the goals of population equality, compactness and the preservation of voting interests can be achieved, all without violating the Voting Rights Act or the Constitution."  (Compl. ¶ 36.) That is "a legal conclusion couched as a factual allegation" that this Court need not take as true. *Iqbal*, 556 U.S. at 678.

In any case, Plaintiffs fail to account for the many "obvious" race-neutral explanations as to why those maps were not adopted.  In particular, those proposals weren't viable for the fol-lowing reasons:

- ***Senator Clarke Tucker's Map*** (Compl. Ex. 6, pp. 3-4):  Tucker's proposal has a total population deviation of 1.55%, and as a result, Plaintiffs unsurprisingly don't claim that Tucker's proposal is consistent with the Supreme Court's one person,

one vote rule that requires population differentials be as small as practicable. *See, e.g.*, *Karcher v. Daggett*, 462 U.S. 725, 732 (1983) (holding that "absolute population equality be the paramount objective of apportionment" and striking down a plan with 0.6984% deviation). Indeed, such a claim would be implausible since the General Assembly succeeded in getting total population variance down to just 0.09%. (Compl. Ex. 2.) Additionally, Tucker's map would have radically altered Arkansas's political geography by splitting Central Arkansas into multiple districts and moving Pulaski County entirely into a district made up primarily of counties in the State's Delta. (Compl. Ex. 6, pp. 3-4). The General Assembly did not need a racial motive to make a different choice.

- *Senator Mark Johnson's Map* (Compl. Ex. 9): Johnson's map projected an even greater population variance than Tucker's map, proposing a total population variance of 4.33%. Again, given the very low population variance the General Assembly was able to achieve, Johnson's map was not a plausible proposal and would not have survived judicial review.

- *Senator Elliot's and Representative Flowers's Maps* (Compl. Ex. 7; Ex. 11): Elliott's and Flowers's proposed maps also proposed unacceptably high population variances of 0.87% and 1.52%, respectively. (Compl. Ex. 7; Ex. 11.) But more importantly, like Tucker's map, those proposals would have drastically changed the State's political geography, leaving only a single county, Pulaski, in District 2. *Id.* The General Assembly was not required to casually toss aside Arkansas's

19

long existing political geography.  *Cf. Cooper*, 137 S. Ct. at 1492 (Alito, J., concurring in part) ("When a new census requires redistricting, it is a common practice to start with the plan used in the map and to change the boundaries of the prior districts only as needed to comply with the one-person, one-vote mandate and to achieve other desired ends.").

Nor for that matter does Plaintiffs' *ad hoc* and incomplete suggestion to move White, Perry, and Jefferson Counties so as to overpopulate District 1 and underpopulate District 4 make any more sense.  (Compl. ¶ 36.)  And the mere fact that Plaintiffs can think of incomplete, additional maps months after the legislative session closed and Arkansas's congressional map became final doesn't mean that the General Assembly was motivated by race.

Ultimately, Plaintiffs' assertion that—but for racial considerations—the General Assembly might have chosen one of these maps is entirely implausible.  Plaintiffs claim that other plans that were proposed "achieved th[e] purpose" of equaliz[ing] the number of voters in each" congressional district, (Compl. ¶ 28), but they don't allege that any of those plans could have done so while minimizing county splits and avoiding a wholesale redrawing of Arkansas's congressional districts, which have maintained their general character for decades.  Far from alleging that the General Assembly "'subordinated' other factors—compactness, county splits, partisan advantage, etc.—to 'racial considerations,'" *Cooper*, 137 S. Ct. at 1464, Plaintiffs' own proposals demonstrate that race predominates all of their alleged alternative mapping decisions.

Plaintiffs' more specific claims regarding the portions of Pulaski County that were split off into Districts 1 and 4 are just as implausible.  Plaintiffs claim that "approximately 23,000 persons, the vast majority of whom are Black, formerly in the Second Congressional District in the southern and eastern portions of Pulaski County . . . were dispersed between the First and Fourth

Congressional Districts," and that this constitutes "cracking." (Compl. ¶ 26.) But there is an obvious alternative explanation for why these two areas were moved from Pulaski County into Districts 1 and 4. District 2 was overpopulated, Districts 1 and 4 were underpopulated, and Pulaski County was the only county in District 2 that bordered *both* District 1 and District 4 (specifically at the county's southeastern border). (Compl. Ex. 2.) Meaning a mapdrawer concerned with minimalizing the number of county splits would quite logically choose to move voters from the only county that could, by itself, balance the populations of those three congressional districts. Plaintiffs have no explanation as to why that decision would have been motivated by race.

Plaintiffs do not plausibly allege facts that, if true, would show an equal-protection violation. This Court should dismiss for failure to state a claim.

2. Plaintiffs also allege that Arkansas's map violates the state equal protection clause, Article 2, section 3 of the Arkansas Constitution. Plaintiffs claim, and Defendants agree, that "the decisions of the Federal courts in interpreting that clause of the Fourteenth Amendment should largely be applicable to the interpretation of Article II, Section 3 of the Arkansas Constitution." (Compl. ¶ 152.) That's because the Arkansas Supreme Court has never interpreted Article 2, section 3 differently than the federal equal protection clause. *See Maiden v. State*, 438 S.W. 3d 263, 275 (Ark. 2014). Thus, Plaintiffs' claims under Article 2, section 3 fail for the same reasons as their equal protection claim under the Fourteenth Amendment. The complaint should be dismissed.

### E.     The Fifteenth Amendment does not support Plaintiffs' vote-dilution claim.

Plaintiffs allege in Count V of their Complaint that the General Assembly violated the Fifteenth Amendment in revising Arkansas's congressional districts. But a claim under the Fifteenth Amendment is not cognizable here because Plaintiffs' "freedom to vote has not been denied or abridged by anyone"; that is, they do not claim that they are unable to "register and vote

without hindrance." *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 334 n.3 (2000) (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 65 (1980)); *see Prejean v. Foster*, 227 F.3d 504, 519 (5th Cir. 2000) ("When a legislative body is apportioned into districts, every citizen retains equal rights to vote for the same number of representatives, even if not for all of them, and every citizen's ballot is equally weighed.").

Rather, they seek to bring a vote-dilution claim under the Fifteenth Amendment. Precedent forecloses that argument. *See Bossier Parish Sch. Bd.*, 528 U.S at 334 n. ("W[e] have never held that vote dilution violates the Fifteenth Amendment . . . [and] we have never even 'suggested' as much.") (internal citations and quotations omitted). Indeed, the Supreme Court has "never [] held any legislative apportionment inconsistent with the Fifteenth Amendment." *Voinovich v. Quilter*, 507 U.S. 146, 159 (1993). Plaintiffs' claims are no different than those rejected by the Supreme Court. Count V fails as a matter of law and should be dismissed.

   **F.    Plaintiffs' allegations demonstrate that their Voting Rights Act claim must be dismissed.**

Lastly, Plaintiffs claim that Arkansas's congressional map violates Section 2 of the Voting Rights Act. That provision prohibits voting practices that "result[] in a denial or abridgment of the right . . . to vote on account of race or color." 52 U.S.C. 10301(a). Under Section 2, such a denial or abridgment is only established if the members "of a class of citizens . . . have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* 10301(b).

   **1.    Plaintiffs' Section 2 claim fails because private parties cannot bring actions to enforce that provision.**

This Court should dismiss Plaintiffs' claim under Section 2 because, as a court in this district recently explained, Section 2 of the VRA lacks a private right of action. *See Ark. State*

*Conf. NAACP v. Ark. Bd. of Apportionment*, No. 4:21-CV-01239-LPR, 2022 WL 496908 (E.D. Ark. Feb. 17, 2022).  Plaintiffs' claim therefore fails as a matter of law.

1.  Although many courts have considered Section 2 cases brought by private parties over the years, two justices recently wrote separately to note that the Supreme Court's "cases have assumed—without deciding—that the Voting Rights Act of 1965 furnishes an implied cause of action under § 2.  Lower courts have treated this issue as an open question." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) (Gorsuch, J., concurring).  Judge Rudofsky analyzed this question in depth in an opinion issued less than two months ago, concluding that Section 2 does not contain a private right of action and may only be enforced by the United States Attorney General.  *Ark. State Conf. NAACP*, 2022 WL 496908, at *17. That decision was correct, and this Court should follow its reasoning and dismiss Plaintiffs' Section 2 claims.

Section 2's text does not contain an express cause of action.  It prohibits a "State or political subdivision" from imposing certain voting qualifications, practices and procedures, 52 U.S.C. 10301(a), and specifies the circumstances in which a "violation of [that prohibition] is established[.]" 52 U.S.C. 10301(b).  But it says not a word about how or by whom that prohibition is to be enforced.  The Act's enforcement section, Section 12, only provides the Attorney General with a cause of action to enforce Section 2.  *See* 52 U.S.C. 10308(d) ("Whenever any person has engaged . . . in any act or practice prohibited by section 10301 . . . the Attorney General may institute for the United States, or in the name of the United States, an action for preventive relief . . . .").  That strongly implies that only the United States has enforcement power, for "[c]ourts should presume that Congress intended that the enforcement mechanism provided in the statute be exclusive." *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1011 (8th Cir. 1999) (en banc).

The text of Section 2, and the statute as a whole, is silent as to a private right of action. The Supreme Court has thus acknowledged that "[Section] 2 . . . provides no right to sue on its face" and "lack[s] . . . express authorizing language" for private suits. *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (Stevens, J., plurality opinion); *id.* at 240 (Breyer, J., concurring in the judgment) (describing any potential "right of action to enforce [Section] 2" as an "implied private right of action").

Because Section 2 "provides no right to sue on its face," *id.* at 232, it follows that it does not create a private right of action. For "[l]ike substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* Absent statutory language that displays that intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.* at 286-87. As Judge Rudofsky noted, *Sandoval* and its progeny have "made quite clear that judicially implied private rights of action are now extremely disfavored." *Ark. State Conf. NAACP*, 2022 WL 496908, at *10.

2. Plaintiffs may argue that at the time Section 2 was enacted, the Supreme Court had a more liberal approach to implying causes of action, embodied by *J.I. Case Co. v. Borak*, 377 U.S. 426 (1964), and that Congress legislated against the background of that approach. But the Supreme Court's current approach to recognizing rights of action applies to *all* statutes; the Court doesn't toggle between its current approach and *Borak* depending on when a statute was enacted. To the contrary, "even when interpreting the same Securities Exchange Act of 1934 that was at issue in *Borak*" itself, the Court has "[n]ot . . . applied *Borak*'s method for discerning

and defining causes of action" since it "abandoned" *Borak*'s method.  *Sandoval*, 532 U.S. at 287.

The same rule applies *a fortiori* to the much later-enacted Voting Rights Act.  Indeed, *Sandoval*

itself concerned the Civil Rights Act of 1964, enacted the year before the VRA, and the Court

declined to apply 1960s cause-of-action jurisprudence.  As Justice Scalia colorfully put it in

*Sandoval*, "[h]aving sworn off the habit of venturing beyond Congress's intent, we will not ac-

cept [plaintiffs'] invitation to have one last drink."  *Id.*

Plaintiffs might also wrongly claim that since courts assumed Section 2 contained a pri-

vate right of action pre-1982, Congress must have ratified that assumption when it amended Sec-

tion 2 and did not expressly foreclose a right of action.  The Supreme Court and lower courts did

not hold pre-1982 that Section 2 contained a private right of action; they merely assumed it.  *See*

*City of Mobile v. Bolden*, 446 U.S. 55, 60 (1980) (plurality opinion) ("[a]ssuming, for present

purposes, that there exists a private right of action to enforce this statutory provision"); *see also*

*Washington v. Finlay*, 664 F.2d 913, 926 (4th Cir. 1981) ("[a]ssuming without deciding . . . that

there is a private right of action").

But in order for Congress to ratify courts' prior understanding of a statute, those courts

must have at the very least actually settled the issue.  *See Liu v. SEC*, 140 S. Ct. 1936, 1947

(2020) ("[T]he prior-construction principle . . . has no application where . . . [the question in dis-

pute] was far from settled.") (internal quotation marks omitted).  Because these cases were de-

cided on mere assumptions and did not settle the issue of the existence of a right of action, there

is no occasion to consider whether Congress ratified their assumption.  The better inference, if

any is to be drawn, from Congress's silence cuts the other way:  If Congress supported a cause of

action in 1982, it would have expressly created one after the Court suggested Section 2 might not

contain one two years prior in *City of Mobile*.

Congress did not create a private right of action to enforce Section 2, and neither should this Court.  Plaintiffs' Voting Rights Act claim should therefore be dismissed.

### 2.    Plaintiffs' Section 2 claim fails on the merits.

As noted above, only the United States—and not private parties—may bring a claim to enforce that provision.  Yet even if private plaintiffs may bring such a claim, Plaintiffs' claim fails as a matter of law and should be dismissed.

To resolve Section 2 claims, the Supreme Court has established three "necessary preconditions" for proving that an electoral structure "operate[s] to impair minority voters' ability to elect representatives of their choice."  *Gingles*, 478 U.S. at 50.[2]  These preconditions do not "standing alone, . . . prove dilution."  *Johnson v. DeGrandy*, 512 U.S. 997, 1012 (1994).  But they are "necessary preconditions for a claim that the use of multimember districts constitute[s] actionable vote dilution under § 2."  *Bartlett v. Strickland*, 556 U.S. 1, 11 (2009) (plurality op.).  Indeed, "unless *each* of the three *Gingles* prerequisites is established, 'there neither has been a wrong nor can be a remedy.'"  *Cooper v. Harris*, 137 S. Ct. 1455, 1472 (2017) (quoting *Growe v. Emison*, 507 U.S. 25, 41 (1993)).  Thus, failure to prove any one of the preconditions is fatal on the merits, and complaints that fail to "properly allege[]" the "*Gingles* preconditions" are regularly dismissed for failure to state a claim.  *Ga. State Conf. of NAACP v. Georgia*, 269 F. Supp.

---

[2] The Supreme Court recently granted review on the question of whether Alabama's congressional districts violate Section 2 of the Voting Rights Act.  *See Merrill v. Milligan*, U.S. Sup. Ct. Docket No. 21-1086.  That case will be argued during the October 2022 Term and could significantly clarify the test for liability under Section 2.  *See Merrill v. Milligan*, 142 S. Ct. 879, 882 (2022) (Roberts, C.J., dissenting from grant of application for stay) (noting that "*Gingles* and its progeny have engendered considerable disagreement and uncertainty regarding the nature and contours of a vote dilution claim" yet dissenting from the grant of a stay because the district court "properly applied existing law in an extensive opinion with no apparent errors.").

As explained herein, Plaintiffs' Section 2 claim fails under existing law.  But if the Court declines to grant dismissal, Arkansas may seek a stay of this case pending the outcome of *Merrill*, in light of the potential change in law.

3d 1266, 1279-80 (N.D. Ga. 2017); *see, e.g.*, *Hall v. Virginia*, 385 F.3d 421, 432 (4th Cir. 2004) (dismissal for failure to satisfy one *Gingles* precondition); *NAACP v. Snyder*, 879 F. Supp. 2d 662, 670-75 (E.D. Mich. 2012) (dismissal for failure to satisfy each *Gingles* precondition).

To satisfy the first necessary precondition, Plaintiffs must allege that a minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. The second requires them to allege that the same minority group is "politically cohesive." *Id.* at 51. Under the third and final *Gingles* precondition, Plaintiffs must allege "that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id.*

Plaintiffs cannot show the first and third *Gingles* preconditions, and their claim fails. Indeed, Plaintiffs cannot—and do not—*allege* that black voters are sufficiently large in number and located in a geographically compact area that Arkansas could ever draw a majority-minority district. Nor for that matter, do they claim that racially polarized voting leads white voters to typically defeat black voters' preferred candidates. To the contrary, Plaintiffs affirmatively plead that "[r]ecent elections . . . in the Second Congressional District, suggest strongly that many Whites *will* support and vote for a Black candidate." (Compl. ¶ 36 (emphasis added)).

a. *Plaintiffs cannot satisfy* Gingles *1.* The first precondition to stating a Section 2 claim is that "the minority group . . . is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. Plaintiffs concede that *none* of their alternative maps create a majority-minority district; in fact, they don't allege it is even possible to draw such a district. And that's not surprising since it simply wouldn't be possible to pack nearly all black Arkansans into a single congressional district.

On Plaintiffs' telling, "[t]he 2020 census results indicate that Arkansas's Black population now comprises approximately 15.1 percent of Arkansas's total population." (Compl. ¶ 41.) Each congressional district contains 25% of the State's population; to constitute a majority in a single district requires over 12.5%. That means that a theoretical majority-black congressional district would require approximately 83% of black Arkansans[3] to be drawn into a single district. Plaintiffs do not allege that it is possible to draw such a district. *Cf. LULAC v. Perry*, 548 U.S. 399, 433 (2006) (holding that district "combin[ing] two farflung segments of a racial group" would not satisfy first *Gingles* precondition). Nor would such an obviously racially gerrymandered district satisfy *Gingles*. *See Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) (holding that a district does not satisfy *Gingles*'s first precondition "if race is the predominant factor in placing voters within or outside of a particular district").

Instead, Plaintiffs allege that "minority voters in Arkansas are sufficiently numerous and geographically compact in one geographic area of Arkansas that they *could prevail* in congressional elections." (Compl. ¶ 35 (emphasis added).) Plaintiffs admit that "none" of the "plans" they suggest as alternatives to the plan adopted by the General Assembly would "produce a majority minority district." (Compl. ¶ 36.) Instead, they argue that "Whites," particularly in District 2, "will support and vote for a Black candidate, and a racial majority is not required for that to happen." *Id.*

Thus, Plaintiffs concede that it isn't actually possible to create a majority-minority district in any particular area of the state, as required to prevail under Section 2. Instead, they allege that removing some number of white voters from District 2 and replacing them with some num-

---

[3] 12.5 divided by 15.1 equals 0.828.

ber of black voters would result in a district where there are sufficient numbers of black Arkansans—though less than a majority—to elect their candidate of choice when joined by white voters of similar political affiliation.  (*See, e.g.*, Compl. ¶ 120 (suggesting "removing White and Perry Counties from [District 2] and absorbing Jefferson County into the Second District).)  While such a "crossover" district may be Plaintiffs' preferred outcome, that is not what Section 2 requires.  *See Bartlett v. Strickland,* 556 U.S. 1, 23 (2009) (plurality opinion)[4] (explaining that a "crossover district is one in which minority voters make up less than a majority of the voting-age population," but "the minority population, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate").  To the contrary, *Bartlett* explains in no uncertain terms that "[Section] 2 does not mandate creating or preserving crossover districts."  *Id.* at 23.  Thus, there is no requirements that Arkansas draw such a district.

Because Plaintiffs do not allege—and actually disclaim—that they meet the first *Gingles* precondition their Section 2 claim fails and must be dismissed.

b.  *Plaintiffs cannot satisfy* Gingles *3.*  To survive dismissal, Plaintiffs must also plausibly allege that "that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."  *Gingles*, 478 U.S. at 50.  But Plaintiffs' allegations on this point are conclusory and unsupported by the sparse factual allegations they muster in support of their legal conclusions.  Indeed, Plaintiffs' only mention of white racial-bloc voting comes in the portion of their Complaint containing their legal claims.  (*See* Compl. ¶ 147 ("Elections in this area reveal a clear pattern of racially polarized voting that allows blocs of white voters usually to

---

[4] As a three-judge court in this district has recognized, Justice Kennedy's opinion for the three-justice plurality is controlling under *Marks v. United States*, 430 U.S. 188, 193 (1977).  *See Jeffers v. Beebe*, 895 F. Supp. 2d 920, 931 n.11 (E.D. Ark. 2012) (three-judge panel).

defeat Black voters' preferred candidates.").)  Those assertions—simple "recitals of the elements of a cause of action" under Section 2—are "not entitled to the assumption of truth."  *Iqbal*, 556 U.S. at 678-79.

Nor are such assertions plausible.  As explained above, it is impossible to draw a compact majority-black congressional district in Arkansas, and Plaintiffs do not claim otherwise.  Instead, Plaintiffs' Section 2 claim is specifically premised on the creation of a "crossover" district. Again, that is a district where white voters *don't* vote together to defeat the preferred candidate of black voters, but where sufficient numbers of white voters support the candidate preferred by black voters to achieve electoral success.  (*See* Compl. ¶ 36 ("Recent elections, including those in the Second Congressional District, suggest strongly that many Whites will support and vote for a Black candidate, and a racial majority is not required for that to happen.").)  Thus, Plaintiffs argue that the addition of a few more black voters into the District 2 will establish a "crossover" district whereby the candidate preferred by black voters will be elected.  But, by definition, the success of Plaintiffs' theory depends on white voters *failing* to vote "sufficiently as a bloc to . . . defeat the minority's preferred candidate," *Gingles*, 478 U.S. at 50—in other words, failing to meet the third *Gingles* precondition.  *See Bartlett*, 556 U.S. at at 16 ("It is difficult to see how the majority-bloc-voting requirement could be met in a district where, by definition, white voters join in sufficient numbers with minority voters to elect the minority's preferred candidate.").

Plaintiffs cannot have it both ways.  In order to meet the *Gingles* preconditions for Section 2 relief, white voters in a district must be polarized such that the preferred candidate of black voters would be defeated absent the creation of a *majority-minority* district, not a "crossover" district.  That allegation is absent from Plaintiffs' Complaint.  Plaintiffs instead allege the opposite—that a majority-minority district "is not required" because "many Whites will support and

vote for a Black candidate" in District 2.  (Compl. ¶ 36.)  That is simply not what the third *Gin-gles* precondition demands.  Plaintiffs' Section 2 claim fails and should be dismissed.

.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Complaint with prejudice.


Dated:  April 12, 2022                              Respectfully submitted,

                                                    LESLIE RUTLEDGE
                                                       Arkansas Attorney General
                                                    NICHOLAS J. BRONNI (2016097)
                                                       Solicitor General
                                                    DYLAN L. JACOBS (2016167)
                                                       Deputy Solicitor General
                                                    OFFICE OF THE ARKANSAS
                                                       ATTORNEY GENERAL
                                                    323 Center Street, Suite 200
                                                    Little Rock, Arkansas 72201
                                                    (501) 682-2007
                                                    (501) 682-2591 (fax)
                                                    Dylan.Jacobs@arkansasag.gov

                                                    *Counsel for Defendant*