IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS'
CENTRAL DIVISION

JACKIE WILLIAMS SIMPSON *ET AL*                     PLAINTIFFS

V.                     No. 4:22-CV-213-JM-DRS-DPM

ASA HUTCHINSON *ET AL*                     DEFENDANTS

BRIEF IN SUPPORT OF PLAINTIFFS' RESPONSE TO
DEFENDANTS' MOTION TO DISMISS

*INTRODUCTION*

The opening paragraph of Defendants' Brief begins with the statement that

"Redistricting is 'a most difficult subject.'" (quoting *Miller v. Johnson*, 515 U.S.

900, 915 (1995)), which is, to be sure, an understatement. Defendants then attempt

to characterize the Plaintiffs' motivations as being purely political, claiming that

"[N]either state nor federal law provides a vehicle for Plaintiffs to transform their

political dissatisfaction – and preference for a more Democrat-friendly map – into

a valid legal claim." Defendants obviously do so in hopes of finding refuge in the

Supreme Court's holdings that challenges to redistricting plans based on political

motivations are not justiciable. *Rucho v. Common Cause*, 139 S.Ct. 2484, 204

L.Ed.2d 931 (2019) (political gerrymandering is nonjusticiable.)

1

Perhaps being in the highly-politicized atmosphere of the Arkansas Attorney General's office it becomes natural for that Office, representing the State, to project their worldview onto others. However, there is frequently a fine line between political interests and the protection of civil and voting rights. The Plaintiffs in this case are not a political party, although some are elected officials. They are, however, all Blacks, and are interested only in preserving the integrity of their vote, their ability to vote as a community, and to have a vote that is as meaningful as all other citizens of this State. The actions of the Arkansas General Assembly, the Governor of Arkansas and the Secretary of State of Arkansas in the development and implementation of the 2021 Reapportionment Plan that is complained of have treated the Plaintiffs as mere pawns in a transparent and dehumanizing effort to reduce Plaintiffs' cohesiveness in the Second Congressional District in order to shore-up the perpetuation of the election of white, Republican members of Congress from that District. Plaintiffs are seeking equal justice and an opportunity to have a meaningful role in selecting members of Congress who will represent them as well as the white, Republican establishment.

Putting aside the Defendants' efforts to politicize the motivations of the Plaintiffs, Defendants make two major objections to the Plaintiffs' Complaint as the basis for their Motion to Dismiss. The first objection is that the sovereign immunity provision of the Eleventh Amendment to the U.S. Constitution prohibits

the bringing of this suit against at least one of the Defendants. The second objection is that Plaintiffs have failed to state any claim for which relief may be granted under either Federal or Arkansas law. Each of these objections have several components and each is wrong.

## BACKGROUND

In the 2021 Congressional Redistricting, the Arkansas General Assembly made relatively few changes, but Defendants are incorrect in claiming in their Brief (Def. Brief p. 4) that "Plaintiffs concede that the changes that were made are insignificant." Instead, Plaintiffs quoted the *Defendant Governor Asa Hutchinson* in saying that "three of the four congressional districts do not differ that much from the current percentages." (*Id*.)  He did, however, go on to state that the changes in made in the Second Congressional District were "concerning."

Plaintiffs' claim in this case is that the General Assembly "cracked" or split-off approximately 24,000 people from the largely Black-populated area of southern Pulaski County from the Second District into the First and Fourth Districts by drawing two "fingers" or peninsulas from the First and Fourth Districts into the Second District in southern Pulaski County – areas that are overwhelmingly Black and that historically vote cohesively – in order to dilute the votes of those people

and to stem the increasing threat to the continued re-election of the Republican Congressional incumbent in the Second District.

To offset the loss of that number of people from the Second District, the General Assembly chose to move Cleburne County in north-central Arkansas – formerly of the First District – into the Second District. Not coincidentally, Cleburne County's population is approximately 24,000, and it is virtually (98%) all-white.

The Complaint alleges in Paragraph 32 that the Black vote in District Two has, in recent years, become highly influential in congressional elections. The percentage of votes for Black candidates for Congress in that District have increased due to the presence of a substantial number of Black voters in southern Pulaski County, and their propensity to vote in a block. In the general election for Second District congressman in November 2020, Joyce Elliott, a Black educator and State Senator from Senate District 31 (constituting a portion of Pulaski County), received 44.6 percent of the votes to the incumbent congressman banker French Hill's 55.3 percent.

The Complaint also alleges that the Second District is the only electorally competitive congressional district in the state for Blacks, and the cohesive Black voting population and other ethnic minorities and their policy concerns have been a major consideration for congressional candidates of both parties. As a result of

4

Acts 1114/1116 (the 2021 Reapportionment Bills), those minorities and their interests in national policies, such as education, health care, economic and social issues, are no longer a significant consideration for the congressman representing the district.

The Defendants attempt to justify their Reapportionment simply on achieving a proportional balance among the four Districts. That rings hollow when the Complaint alleges, and the facts will show, that over 24,000 Blacks gerrymandered from the Second District were replaced by over 24,000 whites. It also violated some of the generally-recognized guidelines of redistricting that districts should be compact, that counties and other political subdivisions should be preserved intact, and that communities in which residents have common interests should be preserved. There were other Plans proposed that achieved the purpose of balancing populations among the Districts without splitting the heavily Black populated areas of Congressional District Two. No, this plan was deliberately developed primarily to reduce the increasing strength of Black voters in the Second District in order to preserve the incumbent's job security.

Referring back to Defendant Governor Asa Hutchinson's comment that "three of the four congressional districts do not differ that much from the current percentages," it is clear that he believed that the gerrymandering made in the Second District's boundaries was significant. It is also noteworthy that Governor

Hutchinson refused to sign the Reapportionment bills, allowing them to become

law without his signature, stating:

> I am concerned about the impact of the redistricting plan on minority
> populations. While the percentage of minority populations for three of
> the four congressional districts do not differ that much from the
> current percentages, the removal of minority areas in Pulaski County
> into two different congressional districts does raise concerns.

(Complaint, ¶29)

### Standard Of Review Of Motion To Dismiss

In evaluating a Motion to Dismiss a complaint under Federal Rule of Civil

Procedure 12(b), The Court accepts as true all factual allegations in the complaint

in the light most favorable to the nonmoving party. *Smithrud v. City of St. Paul*,

746 F.3d 391, 397 (8th Cir. 2014). However, the Court need not accept as true a

plaintiff's conclusory allegations or legal conclusions drawn from the facts. *Hanten*

*v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999); *Westcott v.*

*City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). Although detailed allegations

are not required to survive a Rule 12(b)(6) motion to dismiss, "a complaint must

contain sufficient factual matter, accepted as true, 'to state a claim to relief that is

plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173

L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127

S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid*.

As will be demonstrated herein, Plaintiffs have met this standard.

## ARGUMENT

### 1.        *Sovereign Immunity Does Not Bar This Litigation*

The Eleventh Amendment establishes a general prohibition of suits in federal court by a citizen of a state against his state or an officer or agency of that state. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). However, there are exceptions to this rule. Relevant here, a suit against a state official may go forward in the limited circumstances identified by the Supreme Court in *Ex Parte Young.* Under the *Ex Parte Young* doctrine, a private party can sue a state officer in his official capacity to enjoin a prospective action that would violate federal law. In determining whether this exception applies, a court conducts "a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland, Inc. v. Pub. Serv.*

7

*Comm'n of Maryland,* 535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871

(2002) (alteration in original) (internal quotation omitted). Here, there is no dispute

that the relief plaintiffs seek is prospective. The only question is whether Plaintiffs

have alleged that the defendants are engaged in an ongoing violation of federal

law.

In *Fitzpatrick v. Bitzer,* 427 U.S. 445. 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976),

the Supreme Court explained the impact of the Thirteenth and Fourteenth

Amendments on the sovereign immunity bestowed on states in the Eleventh

Amendment:

> The impact of the Fourteenth Amendment upon the relationship
> between the Federal Government and the States, and the reach of
> congressional power under s 5 [of the Fourteenth Amendment], were
> examined at length by this Court in Ex parte State of Virginia, 100
> U.S. 339, 25 L.Ed. 676 (1880). … It then addressed the relationship
> between the language of s 5 and the substantive provisions of the
> Fourteenth Amendment:
>
>> The prohibitions of the Fourteenth Amendment are
>> directed to the States, and they are to a degree restrictions
>> of State power. It is these which Congress is empowered
>> to enforce, and to enforce against State action, however
>> put forth, whether that action be executive, legislative, or
>> judicial. Such enforcement is no invasion of State
>> sovereignty. No law can be, which the people of the
>> States have, by the Constitution of the United States,
>> empowered Congress to enact. . . . in exercising her
>> rights, a State cannot disregard the limitations which the
>> Federal Constitution has applied to her power. Her rights
>> do not reach to that extent. Nor can she deny to the
>> general government the right to exercise all its granted

8

> powers, though they may interfere with the full
> enjoyment of rights she would have if those powers had
> not been thus granted. Indeed, every addition of power to
> the general government involves a corresponding
> diminution of the governmental powers of the States. It is
> carved out of them.

> 427 U.S. 454-55, 96 S.Ct. 2670-71

Although not quoted in the *Fitzpatrick v. Bitzerby* opinion, *Ex parte*

*Commonwealth of Virginia* also contained findings that are highly applicable to

this case and that should be quoted:

> One great purpose of these amendments was to raise the colored race
> from that condition of inferiority and servitude in which most of them
> had previously stood, into perfect equality of civil rights with all other
> persons within the jurisdiction of the States. They were intended to
> take away all possibility of oppression by law because of race or
> color. They were intended to be, what they really are, limitations of
> the power of the States and enlargements of the power of Congress.
> They are to some extent declaratory of rights, and though in form
> prohibitions, they imply immunities, such as may be protected by
> congressional legislation.
> 100 U.S. 344-45

It is remarkable that those words were written in 1880, when one considers

the continuing efforts in this year of 2022 to oppress minority voting rights, among

others.

While the Eleventh Amendment generally prohibits suits against a state by

its own citizens in federal court, state sovereign immunity is not absolute.

Congress can abrogate state sovereign immunity pursuant to its Fourteenth

Amendment enforcement powers to redress discriminatory state action. To

9

determine whether Congress abrogated state sovereign immunity, the courts inquire as to whether Congress (1) expressed its unequivocal intent to do so and (2) acted "pursuant to a valid grant of constitutional authority." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) (internal quotation marks omitted). There are many decisions of the Supreme Court holding that claims based on the Thirteenth, Fourteenth and Fifteenth Amendments of violation of federal laws guaranteeing the equal protection of the law are not subject to sovereign immunity.

In this case, the Defendants conflate the congressional waiver of sovereign immunity as permitted by the Eleventh, Fourteenth and Fifteenth Amendments, and the authorization under the Voting Rights Act for private parties to enforce that Act.  Those defenses are separate, and will be examined in the following sections.

### The Voting Rights Act Has Been Held To Be Constitutional And Waives States' Sovereign Immunity

The Defendants go so far as to claim that "Congress neither had the constitutional authority to abrogate states' sovereign immunity in enacting Section 2 [of the VRA] and, in any event, didn't 'unmistakably' intend to do so." (Def. Brief, p.8)

With some exceptions as to sections of the VRA not applicable here, the United States Supreme Court declared the VRB to be constitutional. See *South*

*Carolina v. Katzenbach*, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769, the opinion of which included the following:

> The Voting Rights Act was designed by Congress to banish the blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century. The Act creates stringent new remedies for voting discrimination where it persists on a pervasive scale, and in addition the statute strengthens existing remedies for pockets of voting discrimination elsewhere in the country. Congress assumed the power to prescribe these remedies from s 2 of the Fifteenth Amendment, which authorizes the National Legislature to effectuate by 'appropriate' measures the constitutional prohibition against racial discrimination in voting. We hold that the sections of the Act which are properly before us are an appropriate means for carrying out Congress' constitutional responsibilities and are consonant with all other provisions of the Constitution.

> Hopefully, millions of non-white Americans will now be able to participate for the first time on an equal basis in the government under which they live. We may finally look forward to the day when truly '(t)he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.'

See also, *U.S. v. Blaine County, Montana*, 363 F.3d 897 (C.A.9, 2004), certiorari denied 125 S.Ct. 1824, 544 U.S. 992, 161 L.Ed.2d 755;   *U.S. v. Marengo County Com'n,* 731 F.2d 1546 (C.A.11, 1984), appeal dismissed, certiorari denied 105 S.Ct. 375, 469 U.S. 976, 83 L.Ed.2d 311.

There can be little doubt that the Voting Rights Act ("VRA") has been held to be a constitutional exercise of congressional authority to waive the Eleventh Amendment grant of sovereign immunity from suit by its own citizens.

The VRA was designed "to implement the Fifteenth Amendment and, in some respects, the Fourteenth Amendment." *Bd. of Comm'rs of Sheffield*, 435 U.S. at 126–27, 98 S.Ct. 965; *see also Marengo*, 731 F.2d at 1556 ("Congress [in enacting Section 2] ... relied not on any independent power to interpret the Constitution but rather on congressional power to enforce the Civil War Amendments."). As the Supreme Court has repeatedly recognized, the "Civil War Amendments" allow Congress to intrude "into the judicial, executive, and legislative spheres of autonomy previously reserved to the States." *Fitzpatrick*, 427 U.S. at 455, 96 S.Ct. 2666; *see also City of Rome v. United States*, 446 U.S. 156, 179, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980) (explaining that the Civil War Amendments "were specifically designed as an expansion of federal power and an intrusion on state sovereignty"), *abrogated on other grounds by Shelby Cty., Ala. v. Holder*, 570 U.S. 529, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013). Given this design, "principles of federalism that might otherwise be an obstacle to congressional authority are necessarily overridden by the power to enforce the Civil War Amendments 'by appropriate legislation.' " *City of Rome*, 446 U.S. at 179, 100 S.Ct. 1548.

Both § 5 of the Fourteenth Amendment and § 2 of the Fifteenth Amendment, using identical language, authorize Congress to enforce their respective provisions by appropriate legislation. The Supreme Court has often referred to these

enforcement provisions in tandem, describing them as "parallel" powers to enforce the Civil Rights Amendments. *See, e.g*., *City of Boerne v. Flores*, 521 U.S. 507, 518, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). The Fifth, Sixth and Eleventh Circuits have held that if § 5 of the Fourteenth Amendment permits Congress to abrogate state sovereign immunity, so too must § 2 of the Fifteenth Amendment. *See Mixon v. State of Ohio,* 193 F.3d 389, 399; *OCA-Greater Houston v. Texas,* 867 F.3d 604, 614 (5th Cir., 2017); *Lewis v. Governor of Alabama,* 896 F.3d 1282 (11th Cir., 2018). The nature of the Civil War Amendments as an intentional intrusion on state sovereignty and the identical enforcement provisions of both Amendments allow for no other conclusion.

By design, the VRA was intended to intrude on state sovereignty to eradicate state-sponsored racial discrimination in voting. Because the Fifteenth Amendment permits this intrusion, Arkansas is not immune from suit under § 2 of the VRA. Nor is § 2 any great indignity to the State. Indeed, "it is a small thing and not a great intrusion into state autonomy to require the [S]tates to live up to their obligation to avoid discriminatory practices in the election process." *Marengo*, 731 F.2d at 1561.

Plaintiffs are aware of the ruling of the U.S. District Court for the Eastern District of Arkansas in the case of *Christian Ministerial Alliance v. Arkansas*, 2020

WL 12968240 (E.D. Ark. 2020), authored by the Honorable James M. Moody, Jr.,

a member of the panel in this case, which specifically held that the VRA did *not*

abrogate the states' sovereign immunity under the Eleventh Amendment (Opinion,

Sec. III). With all due respect to the esteemed Judge Moody and his decision, it

came notwithstanding that three U.S. Courts of Appeal (the Fifth (*OCA-Greater*

*Houston v. Texas*, 867 F.3d 604, 614 (5th Cir., 2017)); the Sixth (*Mixon v. State of*

*Ohio*, 193 F.3d 389 (6th Cir., 1999); and the Eleventh (*Lewis v. Governor of*

*Alabama*, 896 F.3d 1282 (11th Cir., 2018)  – the only other Circuits to rule on the

issue of waiver of sovereign immunity – had concluded that Congress <u>did</u> abrogate

states' sovereign immunity in enacting the VRA.[1] Further, the Eighth Circuit, in

*Roberts v. Wamser,* 883 F.2d 617 (8th Cir., 1989), apparently assumed such in a

VRA case, and, in fact, found that Congress had created a *private right of action*

for VRA Section 2 claims (888 F.2d at 621), an issue also raised in this case by the

Defendants in their Motion to Dismiss.

Judge Moody recognized in his opinion the decisions of the three Circuits

mentioned above, but nevertheless declined to follow them, relying on the

---

[1] Another decision of the Eleventh Circuit, *Alabama State Conference of National Association for the Advancement of Colored People v. State of Alabama,* 949 F.3d 647 (11th Cir., 2020), confirming that Congress had abrogated state immunity in enacting the VRA, and intended to allow private parties to sue states, was vacated by the U.S. Supreme Court (141 S.Ct. 2618 (Mem.) 2021) and remanded with instructions to dismiss the case as moot.

Supreme Court's decision in *Dellmuth v. Muth*, 491 U.S. 223 (1989), interpreting

The Education of the Handicapped Act (a/k/a The Individuals With Disabilities

Act) with regard to abrogation of sovereign immunity.

While *Dellmuth v. Muth* confirmed the test that "Congress may abrogate the

States' constitutionally secured immunity from suit in federal court only by making

its intention unmistakably clear in the language of the statute," that does not mean

that such abrogation cannot be implied by the language used, without the necessity

of specific and explicit words to that effect. *See Allen v. State Bd. of Elections*, 393

U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), which will be discussed at greater

length herein.

In the VRA, the reader cannot make sense of the provisions without

concluding that Congress intended to, and did, abrogate sovereign immunity. Some

of the key provisions of the VRA that strongly imply abrogation read in relevant

part (italicized words in the quoted text relate to abrogation; underlined words

relate to creation of a private cause of action to be discussed herein):

> ### § 10302. Proceeding to enforce the right to vote
>
> #### (a) Authorization by court for appointment of Federal observers
>
> Whenever the Attorney General <u>or an aggrieved person</u> *institutes a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision* the court shall authorize the appointment of Federal observers by the Director of the Office of Personnel Management in accordance with section 1973d<u>1</u> of Title 42 …

15

***(b) Suspension of use of tests and devices which deny or abridge the right to vote***

If in a proceeding instituted by the Attorney General <u>or an aggrieved person</u> under any statute *to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision* the court finds that a test or device has been used for the purpose or with the effect of denying or abridging the right of any citizen of the United States to vote on account of race or color, or in contravention of the voting guarantees set forth in section 10303(f)(2) of this title, it shall suspend the use of tests and devices in such State or political subdivisions as the court shall determine is appropriate and for such period as it deems necessary.

***(c) Retention of jurisdiction to prevent commencement of new devices to deny or abridge the right to vote***

If in any proceeding instituted by the Attorney General <u>or an aggrieved person</u> under any statute *to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision* the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision, the court, in addition to such relief as it may grant, shall retain jurisdiction for such period as it may deem appropriate …

***§ 10303. Suspension of the use of tests or devices in determining eligibility to vote***

(5) An action pursuant to this subsection shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court. The court shall retain jurisdiction of any action pursuant to this subsection for ten years after judgment and shall reopen the action upon motion of the Attorney General <u>or any aggrieved person</u> alleging that conduct has occurred which, had that conduct occurred during the ten-year periods referred to in this subsection, would have precluded the issuance of a declaratory judgment under this subsection. …

…

**(9)** Nothing in this section shall prohibit the Attorney General from consenting to an entry of judgment if based upon a showing of objective and compelling evidence *by the plaintiff*, and upon investigation, he is satisfied that *the State or political subdivision has complied with the requirements of subsection (a)(1).* Any aggrieved party may as of right intervene at any stage in such action.

### *§ 10310. Enforcement proceedings*
### *(e) Attorney's fees*

In any action or proceeding to *enforce the voting guarantees of the fourteenth or fifteenth amendment*, the court, in its discretion, may allow the prevailing party, *other than the United States*, a reasonable attorney's fee, reasonable expert fees, and other reasonable litigation expenses as part of the costs.

Each of these provisions are in the context of the enforcement of prohibitions or restrictions of the VRA that are imposed by states or governmental subdivisions and that discriminate on the basis of race. These prohibitions or restrictions are meaningless unless they are enforced by the Attorney General or "any aggrieved person" in a federal court. This is particularly true when one considers that the Supreme Court recognized that

> Congress enacted the landmark Voting Rights Act of 1965, 79 Stat. 437, as amended, 52 U.S.C. § 10301 *et seq.*, in an effort to achieve at long last what the Fifteenth Amendment had sought to bring about 95 years earlier: an end to the denial of the right to vote based on race. *Brnovich v. Democratic National Committee, et al*, 1141 S.Ct. 2321, 2330, 210 L.Ed.2d 753 (2021)

It was and is the states and their political subdivisions who have been the perpetrators of the deprivation of minority voting rights from the Civil War to the present, and they are the named targets for enforcement actions under the VRA. While the omission of an explicit abrogation of sovereign immunity is regrettable and is now causing the expenditure of considerable time and effort to affirm such abrogation, the implication of abrogation of sovereign immunity by language such as "Whenever the Attorney General or an aggrieved person *institutes a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision*," is overwhelming. What kind of proceeding other than a lawsuit against the state or political subdivision could be brought without a waiver of sovereign immunity?

### *The Voting Rights Act Provides a Private Right of Action Against the States*

The Voting Rights Act (VRA) is widely considered to be among the most effective civil rights statutes ever passed by Congress. Its success is largely due to the work of private litigants. For more than fifty years, private parties have sued states and localities under the VRA to enforce the substantive guarantees of Amendments 13, 14 and 15 to the U.S. Constitution – "the Civil War Amendments."

Today, private parties remain the primary enforcers of § 2 of the VRA. As of 2018, the Department of Justice had filed only 4 of the 61 enforcement actions under § 2 since 2013. *See* U.S. Civil Rights Commission, *An Assessment of Minority Voting Rights Access in the United States* 10 (2018).

The language of the statute clearly indicates that both the Attorney General and aggrieved persons may institute proceedings against a State or a political subdivision. The State cites *Dellmuth* v. *Muth*, 491 U.S. 223, 228 (1989) in support of its position that the "aggrieved person" language, alone, is insufficient to abrogate sovereign immunity. *Id.* at 660–61. But, virtually all statutes are worded differently and the context of the words in them is important.  The "aggrieved parties" language in *Dellmuth* appeared in an enforcement provision that merely stated that parties could bring suit in State court or in a United States district court. *Dellmuth*, 491 U.S. at 231, 109 S.Ct. 2397. In contrast, § 2 of the VRA *specifically* applies to "any State or political subdivision," and the enforcement provision then refers to suits to enforce the statute by aggrieved persons. *See Morse*, 517 U.S. at 233, 116 S.Ct. 1186 (explaining that the 1975 amendments to the VRA recognized that private rights of action were available to enforce the VRA); *see also id*. at 289, 116 S.Ct. 1186 (Thomas, J., dissenting) ("As appellants accurately state, § 3 *explicitly* recognizes that private individuals can sue *under the [Act]*." (emphasis added) (internal quotation marks omitted)).

In like manner, while the granting of a private right of action is not explicit, it is strongly implicit in the VRA. The underlined portions of the above-quoted provisions of the VRA, by repeatedly referring to "proceedings instituted by the Attorney General or an aggrieved person" – who would naturally be a person whose voting rights are being infringed or affected in violation of the VRA – compel the conclusion that a private right of action has been bestowed. Again, the Eighth Circuit, in *Roberts v. Wamser*, found that a private right of action exists under the VRA for "aggrieved persons" ("standing to sue under this Act is limited to the Attorney General and to aggrieved persons, a category that we hold to be limited to *persons whose voting rights have been denied or impaired*." 883 F.2d at 624.)

In order to abrogate state sovereign immunity, Congress must also act pursuant to a valid grant of power. *See Garrett*, 531 U.S. 356 at 363, 121 S.Ct. 955. While Congress may not abrogate a State's immunity when acting pursuant to its Article I powers, it may do so under its enforcement powers pursuant to § 5 of the Fourteenth Amendment. *See id*. at 364, 121 S.Ct. 955; *see also Fitzpatrick*, 427 U.S. at 456, 96 S.Ct. 2666 ("[T]he Eleventh Amendment, and the principle of state sovereignty which it embodies ... are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment.").

Finally, in *Morse v. Republican Party of Virginia,* 517 U.S. 186, 116 S.Ct.

1186, 134 L.Ed.2d 347 (1996), the Supreme Court squarely addressed the issue of

whether a private right of action was created by the VRA, and found that it was,

explaining:

> In *Allen [v. State Bd. of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22
> L.Ed.2d 1 (1969)]*,* we made two observations about § 5 that apply as
> forcefully to § 10. We noted that "achievement of the Act's laudable
> goal could be severely hampered ... if each citizen were required to
> depend solely on litigation instituted at the discretion of the Attorney
> General." 393 U.S., at 556, 89 S.Ct., at 826. The same is surely true of
> § 10.41 Second, we attached significance to the fact that the Attorney
> General had urged us to find that private litigants may enforce the
> Act. *Id.,* at 557, n. 23, 89 S.Ct., at 827, n. 23. The United States takes
> the same position in this case. See Brief for United States as *Amicus
> Curiae* 25–27.42

> Congress has not only ratified *Allen* 's construction of § 5 in
> subsequent reenactments, see H.R.Rep. No. 91–397, p. 8 (1970), but
> extended its logic to other provisions of the Act. Although § 2, like §
> 5, provides no right to sue on its face, "the existence of the private
> right of action under Section 2 ... has been clearly intended by
> Congress since 1965." S.Rep. No. 97–417, at 30 (citing *Allen* ); see
> also H.R.Rep. No. 97–227, p. 32 (1981) H.R.Rep. No. 97–227, p. 32
> (1981). We, in turn, have entertained cases brought by private litigants
> to enforce § 2. See, *e.g., Chisom v. Roemer,* 501 U.S. 380, 111 S.Ct.
> 2354, 115 L.Ed.2d 348 (1991); *Johnson v. De Grandy,* 512 U.S. 997,
> 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994). It would be anomalous, to
> say the least, to hold that both § 2 and § 5 are enforceable by private
> action but § 10 is not, when all lack the same express authorizing
> language. 517 U.S. at 231-232

> …

21

Furthermore, when Congress reenacted and extended the life of the Voting Rights Act in 1975, it recognized that private rights of action were equally available under § 10. Section 3, for example, originally provided for special procedures in any action brought "under any statute to enforce the guarantees of the fifteenth amendment" by the Attorney General. See 79 Stat. 437. In 1975, Congress amended that section to cover actions brought by "the Attorney General *or an aggrieved person.*" 42 U.S.C. § 1973a (1988 ed.) (emphasis added). The Senate Report explained that the purpose of the change was to provide the same remedies to private parties as had formerly been available to the Attorney General alone. See S.Rep. No. 94–295, pp. 39–40 (1975).45 Since § 10 is, by its terms, a statute designed for enforcement of the guarantees of the Fourteenth and Fifteenth Amendments, see 42 U.S.C. § 1973h(b) (1988 ed.), Congress must have intended it to provide private remedies.

517 U.S. at 233-234

It is noteworthy that Justice Thomas, in his dissent in *Morse,* stated with

regard to the existence of a private right of action under portions of the VRA:

> *Allen v. State Bd. of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), held that § 5 of the Voting Rights Act contains a private right of action, *Allen* does not require the same result under § 10. Section 5 affirmatively proclaims that " 'no person shall be denied the right to vote for failure to comply with [a new state enactment covered by, but not approved under, § 5].' "*Id.,* at 555, 89 S.Ct., at 826. It was "[a]nalysis of this language" that "indicate[d] that appellants may seek a declaratory judgment that a new state enactment is governed by § 5." *Ibid.* A private cause of action was thought necessary to effectuate "[t]he guarantee of § 5 that no person shall be denied the right to vote for failure to comply with an unapproved new enactment subject to § 5." *Id.,* at 557, 89 S.Ct., at 827.20 See also *Cannon v. University of Chicago,* 441 U.S. 677, 690, 99 S.Ct. 1946, 1954, 60 L.Ed.2d 560 (1979).

In *Allen v. State Bd. of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), cited extensively in *Morse, supra,* the Supreme Court explained that it has traditionally implied a private right of action in federal statutes passed to protect a class of citizens, although the statute does not specifically grant such right:

> The Voting Rights Act does not explicitly grant or deny private parties authorization to seek a declaratory judgment that a State has failed to comply with the provisions of the Act.18 However, s 5 does provide that 'no person shall be denied the right to vote for failure to comply with (a new state enactment covered by, but not approved under, s 5).' Analysis of this language *in light of the major purpose of the Act* indicates that appellants may seek a declaratory judgment that a new state enactment is governed by s 5. Further, after proving that the State has failed to submit the covered enactment for s 5 approval, the private party has standing to obtain an injunction against further enforcement, pending the State's submission of the legislation pursuant to s 5.19.

> 393 U.S. at 554-555

> The Act was drafted to make the guarantees of the Fifteenth Amendment finally a reality for all citizens. South Carolina v. Katzenbach, supra, at 308, 309, 86 S.Ct. 803. Congress realized that existing remedies were inadequate to accomplish this purpose and drafted an unusual, and in some aspects a severe, procedure for insuring that States would not discriminate on the basis of race in the enforcement of their voting laws.

> We have previously held that a federal statute passed to protect a class of citizens, although not specifically authorizing members of the protected class to institute suit, nevertheless implied a private right of action. …

> The achievement of the Act's laudable goal could be severely hampered, however, if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General. For example, the provisions of the Act extend to States and the subdivisions thereof. The Attorney General has a limited staff and

often might be unable to uncover quickly new regulations and enactments passed at the varying levels of state government.  It is consistent with the broad purpose of the Act to allow the individual citizen standing to insure that his city or county government complies with the s 5 approval requirements. 393 U.S. at 556-557

Defendants' objections that Congress had no authority to enact the Voting Rights Act and that there is no private right of action under the VRA are clearly without merit.

## II.

## PLAINTIFFS CLAIMS UNDER ARTICLE 1, SECTION 2, AND THE THIRTEENTH AND FOURTEENTH AMENDMENTS ARE JUSTICIABLE

Defendants' Brief asserts that Plaintiffs' claims under Article I, Section 2 of the U.S. Constitution fail because Arkansas' congressional map satisfies the "one person, one vote" rule. (Def. Brief, p. 14). They also claim that Plaintiffs' First Amendment claim fails because that Amendment does not regulate redistricting, and that Plaintiffs' claims under the Fourteenth Amendment fail because Plaintiffs have not plausibly alleged intentional discrimination. Each of those claims is wrong.

24

### A.                    *Plaintiffs' Article I, Section 2 Claim*

Article I, Section 2 is about more than the states' satisfying the one man, one vote rule. It has also been interpreted to protect voters against arbitrary and capricious manipulation of the voting process and procedures.

*Common Cause v. Rucho*, 318 F.Supp.3d 777 (M.D. N.C. 2018) provides an excellent discussion of the history of Article I, Section 2 of the Constitution, and the judicial interpretations of that Section:

> [A] common thread runs through the restrictions on state election regulations imposed by Article I, the First Amendment, and the Equal Protection Clause: the Constitution does not allow elected officials to enact laws that distort the marketplace of political ideas so as to intentionally favor certain political beliefs, parties, or candidates and disfavor others. In particular, Article I preserves inviolate the right of "the People" to elect their Representatives, and therefore bars the States from enacting election regulations that "dictate electoral outcomes" or "favor or disfavor a class of candidates." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 833–34, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995). (318 F.Supp.3d at 800)
> …
> [T]wo provisions in Article I: section 2 … provides that the "House of Representatives shall be composed of Members chosen ... by the People," and the Elections Clause, which provides that "the Times, Places and Manner of holding Elections for ... Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations," U.S. Const. art. I, § 4, cl. 1. (318 F.Supp.3d at 936)
> …
> In accordance with the intent of the Framers, the Supreme Court has held that "[t]he Elections Clause gives States authority 'to enact numerous requirements as to *procedure* and safeguards which experience shows are necessary in order to enforce the fundamental right involved.' " *Id.* (emphasis added) (quoting *Smiley v. Holm*, 285 U.S. 355, 366, 52 S.Ct. 397, 76 L.Ed. 795 (1932) ). Put differently, the

25

Elections Clause empowers the States to promulgate "regulations designed to ensure that elections are fair and honest and that some sort of order rather than chaos accompanies the democratic processes." *Id.* at 834–35, 115 S.Ct. 1842 (emphasis added) (internal quotation marks and alterations omitted). (Id.)

…

The States' broad, delegated power under the Election Clause, however, is not without limit. *See, e.g., Cook v. Gralike*, 531 U.S. 510, 527, 121 S.Ct. 1029, 149 L.Ed.2d 44 (2001) (Kennedy, J. concurring) ("The Elections Clause thus delegates but limited power over federal elections to the States."); *Montano v. Lefkowitz*, 575 F.2d 378, 385 (2d Cir. 1978) (Friendly, J.) ("*Wesberry* makes clear that the apparent breadth of the power granted to state legislatures by [the Elections Clause], is not a carte blanche."). *In particular, "in exercising their powers of supervision over elections and in setting qualifications for voters, the States may not infringe upon basic constitutional protections." Kusper*, 414 U.S. at 56–57, 94 S.Ct. 303; *see also Tashjian*, 479 U.S. at 217, 107 S.Ct. 544 ("*The power to regulate the time, place, and manner of elections does not justify, without more, the abridgement of fundamental rights.*"). Likewise, *the Elections Clause does not serve "as a source of power [for States] to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints.*" *Thornton*, 514 U.S. at 833–34, 115 S.Ct. 1842. In other words, the States' authority under the Elections clause extends *only* to "*neutral* provisions as to the time, place, and manner of elections." *Gralike*, 531 U.S. at 527, 121 S.Ct. 1029 (emphasis added). (Italics added) (318 F.Supp.3d at 937)

See also, *League of Women Voters of Michigan v. Benson*, 373 F.Supp.3d 867 (E.D. Mich, 2019) (3 Judge panel), in which that Court commenced its opinion by stating that "Today, this Court joins the growing chorus of federal courts that have, in recent years, held that partisan gerrymandering is unconstitutional." Among its other rulings, it held that the Michigan redistricting plan violated the Plaintiffs' First Amendment rights, stating:

[C]onstitutional violations may arise from the deterrent, or 'chilling,' effect of governmental [efforts] that fall short of a direct prohibition against the exercise of First Amendment rights." *Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 674, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (internal citation omitted). An adverse action "chills" speech if it would "deter a person of ordinary firmness from the exercise of the right at stake." *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999) (internal citation and quotation marks omitted). *This same principle applies to First Amendment association claims based on partisan gerrymandering. See Rucho*, 318 F.Supp.3d at 931. (Italics added)

Voters [Plaintiffs] have satisfied this standard. By diluting the weight of Democratic voters' votes, the Enacted Plan has made it more difficult to energize the party's base, register voters, recruit candidates, mobilize and attract volunteers, raise money, and motivate people to vote.

Plaintiffs are aware of the U.S. Supreme Court's action in vacating the judgment of the District Court in *Rucho v. Common Cause*, 139 S.Ct. 2484, 204 L.Ed.2d 931 (2019), on the basis that <u>political</u> gerrymandering is nonjusticiable, and therefore the Federal courts will not address it. However, the Court did not turn its back on review of cases involving <u>racial</u> gerrymandering, stating:

In <u>racial</u> gerrymandering cases, we rely on a "predominant intent" inquiry to determine whether race was, in fact, the reason particular district boundaries were drawn the way they were. If district lines were drawn for the purpose of <u>separating racial groups</u>, then they are subject to strict scrutiny because "race-based decisionmaking is inherently suspect." *Miller*, 515 U.S. at 915, 115 S.Ct. 2475. See *Bush*, 517 U.S. at 959, 116 S.Ct. 1941 (principal opinion). But determining that lines were drawn on the basis of <u>partisanship</u> does not indicate that the districting was improper. A permissible intent— securing partisan advantage—does not become constitutionally

impermissible, like racial discrimination, when that permissible intent "predominates."

139 S.Ct. at 2502-2503

So, the question presented by the Supreme Court's ruling in *Rucho* is whether the gerrymandering complained of by the Plaintiffs in this case were drawn for the purpose of separating racial groups, or because of political motivations?

At this stage of the case, we are examining the allegations of the Complaint, not arguing the merits. Plaintiffs herein have alleged in their Complaint that the gerrymandering in the 2021 Arkansas Reapportionment legislation was done deliberately, and for the discriminatory purpose of racially gerrymandering communities of Black voters to reduce their potential ability to elect candidates or adopt issues that they favor. The following paragraphs excerpted from the Complaint demonstrate such allegations:

> 126.   The Arkansas General Assembly's 2021 Congressional Redistricting Plan had the intended and deliberately discriminatory effect of racially gerrymandering or "cracking" communities of Black voters in order to reduce or eliminate the potential and effectiveness of such communities of voters to elect candidates and pass issues that they favored.
> …
> 128.   The adoption of the Arkansas 2021 Congressional Redistricting Plan by the Arkansas General Assembly resulted in the intended and deliberate abridgment of the right of Black citizens to fully and equally participate in the Federal congressional political process, and is intended to enhance the potential for continued success in electing

Republican and White candidates to Congress from the Second
Congressional District.

…

139.   The Arkansas General Assembly's 2021 Congressional
Redistricting Plan had the discriminatory effect of racially
gerrymandering or "cracking" communities of Black voters in order to
reduce or eliminate the potential and effectiveness of such
communities of voters to elect candidates and pass issues that they
favored.

At this stage of the proceeding, the Court assumes that the allegations in the

complaint are true, and view them in the light most favorable to the Plaintiffs. See,

*Jones v. Jegley*, 947 F.3d. 1100 (8th Cir. 2020), finding that a mere allegation of

"expression of intent" in a complaint to contribute to a candidate in a forthcoming

election was sufficient at that stage to justify issuance of a preliminary injunction.

Given the allegations contained in the Plaintiffs' Complaint regarding the

intent of the gerrymandering, the Supreme Court's decision in *Rucho* does not

forestall the Plaintiffs' attempt in this litigation challenging the State's efforts to

minimize the potential impact of the Plaintiffs and their fellow Black voters on the

election of the Second Congressional District's representative. **This is not an**

**attempt by a political party to redraw the district lines more favorably to that**

**party**, but an attempt by a racial minority to preserve and protect the gains that

they have made in recent years to have a meaningful role in the election of

representatives who will represent them in Congress as well as the majority.

29

**A.**                                    ***Equal Protection Claims***

As noted in the foregoing discussion, the Voting Rights Amendment was a

remedy developed by Congress to assist in implementation of the Privileges and

Immunities and Equal Protection provisions of the Thirteenth and Fourteenth

Amendments. One way in which the VRA made it easier to address abuses of

voting rights by the states and their subdivisions was by eliminating the necessity

of showing a deliberate intent to discriminate against a minority group in adopting

gerrymandered districts and other measures that prevented or interfered with, or

rendered ineffective the minorities in voting.

However, the VRA did not eliminate the right of persons to claim

discrimination under the Fourteenth Amendment and other applicable laws. Those

remedies are still available, but the case law requires that the plaintiff show that the

discriminatory practice was intentional.

The Ninth Circuit, in *Garza v. County of Los Angeles,* 918 F.2d 763 (9th Cir.,

1990), reviewed a case much like the one now before this Court, involving claims

of deliberate and intentional discrimination, and held:

> The Voting Rights Act, 42 U.S.C. § 1973, forbids the imposition or
> application of any practice that would deny or abridge, on grounds of
> race or color, the right of any citizen to vote. In 1980, a plurality of
> the Supreme Court held that this provision prohibited only intentional
> discrimination, and would not allow minorities to challenge practices
> that, although not instituted with invidious intent, diluted minority
> votes in practice. *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct.
> 1490, 64 L.Ed.2d 47 (1980). In response to this decision, Congress

30

amended the Voting Rights Act in 1982 to add language indicating that the Act forbids not only intentional discrimination, but also any practice shown to have a disparate impact on minority voting strength. *See* 42 U.S.C. § 1973(b). Thus, after the 1982 amendment, the Voting Rights Act can be violated by both intentional discrimination in the drawing of district lines and facially neutral apportionment schemes that have the effect of diluting minority votes. To the extent that a redistricting plan deliberately minimizes minority political power, it may violate both the Voting Rights Act and the Equal Protection Clause of the fourteenth amendment. *See Bolden,* 446 U.S. at 66–67, 100 S.Ct. at 1499.

The *Garza* Court went on to distinguish the case before it – involving claims of intentional discrimination – from the Supreme Court's ruling in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), noting that *Gingles* established three preconditions for liability under the amendment to Section 2 for claims based <u>only</u> on discriminatory effects: (1) geographical compactness of the minority group; (2) minority political cohesion; and (3) majority block voting. 478 U.S. at 50–51, 106 S.Ct. at 2766–67, explaining:

> The *Gingles* requirements were articulated in a much different context than this case presents. Although the *Gingles* Court was aware of the history of discrimination against blacks, which was the minority there in question, *the Court did not consider any claim that the disputed districting plan had been enacted deliberately to dilute the black vote. See* 478 U.S. at 80, 106 S.Ct. at 2760–61. The claim at issue was that the multi-member districts that were being used, regardless of the intent with which they were created, had the *effect* of diluting the black vote. 478 U.S. at 39–41, 106 S.Ct. at 2781–82. Thus, the court instituted the "possibility of majority" requirement in a case in which it was asked to invalidate a political entity's choice of a multi-member district system, and impose a system of single-member districts, and

31

was not asked to find that the multi-member scheme had been set up with a discriminatory purpose in mind. An emphasis on showing a statistically significant disparate impact is typical of claims based on discriminatory effect as opposed to discriminatory intent. (Emphasis supplied)

In contrast, the district court in this case found that the County had adopted its current reapportionment plan *at least in part* with the intent to fragment the Hispanic population. *See* Findings at 44 No. 81. The court noted that continued fragmentation of the Hispanic population had been at least one goal of each redistricting since 1959. Thus, the plaintiffs' claim is not, as in *Gingles,* merely one alleging disparate impact of a seemingly neutral electoral scheme. *Rather, it is one in which the plaintiffs have made out a claim of intentional dilution of their voting strength.*

918 F.2d at 770

The County cites a number of cases in support of its argument that *Gingles* requires these plaintiffs to demonstrate that they could have constituted a majority in a single-member district as of 1981. None dealt with evidence of intentional discrimination. (Citations omitted)

To impose the requirement the County urges would prevent any redress for districting which was deliberately designed to prevent minorities from electing representatives in future elections governed by that districting. This appears to us to be a result wholly contrary to Congress' intent in enacting Section 2 of the Voting Rights Act and contrary to the equal protection principles embodied in the fourteenth amendment.

Also see, *Rice v. Elmore*, , 165 F.2d 387 (4th Cir., 1947), certiorari denied 68 S.Ct. 905, 333 U.S. 875, 92 L.Ed. 1151.

Without waiving any claim or argument to the applicability of the Voting Rights Act to this case, Plaintiffs assert that, even if this Court should find that the

32

VRA claims cannot be relied upon by them in this case, they nevertheless have justiciable claims under Article 1, and the Thirteenth, Fourteenth and Fifteenth Amendments.

## III.

## PLAINTIFFS ARE NOT REQUIRED TO MEET ALL OF THE *JINGLES* STANDARDS IN THEIR CLAIMS

As noted in the discussion of the *Garza* case in the foregoing section of this Brief, regardless of the availability of the VRA claims regarding facially neutral reapportionment plans, the Plaintiffs can rely upon their claims under the Thirteenth, Fourteenth and Fifteenth Amendments, but with the added burden of proving that the discrimination asserted in the Complaint was deliberate and intentional. Cases such as this were litigated in Federal courts prior to the enactment of the VRA under those Amendments, and the VRA, among other things, changed the standard by which a violation of voting rights was measured from "intentional" to the "impact" of the action. To again quote the *Garza* Court:

> Congress amended the Voting Rights Act in 1982 to add language indicating that the Act forbids not only intentional discrimination, but also any practice shown to have a disparate impact on minority voting strength. *See* 42 U.S.C. § 1973(b). Thus, after the 1982 amendment, the Voting Rights Act can be violated by both intentional discrimination in the drawing of district lines and facially neutral apportionment schemes that have the effect of diluting minority votes. 918 F.2d at 766.

33

Thus, assuming *arguendo* that the Plaintiffs are unable to meet the first prong of the *Gingles* test for considering a voter dilution claim under the VRA, *i.e.*, to demonstrate that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district (which Plaintiffs do not concede they cannot show), the Plaintiffs should still be allowed to proceed with their claims under the "Civil War Amendments."

Finally, the State addresses the issue of the Supreme Court's review of the case of *Merrill v. Milligan*, Supreme Court Case No. 21A375 (21-1086) and 21A376 (21-1083), in which a number of opinions were issued by Justices of the Court regarding a stay of the 3-Judge District Court's opinion and injunction.

In a footnote to Defendants' Brief (Def. Brief, p. 26, ftn. 2) the State indicates that if this Court does not grant its Motion to Dismiss, the State may request a stay of these proceedings to await the Supreme Court's review of and decision in *Merrill v. Milligan*. Plaintiffs need not respond in depth to that observation at this time, other than to say that Plaintiffs will oppose any such request. While the law in this area may be said to be in flux, that can also be said of a number of other areas of the law. Justice should be dispensed on the law as it exists at the time cases are brought, and not on what it might be at some indefinite time in the future.

34

## <u>CONCLUSION</u>

The primary issue before this Court on Defendants' Motion to Dismiss is whether the Plaintiffs have stated justiciable claims under the constitutional provisions and the Voting Rights Act identified in the Complaint.

The allegations of the Complaint, accepted as true, state claims for relief based on factual content that are plausible on their face and from which this Court may draw a reasonable inference that the State of Arkansas has developed its 2021 Redistricting Plan based upon racial gerrymandering. This satisfies the requirements for overcoming Defendants' Motion to Dismiss provided in *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal*.

The Court should overrule the Defendants' Motion to Dismiss, and issue a scheduling order for further development of this case.

Respectfully submitted,

Richard H. Mays
Ark. Bar No. 61043
Attorney for Plaintiffs
**RICHARD MAYS LAW FIRM PLLC**
2226 Cottondale Lane – Suite 210
Little Rock, AR 72202
Tel: 501-891-6116
E-mail: rmays@richmayslaw.com
njackson@richmayslaw.com

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a copy of the above and foregoing Brief in Support of Plaintiffs' Response to Defendants' Motion to Dismiss has been served upon counsel of record for the Defendants by the Court's ECF system.  Counsel for Plaintiffs is unaware of any attorney or party to this action who require service by other means.

Date:  May 9, 2022                                         <u>*/s/    Richard H. Mays*</u>
                                                                            Richard H. Mays