# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# CENTRAL DIVISION

JACKIE WILLIAMS SIMPSON,
REPRESENTATIVE DENISE ENNETT,
WANDA KING, CHARLES E. BOLDEN,
SENATOR LINDA CHESTERFIELD, and
DR. ANIKA WHITFIELD

    Plaintiffs,

v.

ASA HUTCHINSON, in his official capacity
as Governor of the State of Arkansas; and
JOHN THURSTON, in his official capacity
as the Arkansas Secretary of State, and the
STATE OF ARKANSAS,

    Defendants.

No.: 4:22-cv-213-JM

# BRIEF OF SENATOR TOM COTTON AS *AMICUS CURIAE*
# IN SUPPORT OF DEFENDANTS

Jason B. Torchinsky, VA #47481*
Jonathan P. Lienhard, VA #41648*
HOLTZMAN VOGEL BARAN
    TORCHINSKY JOSEFIAK
15405 John Marshall Highway
Haymarket, VA 20169
P: (540) 341-8808
F: (540) 341-8809
E: jtorchinsky@holtzmanvogel.com
*admitted to the United States District Court
for the Eastern District of Arkansas*

Michael Lamoureux, AR #2000012
P: (479) 886-2277
E: Lamoureuxlaw@gmail.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTEREST OF *AMICUS CURIAE* ..................................................................................... 1

SUMMARY OF ARGUMENT ............................................................................................. 2

ARGUMENT ......................................................................................................................... 2

    I.    The Importance of Racial Gerrymandering Claims ................................................ 2

    II.    The Distinction Between Partisan and Racial Gerrymandering Claims ................ 4

CONCLUSION ....................................................................................................................... 9

CERTIFICATE OF SERVICE ............................................................................................. 11

# TABLE OF AUTHORITIES

## CASES

*Allen v. State Bd. of Elections*, 393 U.S. 544 (1969) ........................................................................2

*Davis v. Bandemer*, 478 U.S. 109 (1986) ........................................................................................8

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) ...................................................................................2

*Hunt v. Cromartie*, 526 U.S. 541 (1999) ................................................................................4, 7, 8

*Miller v. Johnson*, 515 U.S. 900 (1995) ..................................................................................5, 6, 9

*Mobile v. Bolden*, 446 U.S. 55 (1980) .............................................................................................3

*Morrison v. Olson*, 487 U.S. 654 (1988) .........................................................................................5

*Rogers v. Lodge*, 458 U.S. 613 (1982) ............................................................................................3

*Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) ................................................................*passim*

*Shaw v. Reno*, 509 U.S. 630 (1993) ............................................................................................3, 5

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) ..............................................................................8, 9

*Tex. Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006) ..................................................6

## STATUTES

U.S. Const. art. I, § 4 .........................................................................................................................4

52 U.S.C. § 10301(a) ........................................................................................................................3

## OTHER AUTHORITIES

Dale Ellis & Ryan Tarinelli, *Arkansas Democrats Get Behind Redistricting Suit*, Ark. Democrat-Gazette (Mar. 14, 2022) ..................................................................................7

Gary Tobar for State Representative District 34 ..............................................................................7

Steve Brawner, *He's Trying to Be the Best Wes, Not a Trailblazer*, Sw. Times Record (Jan. 26, 2022) .....................................................................................................................7

U.S. Census Bureau, *Race and Ethnicity in the United States: 2010 Census and 2020 Census*, (Aug. 12, 2021) ................................................................................................................. 9

## INTEREST OF *AMICUS CURIAE*

Amicus curiae Senator Tom Cotton is a United States Senator from the State of Arkansas. As a member of Congress representing the interests of Arkansans in the federal government, Senator Cotton is familiar with the constitutional and federal statutory law that States are tasked with applying in their congressional redistricting processes. As a Senator elected statewide, Senator Cotton has no direct political interest in Arkansas's congressional map, but he is interested in ensuring good government and allowing the Arkansas legislature to fulfill its constitutional duty of drawing the congressional map. He closely followed Arkansas's own 2021 redistricting process.

Because of a monthslong delay in the release of census data, Arkansas legislators worked under tight deadlines and demonstrated their commitment to public service and integrity by producing a fair and compact map that preserves communities of interest while making few changes from the prior congressional map. Senator Cotton believes these legislators should be commended for their work; not subjected to baseless smears from political opponents. But even if the Court finds that there is evidence of a *political* gerrymander, that does not mean Plaintiffs should get the relief that they seek. Given the U.S. Supreme Court's decision in *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), holding that partisan gerrymandering claims are nonjusticiable political questions that have no place in federal court, Senator Cotton is concerned about Plaintiffs bringing partisan gerrymandering claims disguised as racial gerrymandering causes of action. Racial and partisan gerrymandering are entirely different categories that are subject to different legal standards. Lawsuits that confuse or conflate the two claims undermine the rationale that animated the *Rucho* decision: Plaintiffs, at bottom, are still asking federal courts to adjudicate issues that are fundamentally political questions by vaguely alleging impermissible racial intent,

even as they only allege legally permissible partisan intent. Senator Cotton believes that the federal courts must vigilantly guard the line between partisan gerrymandering, which is an outgrowth of constitutionally protected political activity, and racial gerrymandering, which is violative of constitutional principles that treat all Americans as equal and protect minority voters.

## SUMMARY OF ARGUMENT

Although Plaintiffs have brought seven causes of action, this brief will address only one: Plaintiffs' Fourteenth Amendment Equal Protection claim (Count IV). Plaintiffs do not offer evidence sufficient to support an allegation of racial gerrymandering. Their Equal Protection claim, although premised on a claim of intentional racial vote dilution, is a thinly veiled partisan gerrymandering claim as evidenced by the fact that Plaintiffs solely refer to allegations of partisan—not racial—intent. These allegations fail to satisfy the Supreme Court's standard for pleading a racial gerrymandering claim, and permitting such claims to be hard in federal court raises the possibility of differential enforcement of federal law in different parts of the country.

## ARGUMENT

### I. The Importance of Racial Gerrymandering Claims.

Racial gerrymandering claims are an important tool for vindicating the federal constitutional rights of minority voters. The Supreme Court has recognized that "the right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot," meaning that a voter can still suffer a cognizable constitutional injury even if their vote was correctly counted in the district to which they were assigned. *Allen v. State Bd. of Elections*, 393 U.S. 544, 569 (1969). When a state has intentionally diluted minority voting power through redistricting, "state power [has been] used as an instrument for circumventing a federally protected right." *Gomillion v. Lightfoot*, 364 U.S. 339, 347 (1960). The assignment of voters to a particular

2

congressional district because of their race is clearly the kind of racial classification that violates the Constitution, and that federal courts are well-situated to identify and redress.

Because a racial gerrymandering claim is so serious, however, Plaintiffs must meet an especially high bar to prove their claim. A plaintiff must demonstrate that a challenged redistricting plan was both "adopted with a discriminatory purpose *and* ha[s] the effect of diluting minority voting strength." *Shaw v. Reno*, 509 U.S. 630, 641 (1993) (emphasis added). Both prongs are essential; if a plaintiff fails to show that both racially discriminatory intent and impact are present, they cannot obtain relief. To wit, the Supreme Court has long "rejected the notion that a law is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than another." *Rogers v. Lodge*, 458 U.S. 613, 618 (1982). In addition, the Court has recognized that "[t]he Equal Protection Clause of the Fourteenth Amendment does not require proportional representation as an imperative of political organization." *Mobile v. Bolden*, 446 U.S. 55, 75-76 (1980). Although Congress can choose to regulate a broader range of state conduct through federal statutes—and, indeed, it has, as demonstrated by the 1982 revision of VRA Section 2[1]—the Constitution itself bars only intentional racial discrimination and does not dictate any redistricting outcome.

The distinction between impermissible discriminatory intent and permissible disparate impact in the racial gerrymandering context is sensible. It should be easier for individuals to obtain relief when they have been *directly targeted* by the government based solely on their protected status (race) than when members of a particular race have been *incidentally impacted* by a racially neutral government policy. Racial classifications are a grievous constitutional wrong because they discriminate against people based on an immutable characteristic.

---

[1] *See* 52 U.S.C. § 10301(a) (prohibiting voting standards, practices, or procedures that "*result[]* in a denial or abridgement of the right" to vote) (emphasis added).

The same logic does not extend to allegations of partisan gerrymandering, in which maps are drawn to benefit a particular political party rather than to ensure the dominance (or the submission) of a particular racial group. In the partisan gerrymandering context, the Supreme Court has held that even a publicly expressed intent to advantage members of a particular party is insufficient to render a claim justiciable. *See Rucho*, 139 S. Ct. at 2491 (finding a lack of justiciability even where a state legislator claimed he drew a Republican-dominated congressional map because "I think electing Republicans is better than electing Democrats. So I drew this map to help foster what I think is better for the country."). If even that level of unmistakable partisan intent—which is far more than anything cited by Plaintiffs in this case—was insufficient to state a claim, then alleging a disparate impact alone is clearly not enough.

## II. The Distinction Between Partisan and Racial Gerrymandering Claims.

Unlike racial gerrymandering, partisan gerrymandering is not only constitutionally permissible but, in a sense, constitutionally preordained. The Constitution vests state legislatures— *i.e.*, bodies composed entirely of politicians who have been directly elected by their constituents and who are motivated at least in part by the desire to win reelection—with the sole authority for determining "[t]he times, places and manner of holding elections" within their state, subject to override only by the U.S. Congress. U.S. Const. art. I, § 4. The Supreme Court has been clear that racial gerrymandering and partisan gerrymandering are fundamentally different actions, and the Court's standards for assessing the permissibility of the former are in no way applicable to the latter. *See Rucho*, 139 S. Ct. at 2488 (noting that "partisan gerrymandering claims have proved far more difficult to adjudicate, in part because a jurisdiction may engage in constitutional political gerrymandering") (quoting *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999)).

4

Importantly, partisan gerrymandering allegations are not justiciable in federal court, whereas properly pleaded racial gerrymandering claims are justiciable in federal court. *See id.* at 2506-2507 ("We conclude that partisan gerrymandering claims present political questions beyond the reach of the federal courts."). This is an inconvenient truth for Plaintiffs when faced with a congressional district map they believe has been drawn to benefit one political party. Unwilling to seek an audience in state court, they cast about in search of an alternative cause of action that will allow them to have their claims heard in federal court. In this case, Plaintiffs have attempted to disguise their partisan gerrymandering allegations as a racial gerrymandering claim. But no one should mistake the true nature of the beast. Despite Plaintiffs' poor attempt at camouflage, "this wolf comes as a wolf," and this Court should decline to encourage further subterfuge in pleading by giving credence to such claims. *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting).

"Unlike partisan gerrymandering claims," a racial gerrymandering lawsuit "does not ask for a fair share of political power and influence . . . . It asks instead for the elimination of a racial classification." *Rucho*, 139 S. Ct. at 2502. Confronted with "our country's long and persistent history of racial discrimination in voting," as well as its "Fourteenth Amendment jurisprudence, which always has reserved the strictest scrutiny for discrimination on the basis of race," the Supreme Court has set an achievable standard for proving racial vote dilution. *Shaw*, 509 U.S. at 650. That standard requires a plaintiff "to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the *predominant factor* motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller v. Johnson*, 515 U.S. 900, 916 (1995) (emphasis added). For partisan gerrymandering claims, by contrast, there is no quantity of

evidence that Plaintiffs can supply that would carry them over the justiciability threshold; federal courts simply "have no commission to allocate political power and influence in the absence of a constitutional directive or legal standards to guide [them] in the exercise of such authority." *Rucho*, 139 S. Ct. at 2508. Although Plaintiffs persist in pretending their claim concerns a racial gerrymander, this is belied by the evidence they present in support, which is at most exclusively indicative of *partisan*, not *racial*, intent.

Although Plaintiffs spend many pages of their Complaint detailing the history of racial discrimination in Arkansas elections one hundred years ago, they never argue that Arkansas's 2021 congressional redistricting process was permeated by racial discrimination. There is a simple explanation for the conspicuous absence of contemporary evidence: There is none. Rather, based upon Plaintiffs' own allegations, they have alleged only an attempt by Republican Party politicians to adopt a congressional map that favors Republican candidates; and if that is what actually occurred here, then the map is not unlawful. "A permissible intent—securing partisan advantage—does not become constitutionally impermissible, like racial discrimination, when that permissible intent 'predominates.'" *Rucho*, 139 S. Ct. at 2503. When a political party wins control of state government through a democratic election, it should surprise no one that it strives "to better direct the machinery of government toward the party's interests." *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006). That is, in a sense, the nature of the game, and has been since the Constitution was ratified.

If Plaintiffs intend to prove a racial gerrymander, then they must present evidence that race—*not* partisanship—was the "predominant factor" motivating the adoption of Arkansas's new congressional map. *Miller*, 515 U.S. at 916. Based upon Plaintiffs' own words, they have not done so. Plaintiff Senator Linda Chesterfield told the press that Arkansas Republicans "were going to

6

break up Pulaski County to make sure that never again would there be the ability for any Democrat—especially a minority—to successfully run for a seat in the U.S. Congress."[2] However, the Supreme Court's "decisions have made clear that a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact." *Hunt*, 526 U.S. at 551. Senator Joyce Elliott (albeit not herself a plaintiff in this suit) similarly claimed that "The intent was for the 2nd District to be diluted and to not have the opportunity to elect a Democrat ever in the 2nd District." Ellis & Tarinelli, *supra* note 2; *see also* Compl. ¶ 119 (alleging the map was intended to "dictate electoral outcomes by *favoring candidates of one party* and disfavoring candidates of another") (emphasis added).

At times, Plaintiffs make vague unsupported allegations of a racially discriminatory motive, such as when they allege that the enacted map "is intended to enhance the potential for continued success in electing Republican and White candidates to Congress from the Second Congressional District," but they always pair that claim with an allegation of *partisan* intent. Compl. ¶ 141. Plaintiffs offer no evidence that Republicans try to elect only *white* candidates and, in fact, multiple black Arkansans are running for the legislature this year as Republicans.[3] Plaintiffs' baseless allegations not only smear the citizen legislators of Arkansas, they also fail to state a claim of racial gerrymandering. By pleading a racial gerrymandering claim based solely on an alleged Republican political advantage, Plaintiffs are effectively arguing that any map that is

---

[2] Dale Ellis & Ryan Tarinelli, *Arkansas Democrats Get Behind Redistricting Suit*, ARK. DEMOCRAT-GAZETTE (Mar. 14, 2022), https://www.arkansasonline.com/news/2022/mar/14/democrats-get-behind-redistricting-suit/.
[3] *See, e.g.*, Gary Tobar for State Representative District 34, http://garytobar.com/index.html?msclkid=7bd9512abb6411ec8114a2a6053c31bc; Steve Brawner, *He's Trying to Be the Best Wes, Not a Trailblazer*, SW. TIME RECORD (Jan. 26, 2022), https://www.msn.com/en-us/news/politics/he-s-trying-to-be-the-best-wes-not-a-trailblazer-steve-brawner/ar-AATa7tc?msclkid=a5f626b3bb6411ecb824126e55fa16e4 (detailing Wes Booker's campaign for House District 71 as a black Republican).

7

not gerrymandered to benefit Democratic candidates must be unlawful. But the State of Arkansas is under no obligation to produce a map drawn to maximize the Democrats' political advantage. If Democratic politicians wish to draw Arkansas's congressional map—as they previously did for decades—they should win elections instead of making a baseless allegation of racial gerrymandering.

It should be obvious to all observers of American politics that race may and often does, to some extent, correlate with partisanship. At the same time, it should be equally obvious that a person's race does not *dictate* their political preferences, and that partisanship is susceptible to change in a way that race is not. *See Davis v. Bandemer*, 478 U.S. 109, 156 (O'Connor, J., concurring) ("[W]hile membership in a racial group is an immutable characteristic, voters can—and often do—move from one party to the other or support candidates from both parties."). Moreover, even in States where race and party preference overlap, the Supreme Court's "decisions have made clear that a jurisdiction may engage in constitutional political gerrymandering, *even if it so happens that the most loyal Democrats happen to be black Democrats* and even if the State were *conscious* of that fact." *Hunt*, 526 U.S. at 551 (emphasis added). That is essentially all that Plaintiffs have alleged here.

If this Court decides to review complaints that are premised on alleged partisan conduct simply because they are dressed up with a thin racial gerrymandering veneer, then partisan gerrymandering claims would once again become justiciable in some states even as they remain nonjusticiable in others. If that were the case, federal law would apply differently in different parts of the Republic. Although differential treatment of States can sometimes be justified by "exceptional conditions" supported by sufficient evidence, "the fundamental principle of equal sovereignty remains highly pertinent in assessing subsequent disparate treatment of States." *Shelby*

8

*Cnty. v. Holder*, 570 U.S. 529, 544 (2013). Arkansas enjoys the same sovereignty as all other States, and a judicial system that allows evidence of partisan intent to suffice for pleading a racial vote dilution claim against Arkansas, even as it would never accept such evidence as sufficient to state a claim in less diverse states like Maine or Vermont,[4] would be counter to our constitutional principles.

Partisan gerrymandering is a political question that federal courts are ill-equipped to adjudicate. *Rucho*, 139 S. Ct. at 2508. Racial gerrymandering is an entirely different inquiry with its own legal standards for determining what constitutes an unlawful intent. *See Miller*, 515 U.S. at 916. Given the Supreme Court's clear precedent barring the federal adjudication of partisan gerrymandering claims and Plaintiffs' failure to properly allege racially discriminatory intent in their Complaint, this Court should dismiss Plaintiffs' equal protection claim due to their failure to properly state a claim of racial vote dilution.

## CONCLUSION

Because Plaintiffs have failed to properly plead a racial gerrymandering claim under the Equal Protection Clause, this Court should dismiss Count IV of Plaintiffs' Complaint.

Dated: April 14, 2022

                                                /s/ Jason Torchinsky
                                                Jason B. Torchinsky, VA #47481*
                                                Jonathan P. Lienhard, VA #41648*
                                                HOLTZMAN VOGEL BARAN
                                                               TORCHINSKY JOSEFIAK
                                                15405 John Marshall Highway
                                                Haymarket, VA 20169
                                                P: (540) 341-8808
                                                F: (540) 341-8809
                                                E: jtorchinsky@holtzmanvogel.com

---

[4] U.S. Census Bureau, *Race and Ethnicity in the United States: 2010 Census and 2020 Census*, (Aug. 12, 2021) https://www.census.gov/library/visualizations/interactive/race-and-ethnicity-in-the-united-state-2010-and-2020-census.html (indicating that as of 2020, Maine (90.8% white) and Vermont (89.8% white) were the least racially diverse states in the country, whereas Arkansas was only 70.2% white).

9

*admitted to the United States District Court
for the Eastern District of Arkansas

Michael Lamoureux, AR #2000012
P: (479) 886-2277
E: Lamoureuxlaw@gmail.com

10

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I served one copy of the foregoing by overnight mail this 14th day of April, 2022, to the following counsel of record:

Richard H. Mays
Richard Mays Law Firm PLLC
2226 Cottondale Lane, Suite 210
Little Rock, AR 72202

Dylan L. Jacobs
Arkansas Attorney General's Office
Catlett-Prien Tower Building
323 Center Street, Suite 200
Little Rock, AR 72201-2610

Nicholas J. Bronni
Arkansas Attorney General's Office
Catlett-Prien Tower Building
323 Center Street, Suite 200
Little Rock, AR 72201-2610

Dated: April 14, 2022

_____
Jonathan P. Lienhard