IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

_____

No. 4:22-cv-213

_____

Jackie Williams Simpson, *et al.*

Plaintiffs,

v.

Asa Hutchinson, *et al.*

Defendants.

_____

Before STRAS, Circuit Judge, MARSHALL, Chief District Judge, and MOODY, District Judge.

_____

**Memorandum Opinion and Order**

STRAS, Circuit Judge.

Redrawing congressional maps is a politically charged exercise. After Arkansas redrew its map following the 2020 census, a group of black voters challenged it. There are a number of claims in the complaint, but not enough pleaded facts to support any of them. *See* Fed. R. Civ. P. 12(b)(6). So we dismiss some claims with prejudice and grant the plaintiffs leave to replead the rest.

I.

After receiving the results of the 2020 census, the Arkansas General Assembly began its once-a-decade task of redrawing its congressional districts. [Compl. ¶¶ 16, 17.] The population of Arkansas's second and third districts had grown, which gave each of them a greater share of the state's total population than the first or the fourth. [Compl. ¶ 22.] To bring the four congressional districts back into compliance with the "one-person, one-vote" principle from *Wesberry v. Sanders*, 376 U.S. 1, 17–18 (1964), the General Assembly considered 27 possible redistricting plans. [Compl. ¶¶ 22, 23.]

With the assistance of Arkansas's Bureau of Legislative Research, the General Assembly eventually settled on one. [Compl. ¶¶ 24, 25.] The new map split up only two Arkansas counties, three fewer than the one passed a decade before. [Compl. Exs. 1–4.] One was Pulaski County, home to Little Rock, which had 23,000 residents moved into the first and fourth districts. [Compl. ¶¶ 25, 26, Exs. 2, 4.] To make up for the loss to the second district, 23,000 residents of Cleburne County took their place. [Compl. ¶ 27.]

The new map faced its share of criticism. Little Rock Mayor Frank Scott, Jr., was concerned that it created a "gerrymander[] along racial lines." [Compl. ¶ 39.] Governor Asa Hutchinson worried "about [its] impact . . . on minority populations," including the "removal of minority areas [of] Pulaski County into two different [c]ongressional districts." [Compl. ¶ 29.] Although he refused to sign the bill, he allowed the map to become law anyway. [Compl. ¶ 30.]

This lawsuit is about the map's treatment of Pulaski County's black community. According to the complaint, the redrawn lines have impermissibly "dispers[ed] . . . black[] [voters] into districts in which they constitute an ineffective minority," otherwise known as "cracking." *Bartlett v. Strickland*, 556 U.S. 1, 14 (2009) (plurality opinion) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11

(1986)).  The cracking allegedly occurred by replacing the predominantly black voters of southern and eastern Pulaski County with the predominantly white voters of Cleburne County.  [Compl. ¶ 37, Ex. 13.]  The net effect, at least according to the complaint, "discourage[s] . . . the Black [residents] of the area [from] vot[ing] and . . . reduce[s] the significance of their votes."  [Compl. ¶ 37.]

Armed with these allegations, the plaintiffs brought a range of federal and state claims, including several challenging the constitutionality of the new map and another under § 2 of the Voting Rights Act.  We have reviewed the complaint and determined that, as currently written, it "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

II.

The vote-dilution claims are the centerpiece of the complaint.  *See* U.S. Const. amends. XIV, XV.  The theory behind them is that the new map denies black voters "the opportunity to participate *effectively* in the political process."  *Perkins v. City of West Helena*, 675 F.2d 201, 206 (8th Cir. 1982) (emphasis added).

These types of claims have long required a showing of "discriminatory purpose," *Reno v. Bossier Par. Sch. Bd. (Bossier Parish I)*, 520 U.S. 471, 481–82 (1997), meaning the complaint must contain facts that plausibly show, either directly or indirectly, that Arkansas's General Assembly acted with that purpose in mind, *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009).  And not just any discriminatory purpose will do.  Rather, race must be the "*predominant* factor."  *Easley v. Cromartie*, 532 U.S. 234, 241 (2001) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 547 (1999)).  Redistricting, after all, is a time for the General Assembly "to exercise the political judgment necessary to balance competing interests," *id.* at 242 (quoting *Miller v. Johnson*, 515 U.S. 900, 915 (1995)), which leaves us to conduct "a 'sensitive inquiry into such circumstantial and direct evidence of intent as may be available,'" *Hunt*, 526 U.S. at 546 (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,

429 U.S. 252, 266 (1977)) (emphasizing that "assessing a jurisdiction's motivation . . . is an inherently complex endeavor").

A.

Missing here are "facts plausibly showing" that race motivated the General Assembly's decision, much less that it was the predominant factor behind it. *Iqbal*, 556 U.S. at 682. There is no "smoking gun" here: neither the plan's sponsors nor other members of the General Assembly provided a "rationale or explanation" for the new map "other than . . . equaliz[ing] the number of voters" across Arkansas's four congressional districts. [Compl. ¶ 28]; *Cooper v. Harris*, 137 S. Ct. 1455, 1468–69, 1479 (2017). To be fair, "[o]utright admissions of impermissible racial motivation are infrequent[,] and plaintiffs often must rely upon other evidence." *Hunt*, 526 U.S. at 553. Even so, there are no allegations that "nudge[]" an inference of discriminatory intent "across the line from conceivable to plausible" either. *Iqbal*, 556 U.S. at 680 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). Nothing so far plausibly connects the map's alleged discriminatory *effects* to the *intent* of those who adopted it. *See Washington v. Davis*, 426 U.S. 229, 239 (1976) (explaining that "a law" is not "unconstitutional *solely* because it has a racially disproportionate impact").

The plaintiffs' answer is that we should draw favorable inferences from several allegations in the complaint. One is the General Assembly's decision not to choose a different map from the twenty-six others it considered. To bolster their point, they filed exhibits describing six of those maps. [Compl. Exs. 6–11.]

Four of the maps are nonstarters because they would have invited a challenge under the "one-person, one-vote" principle. *See Wesberry*, 376 U.S. at 17–18. Although states can justify small population variances between congressional districts, it is more difficult when the variance exceeds 0.7%. *See Karcher v.*

-4-

*Daggett*, 462 U.S. 725, 728, 732, 744 (1983).  Those four maps start with a variance of 0.87% and go up from there.  [Compl. Exs. 6–7, 9, 11.]

The plaintiffs also do not explain how the rejection of the two other maps shows a discriminatory purpose.  It may well reveal an awareness that alternatives were available.  But mere awareness is not enough.  *See Pers. Adm'r v. Feeney*, 442 U.S. 256, 279 (1979).  Rather, discriminatory purpose requires a showing that the General Assembly "selected or reaffirmed a particular course of action at least in part 'because of'" its impact on a specific group.  *Id.*  At best, the rejection of the other maps reveals a "possibility of misconduct," but possibilities cannot get the plaintiffs past a motion to dismiss.  *Iqbal*, 556 U.S. at 679.

Nor can the after-the-fact comments of Governor Asa Hutchinson and Little Rock Mayor Frank Scott, Jr.  According to the complaint, both expressed reservations about the new map.  [Compl. ¶¶ 29, 39.]  Absent, however, are allegations that either one worked with the General Assembly on reapportionment or otherwise knew why it selected one map over the others.  And even if they had knowledge, the deeper difficulty is that both spoke about the map's effects, not the purpose behind it.  [Compl. ¶¶ 29, 39.]  So, at most, these statements show a racial impact, not a racial purpose.

Moreover, even assuming those statements allow for an inference of racial bias, they do not plausibly show that it was the "*predominant* factor."  *Easley*, 532 U.S. at 241 (citation omitted).  The plaintiffs' complaint recognizes that there are "obvious alternative explanation[s]," *Twombly*, 550 U.S. at 567, including the preservation of the existing boundaries between "counties and other political subdivisions."  [Compl. ¶ 21.]

The complaint also raises a second possibility: a purely partisan motive.  Here is just a sampling of what it says: the new map "dictate[s] electoral outcomes by favoring candidates of one party and disfavoring candidates of another" and the

General Assembly "intended to enhance the potential for continued success in electing *Republican and White* candidates to Congress from the Second Congressional District."   [Compl. ¶¶ 119, 141 (emphasis added).]   If a partisan motive is predominant, then a racial motive cannot be.   And to the extent it is, partisan-gerrymandering claims "present political questions beyond the reach of the federal courts."   *Rucho v. Common Cause*, 139 S. Ct. 2484, 2506–07 (2019); *see also Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2335 (2021) (suggesting that courts ought to "distinguish between partisan and racial motives" (quotation marks omitted)).

The only other specific allegations involve the new map itself, which splits the black community in southern and eastern Pulaski County into two congressional districts. [Compl. ¶ 26.]  Even if the new map is "consistent with" racially motivated redistricting, it does not "*plausibly* establish this purpose" on its own.  *Iqbal*, 556 U.S. at 681 (emphasis added).  Nor does using the word "cracking" in the complaint. [Compl. ¶ 139.]  It is not a fact, but a conclusion to draw from them.

All that is left is a "formulaic recitation of the elements of" a vote-dilution claim.  *Twombly*, 550 U.S. at 555.  Saying that the "Arkansas General Assembly . . . deliberate[ly] abridge[d] . . . the right of Black citizens to fully and equally participate in the [f]ederal congressional political process" is a conclusion.  [Compl. ¶ 141.]  We do not have to "accept" it "as true."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  And we will not do so without specific "[f]actual allegations" that "raise [the] right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

B.

Even if the complaint contained specific factual allegations, however, the Fifteenth Amendment vote-dilution claim faces another hurdle.  Four decades ago, the Eighth Circuit held that "racially discriminatory vote dilution is also cognizable

under the Fifteenth Amendment." *Perkins v. City of West Helena*, 675 F.2d 201, 205–06 (8th Cir. 1982). Since then, the Supreme Court has weighed in twice. The first time it assumed that the claim existed, observed that it "never ha[d] held [that] any legislative apportionment [is] inconsistent with the Fifteenth Amendment," and rejected the claim on the merits. *Voinovich v. Quilter*, 507 U.S. 146, 159 (1993). It then noted, seven years later, that it had "never even 'suggested'" that "vote dilution violates the Fifteenth Amendment." *Reno v. Bossier Par. Sch. Bd. (Bossier Parish II)*, 528 U.S. 320, 334 n.3 (2000) (citation omitted).

Against this backdrop, members of this panel disagree about whether Fifteenth Amendment vote-dilution claims exist. One view is that the Fifteenth Amendment's text and binding Eighth Circuit precedent support a properly pleaded claim. *See* U.S. Const. amend. XV, § 1 ("The right of citizens of the United States to vote shall not be denied or abridged . . . by any State on account of race, color, or previous condition of servitude."); *Perkins*, 675 F.2d at 205–06; 17A Charles Alan Wright et al., *Federal Practice and Procedure* § 4235 (3d ed. 2022 update) ("Far the more common view" is that a three-judge court "is bound by decisions of the court of appeals for its circuit."). The other is that the text has nothing to say about vote dilution, *Voinovich* and *Bossier Parish II* abrogated *Perkins*, and Eighth Circuit precedent likely does not bind us in any event. *See* 17A Wright et al., *supra*, § 4235 (explaining that "[t]here is some authority that a three-judge court is 'not bound by any judicial decisions other than those of the United States Supreme Court'" (quoting *Jehovah's Witnesses in State of Wash. v. King Cnty. Hosp. Unit No. 1 (Harborview)*, 278 F. Supp. 488, 504–05 (W.D. Wash. 1967))).

No matter which view is correct, the plaintiffs' complaint falls short here. As we explained above, there are not enough facts to plausibly allege a discriminatory purpose. So we set aside our disagreement for the moment and simply assume that vote-dilution claims can come in both a Fourteenth and Fifteenth Amendment

package.  We will also assume, based on *Perkins*, that both claims have the same elements.[1]  675 F.2d at 206–07 (treating the two claims interchangeably).

## C.

What we can say at this stage is that the plaintiffs are a few specific factual allegations short of pleading a plausible vote-dilution claim.[2]  *See Iqbal*, 556 U.S. at 679.  Nevertheless, given that it is possible they can still plead one, we will give them another chance to do so.  *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend a complaint] when justice so requires.").

## III.

The remaining federal constitutional claims, by contrast, meet their end here. According to the plaintiffs, Arkansas's redistricting plan violates Article I, § 2; the First Amendment; and the Privileges or Immunities Clause of the Fourteenth Amendment.  Each fails as a matter of law.

---

[1]Given the overlap between the Fourteenth and Fifteenth Amendment vote-dilution claims, the latter "may not move the needle much." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 760 (8th Cir. 2019).

[2]The voters also brought a claim under Article II, § 3 of the Arkansas Constitution, which provides that "[t]he equality of all persons before the law is recognized, and shall ever remain inviolate."  The parties agree that Arkansas courts have "traditionally viewed equal protection [the same as] federal courts," *Maiden v. State*, 438 S.W.3d 263, 275 (Ark. 2014), meaning that, if the federal vote-dilution claims survive, so does the one under state law.

A.

The first of the three, Article I, § 2 of the United States Constitution, describes the process for electing members to the House of Representatives. As relevant here, it states that they "shall be apportioned among the several States which may be included within this Union, according to their respective Numbers." U.S. Const. art. I, § 2. The Supreme Court has interpreted this language as providing the basis for the "one-person, one-vote" principle. *See Wesberry*, 376 U.S. at 17–18. The plaintiffs urge us to go a step further and declare that it also prohibits racial gerrymandering.

The only authority for this otherwise novel theory is the since-vacated decision from *Common Cause v. Rucho*, 318 F. Supp. 3d 777 (M.D.N.C. 2018), *vacated and remanded*, 139 S. Ct. 2484 (2019). On appeal, the Supreme Court rejected the idea that Article I, § 2 prohibits partisan gerrymandering, which involves drawing district lines for political reasons. *See Rucho*, 139 S. Ct. at 2506.

Trying to fit a racial-gerrymandering claim under Article I, § 2 also presents a square-peg, round-hole problem. The one-person, one-vote principle is "easy to administer" precisely because it is "a matter of math." *Rucho*, 139 S. Ct. at 2501. All it requires is that a state's congressional districts do not "contain[] [a] widely varied number[] of inhabitants." *Wesberry*, 376 U.S. at 8. As the plaintiffs all but concede, the potential problem here is racial discrimination, not population variance. So no matter how they plead it, the Article I, § 2 claim cannot work. [Compl. Exs. 2, 4.]

B.

The same goes for the First Amendment claim. The Arkansas redistricting plan places "no restrictions on speech, association, or any other First Amendment

activities."   *Rucho*, 139 S. Ct. at 2504.   It just places some voters in one congressional district rather than another.

Apparently recognizing this fact, the plaintiffs argue that it must have a "chilling effect."  [Pls.' Resp. 27.]  A chilling effect describes the *indirect* effects that a vague or overbroad law has on First Amendment expression.  *See Laird v. Tatum*, 408 U.S. 1, 10–12 (1972).

Arkansas's redistricting plan, however, is neither vague nor overbroad, so there can be no chilling effect.  *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 324 (2010).  No one has to "guess" about what they can say or do under the plan, nor are there any allegations that moving a group of voters from one district to another deters the exercise of any specific expressive or associational right.  *Id.*; *cf. Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2388–89 (2021) (explaining that a state law requiring disclosure of an organization's donors impermissibly chills association).  And even if there were, voters remain "free to engage in [First Amendment] activities no matter what . . . effect . . . [the] plan may [have] on their district."  *Rucho*, 139 S. Ct. at 2504.

C.

The current state of the law also forecloses the claim that Arkansas's plan violates the Privileges or Immunities Clause of the Fourteenth Amendment.  For better or worse, the Supreme Court has long given it an exceedingly narrow construction.  *See Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1873); *see also McDonald v. City of Chicago*, 561 U.S. 742, 756–58 (2010) (declining to overrule the *Slaughter-House Cases*).  Unless the Supreme Court decides to revisit the *Slaughter-House Cases*, this claim necessarily fails too.

IV.

Finally, the statutory claim arises under § 2 of the Voting Rights Act, which does not require a showing of discriminatory purpose. *See Brnovich*, 141 S. Ct. at 2332. Rather, the objective is to determine whether, under a totality of the circumstances, "members of a protected class . . . '*have less opportunity* than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *Id.* (quoting 52 U.S.C. § 10301(b)).

The three *Gingles* prerequisites chart the way for a plaintiff trying to plead a § 2 claim. They are:

> (i) the racial group [must be] sufficiently large and geographically compact to constitute a majority in a single-member district; (ii) the group [must be] politically cohesive; and (iii) the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate.

*Bossier Parish I*, 520 U.S. at 479–80 (brackets, omissions, and quotation marks omitted) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986)). Unless a plaintiff can plead and "establish[]" all three, there is no "wrong" under § 2. *Cooper*, 137 S. Ct. at 1472 (quoting *Growe v. Emison*, 507 U.S. 25, 41 (1993)).

At the hearing on the motion to dismiss, plaintiffs' counsel conceded that there is no way to satisfy the first requirement. As he explained:

> The numbers are just not good. It's difficult to come up with a [district] to satisfy the [first] *Gingles* [] factor of having a minority community that could conceivably by itself elect a candidate. We don't have a district like that and I don't think we can come up with one like that. . . . [Y]ou're basically talking about a majority[-]minority district, and we don't have that here, and we probably won't, because . . . the black

population of the state as a whole is approximately 15 percent of the total.

[Mot. Hr'g Tr. 9:53–54.]  A similar admission appears in the complaint, which says that none of the twenty-seven redistricting plans would have "produce[d] a majority[-]minority district" and that "a racial majority is not required."  [Compl. ¶ 36.]  The point is that the plaintiffs have candidly admitted that there is no way they can state a claim under § 2 of the Voting Rights Act.[3]

V.

One loose end remains.  The State of Arkansas and Governor Asa Hutchinson each argue they are immune from suit under the doctrine of sovereign immunity, which limits our authority to hear lawsuits brought by private parties against states and their officials.  *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996).  The question we must answer is whether Congress abrogated sovereign immunity through the Voting Rights Act.

A.

Congress has the authority to abrogate sovereign immunity under some of its constitutional powers.  The enforcement power under § 5 of the Fourteenth Amendment is one of them.  *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 80 (2000)

---

[3]Although the defendants argue there is no private right of action under § 2 of the Voting Rights Act, we assume without deciding that there is one.  *See City of Mobile v. Bolden*, 446 U.S. 55, 60 (1980) (plurality opinion) (assuming without deciding "that there exists a private right of action to enforce" § 2); *see also Brnovich*, 141 S. Ct. at 2350 (Gorsuch, J., concurring) (explaining that "the existence (or not) of a cause of action does not go to a court's subject-matter jurisdiction").  It ultimately makes no difference, however, because the plaintiffs have conceded they cannot state a § 2 claim.

(explaining that the Supreme Court has "reaffirmed" the ability of Congress to abrogate sovereign immunity under § 5 "on numerous occasions").  That power, which is exercised through "appropriate legislation," allows Congress to "provide for private suits against States or state officials which are constitutionally impermissible in other contexts."  *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976); *see also* U.S. Const. amend. XIV, § 5; U.S. Const. amend. XV, § 2.

The problem for the plaintiffs, however, is that Congress must abrogate sovereign immunity with "unmistakable clarity."  *Dellmuth v. Muth*, 491 U.S. 223, 231 (1989) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)).  There is no mention of sovereign immunity in the Voting Rights Act nor any explicit authorization for a cause of action against states.  So nothing, in other words, "unmistakably" abrogates it.  *Id.*

The plaintiffs' strongest argument to the contrary comes from §§ 3, 4, and 12 of the Voting Rights Act.  Relying on six passages in total, they piece together what they believe is a clear legislative intent to permit suits against states.  One set allows an "aggrieved person" to institute proceedings "to enforce the voting guarantees of the fourteenth or fifteenth amendment *in any State or political subdivision*."  52 U.S.C. § 10302(a), (b), (c) (emphasis added).  Another provision allows the Attorney General to consent to the entry of judgment if "the plaintiff" makes a "showing of objective and compelling evidence . . . that *the State or political subdivision has complied* with the requirements of subsection (a)(1)."  *Id.* § 10303(a)(9) (emphasis added).  The plaintiffs pose an important question: why mention states and political subdivisions at all if no one can sue them?

Recognizing the *possibility* of a lawsuit against a "state or political subdivision" is different from specifically *authorizing* it.  The Voting Rights Act may very well, as the Supreme Court put it, "lend[] force to the inference that the [s]tates were intended to be subject" to liability.  *Dellmuth*, 491 U.S. at 232.  But an inference is not an "unequivocal declaration," and only the latter allows us to say

"that Congress intended to exercise its powers of abrogation."   *Id.*   With no "unequivocal declaration," Arkansas cannot remain in the lawsuit.[4]   *See Atascadero*, 473 U.S. at 242.

B.

Neither can Governor Hutchinson.   Under *Ex parte Young*, 209 U.S. 123 (1908), a state official is "not the State for sovereign-immunity purposes" if the lawsuit seeks only injunctive relief for violations of federal law.   *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 254–55 (2011).   With important limits, it allows courts to remedy ongoing violations of federal law through the "fiction" of directly suing a state official.   *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997).

One important limit is that the officer sued must have "some connection with the enforcement of the act."   *Ex parte Young*, 209 U.S. at 157.   Otherwise, as *Ex parte Young* warns, "the constitutionality of every act passed by the legislature could be tested by a suit against the governor . . . , based upon the theory that . . . as the executive of the [s]tate[, he] was . . . charged with the execution of all its laws."   *Id.* (quoting *Fitts v. McGhee*, 172 U.S. 516, 530 (1899)).

We cannot allow Governor Hutchinson to remain in the case based on little more than a general duty to enforce the law.   Consider the allegations in the complaint, which describe his obligation to "administer[] and enforce[] the state's law and Constitution, including those related to elections, and including the rights

---

[4]The same goes for the claim against Arkansas under Ark. Const. art. 2, § 3. *See Milberg, Weiss, Bershad, Hynes, & Lerach, LLP v. State*, 28 S.W.3d 842, 854 (Ark. 2000) (explaining that the Arkansas Constitution preserves sovereign immunity absent waiver).

of citizens of the State to vote and to equal protection of the laws."  [Compl. ¶ 9.]
These are nothing more than legal conclusions, and even then, they do not suggest
that he has any "special" role in elections.  *Ex parte Young*, 209 U.S. at 157; *see also*
*Church v. Missouri*, 913 F.3d 736, 749 (8th Cir. 2019) (explaining that "general-
enforcement authority" is only enough "if that authority gives the governor *methods*
of enforcement").

The "special" role instead belongs to the Secretary of State.  *Ex parte Young*,
209 U.S. at 157.  As a separately elected official with his own set of duties, he "is
responsible for administering and overseeing the state's elections and implementing
election laws and regulations, including Arkansas's congressional plan."  [Compl.
¶ 10]; *see also* Ark. Const. art. 6, §§ 2, 21.  In light of this specific delegation of
authority, we can only conclude that Governor Hutchinson's role in elections, if any,
is too tenuous to allow a prospective injunctive action to be brought against him.
*See Tex. Democratic Party v. Abbott*, 978 F.3d 168, 180 (5th Cir. 2020) (holding
that "the connection between the [Texas] Governor and enforcement of the
challenged [voting] provisions [was] insufficient" for *Ex parte Young* to apply).

VI.

Based on the foregoing, we hereby order that:

1.      The defendants' motion to dismiss is **GRANTED IN PART** on Counts I, II,
and III of the complaint, which are dismissed with prejudice.  The same goes for the
State of Arkansas and Governor Asa Hutchinson.

2.      A ruling on the motion to dismiss with respect to Counts IV, V, and VI is
**DEFERRED** for thirty days.  During that time, the plaintiffs may submit an

amended complaint to focus their remaining claims and attempt to cure the pleading deficiencies we have identified.

IT IS SO ORDERED this 24th day of October, 2022.

_____