# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

| | |
|---|---|
| JACKIE WILLIAMS SIMPSON, REPRESENTATIVE DENISE ENNETT, WANDA KING, CHARLES E. BOLDEN, SENATOR LINDA CHESTERFIELD, And DR. ANIKA WHITFIELD | CIVIL ACTION |
| **Plaintiffs,** | Case No: 4:22-cv-213 |
| v. | |
| JOHN THURSTON, in his official capacity as the Arkansas Secretary of State, and the STATE OF ARKANSAS | REQUEST FOR THREE-JUDGE PANEL |
| **Defendants.** | (28 U.S.C. §2284) |

## FIRST AMENDED COMPLAINT

### *Introduction*

1.     This is an Amended Complaint challenging two identical Congressional redistricting acts (Acts 1114 and 1116 of the 93rd General Assembly of Arkansas, herein, "the 2021 Reapportionment Acts", or simply "The Acts") adopted by the Arkansas General Assembly ("the Legislature") in October 2021, asserting that those Acts violated Federal and State constitutional provisions and Section 2 of the Federal Voting Rights Act by dividing a largely Black and Hispanic community in

1

southern Pulaski County, well-known in the State through its past voting patterns to support minority candidates or candidates favoring minority positions, the intent and effect of which was to greatly dilute ("crack") that voting bloc among not two but *three* congressional districts where their votes would assuredly be less consequential.

2.  Plaintiffs contend that the voter dilution, or "cracking" of the two portions of southern Pulaski County from the Second Congressional District into the First and Fourth Congressional Districts by the Acts violate the Equal Protection provision of the Fourteenth Amendment; the Fifteenth Amendment to the U.S. Constitution; Section 2 of theVoting Rights Act of 1965, as amended (52 U.S.C. § 10301); and Article 2, Section 3 of the Constitution of the State of Arkansas.

3.  This Amended Complaint is submitted pursuant to the Memorandum Opinion and Order of this Panel issued October 24, 2022, which dismissed three counts in the original Complaint and left those described above to be included in this Amended Complaint, contingent upon Plaintiffs submitting, not merely circumstantial evidence, but "facts plausibly showing" that the Legislature *intended* to dilute the voting power of Blacks in an admittedly partisan gerrymandering, and that such intent was the predominant factor for such dilution, rather than merely demonstrating that was merely the *impact* of such legislation. That is a formidable task, since the members of the Legislature were specifically

warned in writing prior to the session in which reapportionment was considered by
their Bureau of Legislative Research staff that their written and oral
communications concerning the redistricting process could become a part of
legal proceedings such as this, and Plaintiffs' FOIA requests for such
communications have been denied by the Bureau.

4.  Plaintiffs' Amended Complaint, nevertheless, approaches the task of
showing intent, partly by submitting a documented account of the relevant
redistricting deliberations in the Legislature, which provides strong circumstantial
and direct evidence available to the Plaintiffs even without benefit of discovery.
The "sensitive inquiry" with which this Court is charged to conduct may include
consideration of "such circumstantial <u>and</u> direct evidence of intent as may be
available." *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999).

## Parties

### The Plaintiffs

5.  The United States Supreme Court has stated that the achievement of the
Voting Rights Act's laudable goal could be severely hampered if each citizen were
required to depend solely on litigation instituted at the discretion of the Attorney
General.  *Allen v. State Bd. of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1
(1969). Thus, this action is brought by the Plaintiffs named below who reside in
the election districts that are the subject of the racial-gerrymander claims alleged

3

herein, and have standing to challenge the legislation that created the contested districts.   *Shaw v. Hunt*, 116 S.Ct. 1894, 517 U.S. 899, 135 L.Ed.2d 207 (1996).

6.  The Plaintiff, **Jackie Williams Simpson**, is a Black citizen of the United States of America, and of the State of Arkansas. Plaintiff Simpson resides and is registered to vote in Pulaski County, Arkansas in an area that has been and continues to be located in the Second Congressional District of Arkansas. However, as a result of the State's 2021 Congressional Redistricting of the Second District, she has been separated from thousands of her friends, churchgoers and others with compatible political and social views, which diminishes or nullifies her own views and vote insofar as affecting the results of elections in the Second Congressional District. Plaintiff Simpson is the great-granddaughter of Nathan Nunley who was murdered by a law enforcement officer in Des Arc, Prairie County, Arkansas, in 1937 when he asked to be excused from working on the levee during the 1937 Flood because he had a sick wife and a newborn baby. She is also the great-granddaughter of Reverend Joseph Knox, a Baptist preacher, who was wrongfully convicted and imprisoned for aiding and abetting in the murder of Clinton Lee during the Elaine Massacre of 1919 and served time in prison until "furloughed" by Governor Thomas McRae.

7.  The Plaintiff, **State Representative Denise Ennett,** is a Black citizen of the United States, the State of Arkansas, and the City of Little Rock. She lives and

votes in what was and continues to be the Second Congressional District of

Arkansas, and is currently a duly-elected and serving State Representative elected

in an area originally located in the Second Congressional District that now is split

between the Second and Fourth congressional districts. As a result of the State's

2021 Congressional Redistricting of the Second District, she has been separated

from thousands of her friends, churchgoers, constituents and others with similar

political and social views, which diminishes or nullifies her own views and vote

insofar as affecting the results of elections in the Second Congressional District.

8.  The Plaintiff, **Wanda King**, is a Black citizen of the United States, the

State of Arkansas and Pulaski County, who lives and votes in Scott in Pulaski

County on the north side of the Arkansas River. She was formerly a resident of and

voter in the Second Congressional District but now lives and votes in the First

Congressional District, separated from her friends and colleagues in Pulaski

County and the Second Congressional District that represents her larger

community in Congress, and will now be detached from the rest of her larger

community and whose voice and influence on the congressional representative for

her city, county and schools will be terminated.

9.  The Plaintiff, **State Senator Linda Chesterfield**, is a Black citizen of the

United States, the State of Arkansas and Pulaski County, who lives south of Little

Rock in what was formerly the Second Congressional District but is now the

Fourth Congressional District. She is a duly elected and serving State Senator, whose senatorial district now lies in the First, Second, and Fourth Congressional Districts. Parts of her original senatorial district are now detached from the rest of her larger community and whose voice and influence on the congressional representative for her city, county and schools will be terminated.

10.     The Plaintiff, **Dr. Anika Whitfield,** is a Black citizen of the United States, the State of Arkansas and Pulaski County, who lives in the City of Little Rock in the Second Congressional District of Arkansas. She is a podiatrist, an ordained Baptist minister, and co-chair of Grassroots Arkansas**,** the Arkansas Poor People's Campaign and other organizations that frequently voice their opinions on legislation and public policy to members of the Arkansas Congressional delegation, and whose members and interests are now spread among three congressional districts as a direct result of The 2021 Reapportionment Acts. Consequently, the strength of Dr. Whitfield and her organizations' influence on federal policies has been purposefully muted by the removal of a large segment of the community to districts and populations that are different geographically and socially.

11.     The Plaintiff, **Charles E. Bolden** is a Black citizen of the United States, the State of Arkansas and Pulaski County, who lives in the City of Jacksonville in the Second Congressional District of Arkansas.   He is active in

politics, public service, and in community organizations that frequently voice their opinions on legislation and public policy to members of the Arkansas Congressional delegation. He and the organizations with which he is affiliated find, as a result of The Acts, that their members and interests are now spread among three congressional districts, and that the strength of his and his organizations' influence on federal legislation and policies has been purposefully muted by The Acts as a result of the removal of a large segment of the formerly cohesive community to districts and populations far removed geographically and socially.

## The Defendants

12.     Defendant John Thurston is the Arkansas Secretary of State and is named in his official capacity. Secretary Thurston is Arkansas's chief election official and is responsible for administering and overseeing the state's elections and implementing election laws and regulations, including Arkansas's Congressional plan.

13.     The State of Arkansas is a governmental entity, and one of the fifty (50) states of the United States of America. As such, it is subject to the Constitution and laws of the United States, including the 14th and 15th Amendments to the Constitution of the United States, and the Federal Voting Rights Act. The General Assembly of the State, which is the legislative branch of the government

of the State of Arkansas, has the responsibility within the State to apportion the State's allotted number of members of the U.S. House of Representatives throughout the State, and, in so doing, adopted The Acts that have caused harm to the Plaintiffs' rights as herein described.

## Jurisdiction and Venue

14.    28 U.S.C. § 1343 provides:

> The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
> * * *
> (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1343(a)(4); 42 U.S.C. §§1983 and 1988, and 28 U.S.C. §§1331 (Federal Question), and 1357.

15.    This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202.

16.    Venue is proper under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims described herein occurred in this District.

17.    Pursuant to 28 U.S.C. §2284, a district court of three judges shall be convened when an action is filed challenging the constitutionality of the apportionment of congressional districts. In their original Complaint, Plaintiffs

requested such a three-judge panel, the Defendants agreed that the case is suitable

for such panel, and a Panel has been designated and is now sitting. Plaintiffs

request that it continue to do so.

## FACTUAL BACKGROUND

18.    Ark. Code Ann. § 7-2-101 establishes that Arkansas is divided into

four (4) congressional districts and the responsibility for the delineation of

congressional districts of substantially equal population is given to the Arkansas

General Assembly. Current United States Census data is utilized to determine the

population of Arkansas and its distribution across the state.

### The 2020 Census

19.    According to the results of the 2020 Census, between 2010 and 2020,

Arkansas's population increased by approximately 95,000 people. As a result of

this population growth, the state has a current population of approximately

3,011,524 people,[1] and will retain four (4) seats in the U.S. House of

Representatives.

---

[1] The Census Bureau has subsequently reported that Arkansas' population was underreported by over 5%.

20.     The population growth during this period is attributable in part to an increase in Arkansas's minority population and immigration. The 2020 census results indicated that Arkansas's Black population now comprises approximately 15.7 percent of Arkansas's total population, many of which are located in Pulaski County and in the south and southeast portions of Arkansas. Meanwhile, Arkansas's white population remained relatively stable at 78.6 percent over the past decade from the 77% reported in 2010. In total, Arkansas's minority population now comprises approximately 21.4 percent of the state's total population, including all minorities.  The main areas of population growth were in Northwest Arkansas (Congressional District 3), and central Arkansas (Congressional District 2).

21.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution has been interpreted by the United States Supreme Court to require the States to draw legislative districts so that each district is the same size in population as the others, as nearly as is practicable.

22.     Judicial examinations of Congressional redistricting under Article 1, Section 2 of the US Constitution question whether a reapportionment follows the "One person-One vote rule" established in *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481(1964), which provided:

> We hold that, construed in its historical context, the command of Art. I, § 2 that Representatives be chosen "by the People of the several States" means that, *as nearly as is practicable*, one man's vote in a congressional election is to be worth as much as another's. *Wesberry*

*v. Sanders*, 376 U.S. 1, at 7-8 (1964). … While it may not be possible to draw congressional districts with mathematical precision, that is no excuse for ignoring our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal for the House of Representatives. That is the high standard of justice and common sense which the Founders set for us.

376 U.S. at 8.

23.     In determining and evaluating apportionment of the voters of the state, the State must show that any population deviation is justified by some compelling governmental rationale. The courts have consistently noted that the goal is for a district to be as equal in population to all other districts as practicable.

## Traditional Redistricting Principles

24.     In determining a reapportionment plan, state legislatures have evolved generally accepted principles that have been approved by judicial opinions. *Bethune-Hill v. Virginia State Board of Elections,* 580 U.S. 178, 137 S.Ct. 788, 197 L.Ed.2d 85 (2017).  Those principles are:

(a) ***Compactness***: Having the minimum distance between all the parts of a constituency (a circle, square or a hexagon is the most compact district).

(b) ***Contiguity***: All parts of a district being connected at some point with the rest of the district.

(c) ***Preservation of counties and other political subdivisions***: This refers to not crossing county, city, or town, boundaries when drawing districts.

(d) *Preservation of communities of interest*: Geographical areas, such as neighborhoods of a city or regions of a state, where the residents have common political interests that do not necessarily coincide with the boundaries of a political subdivision, such as a city or county.

(e) **Avoiding pairing incumbents**: This refers to avoiding districts that would create contests between incumbents.

(f) **Compliance with the Equal Protection Clause of the Fourteenth Amendment** means that mapmakers cannot draw districts based solely or primarily on race. The U.S. Supreme Court has held that districts should not be defined exclusively by race, although *it is permissible to take race into account while drawing district boundaries*. *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). There are exceptions for distinguishing among citizens based on racial considerations in order to further a compelling governmental interest. (Id.) Lawmakers/Mapmakers cannot discriminate against minorities by diluting their voting power among multiple congressional districts. *Thromburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

(g) **Compliance with the Voting Rights Act of 1965 (VRA)**: In addition to equal population as the primary goal and the Fourth Amendment's prohibition against intentional discrimination, *the VRA prohibits any*

*practice or procedure that has a discriminatory effect on racial or language minorities.* (Emphasis added)

In adopting The Acts complained of herein, the Legislature violated every one of these traditional redistricting principals.

## The Arkansas 2021 Redistricting Plan

25.    The 2020 Census showed that the total population of Arkansas was 3,011,524, and, divided among four (4) congressional districts, the ideal population of each district would be 752,881. As Congressional Districts Two and Three had increased in population over those in the 2010 Census, the geographic area of those districts would need to shrink, and as the populations in Districts One and Four had diminished, the geographic area of those Districts needed to expand to bring their respective populations into close conformity with the "one-person, one-vote" principle proclaimed by the U.S. Supreme Court in *Wesberry v. Sanders*.[2]

---

[2] As a complicating factor in this case, the census numbers used in preparing the redistricting in Acts 1114 and 1116 were far off-base. On May 19, 2022, the Bureau of the Census announced that an analysis of the census showed that eight states had significant undercounts. Arkansas had the highest undercount at 5.04 percent. The Bureau said its analysis had no way of determining which parts of a state had undercounts or overcounts or what ethnic or racial populations were undercounted.

26.     By way of context, the southern-most area of Pulaski County is historically and currently occupied by Black citizens who have traditionally been and continue to be a cohesive, mutually-supportive community who frequently vote in the same way for candidates for political and other public offices, and on issues of mutual interest. Their three school districts have been the subjects of long-running Federal litigation over racial discrimination.

27.     The cohesive Black voting population and other ethnic minorities in the southern area of Pulaski County and their policy concerns have long been a major consideration for congressional candidates of both parties, and that area has received considerable attention from those candidates. However, as a result of The Acts and the resultant loss of voting impact, there will no longer be an incentive for congressional candidates to seek out and seriously consider the views of those minorities and their positions on national policies such as education, health care, economic and social issues, and their votes.

28.     Prior to the enactment of the Acts, the Black vote in Congressional District Two had, in recent years, become highly influential in congressional elections.  Attached to this Complaint as **Exhibit No. 1** is a chart showing Voting Results and Racial Proportions by Precinct in the Second District Congressional Elections in Pulaski County 2016-2020.  This chart shows that in the general election for Second District congressman in November 2020, Joyce Elliott, a Black

educator and State Senator from Senate District 31 (constituting a portion of Pulaski County), received 44.6 percent of the votes to the incumbent Congressman French Hill's 55.4 percent, which clearly indicated the willingness of white voters in District 2 to join with Black voters on a qualified candidate. The Second District is the only electorally competitive congressional district in the state for Blacks and other minorities.

29.    Throughout the history of Arkansas, there has never been any doubt about the racial make-up of southern Pulaski County. For more than four decades it has been Arkansas's most famous—some would say infamous—community. The substandard schools across the expanse of mostly poor neighborhoods and their poor showing on standardized tests and graduation rates, and the history of racial discrimination and oppression have been the subject of the longest-running lawsuits in the state's history—suits that arrested the attention and often the anger of the legislature and every taxpaying citizen in the state who paid to overcome the wrongs that the courts concluded had been done to the minority community over a century.

30.    It was also this large minority community that brought about a bitter and heavily reported struggle over the Little Rock School District, when the state Board of Education took over the administration of Little Rock schools in 2015 because of the poor showing on tests of schools in neighborhoods that Acts 1114

and 1116 split three ways. Members of the General Assembly are well-aware of the racial make-up of this community and its pivotal role in Arkansas law and politics.

31.    In this setting, the General Assembly met in regular session in January 2021, and concluded most of its regular business on April 28, 2021 for a few matters including the congressional and state legislative reapportionment, which depended on the availability of the 2020 Census data which had not been completed at that time. At that time, it recessed until September 28, 2021, at which time it reconvened to consider the remaining matters, including reapportionment.

32.    For the Legislators' information and guidance before the redistricting session began, the General Assembly's Bureau of Legislative Research prepared for the General Assembly a briefing document containing data on the existing congressional districts along with a summary of the legal obligations the lawmakers were required to meet. In addition, the Bureau warned the legislators that, if a lawsuit challenging their work were filed, the staff would be required, in the event of discovery, to supply plaintiffs and the court all correspondence, including emails and text messages, regarding their work on the bills. That warning was as follows:

### Confidentiality

- The confidentiality you are accustomed to in the drafting and research process may not be available in a court challenge.

16

●     Comments or written documents you provide to staff, your colleagues, or other state officials may be discoverable in the event of a legal challenge.

●     This could include emails, text messages, conversations with staff, or other information related to the mapping process.

●     However, as stated above, absent any litigation on the matter, Bureau staff will continue to keep your drafts confidential and not be shared without your approval.

A copy of the Memorandum prepared by the Bureau of Legislative Research is attached hereto as **Exhibit No. 2.**

33.     This warning from the Bureau about confidentiality was clearly related to the redistricting bills that would presumably be discussed during the reapportionment session, referring specifically to "emails, text messages, conversations with staff, or other information related to the *mapping* process." Plaintiffs have submitted Freedom of Information Act requests to the Bureau of Legislative Affairs, and it has refused to provide any information under claim of privilege.

34.     The General Assembly reconvened on September 29, 2021, to take up congressional redistricting and other issues. The first week was consumed with the preparation of many proposed redistricting maps circulated at the beginning of the session, and the House and Senate Committees on State Agencies and

Governmental Affairs charged with handling the redistricting bills met to start managing the process.

35.     The House committee was comprised of eighteen Republicans and two Democrats, of which 17 were White and 1 Black. The Senate committee consisted of seven Republicans and one Democrat, all of whom were White. Twenty-seven maps—seventeen in the House of Representatives and ten in the Senate—were incorporated into bills, introduced and sent to the committees.

36.     Each day, prior to the general sessions of the House of Representatives and Senate of the General Assembly, the proposed legislation on reapportionment was discussed in committees of those two bodies. The discussions in those committees, and later, on the floor of both houses in general session, shed considerable light on the unwritten and unspoken motivations and intent of the sponsors of the two Acts in question.

37.     Notwithstanding that twenty-seven maps were prepared by members of the Senate and House, incorporated into bills, introduced and sent to the committees, the 135 legislators did not evaluate any of those bills and settle on the one that more nearly satisfied the *Wesberry v. Sanders* goal of perfect population parity among the four districts in the absence of racial considerations.

38.     To the contrary, the House and Senate only considered one map and bill. That map surfaced mysteriously through an e-mail to Senate and House

committee chairmen from an unknown source or sources on the night of Monday,

October 4, 2021, the day before the two committees were to meet, consider and

report out to the House and Senate the bills they each were to approve.

39.     According to videos and the transcripts of the committee meetings in

each house, an email was sent from an unknown source on Monday, October 4,

2021, to the chairmen of both the House and Senate committees on State Agencies

and Government Affairs ("the Committees") between 9:00 o'clock and 10:00

o'clock Monday night. The email informed the Chairmen of the Committees that a

new map and accompanying bill (herein, the "New Map and Bill"), prepared by a

source outside the Legislature or the Legislative Research Bureau, *was to be the*

*redistricting plan*. The bill would be made available to the committees in both

houses Tuesday morning.

40.     On Tuesday, October 5, 2021, **Senator Jason Rapert**, Chairman of

the Senate Committee on State Agencies and Government Affairs, responded to

complaints from members of the Committee about a new map and bill being

presented without an opportunity for review by the members by stating:

> I took the position last night, and these members can tell you I
> actually texted members in addition to letting them know that
> *there's an email that just came in that's got a map and you*
> *need to be aware that we've got to look at this*.

41.     **Senator Bob Ballinger**, a member of the Committee, also
commented:

> This map was drawn … People who've worked real hard in this
> committee on maps for a long time *saw this map last night*
> *when we got an e-mail at 9:30, right?*

42.     Also, **Senator Mathew Pitsch**, representing Sebastian County, which

had been split in the 2010 reapportionment, and who had been assured by the

Senate leadership that the County would not be split in this reapportionment, only

to find late in the evening of October 5, 2021 that it was going to continue to be

split under the New Map, bitterly commented:

> Being a gentleman precludes me from using the language that was
> used by members back home, with this map in front of me. *This map*
> *got filed at 8:50 last night*. It's tough to get a busload of people here
> by 11 o'clock the next morning, but they are unhappy back home.")

43.     Also, **Rep**. **John Payton** of Cleburne County, which was to be moved

from the First District to the Second District under the New Map, stated:

> Members, I sat on the State Agencies Committee. *I'm sure most of you*
> *probably didn't even see the map until 15 minutes ago,* but this bill
> was rushed. (Italics added to quotes)

44.     As noted by the comments of Senators quoted above, upon receipt of

the New Map, telephone calls went out late Monday night from the Committee

chairmen who had received the above-referenced email to affected lawmakers,

including to Republican legislators in Sebastian County who were intent on ending

the Congressional division of that County, saying that Sebastian County would,

after all, have to be split again for another ten years. Presumably, the motivation and intent of revoking the promise to make Sebastian County "whole" again was because Pulaski County was going to be split in a much greater way and appearances would be bad if it was the only county split in such a dramatic way.

45.     When the committees in both houses assembled Tuesday morning for their planned review and selection of the 27 Bills and Maps that had been earlier introduced, and to vote out the top-ranked bill in each committee to the Senate and House for final passage, confusion was rampant. First, the original bills written by the Bureau of Legislative Research turned out to have serious drafting errors. More significantly, the Bureau had not seen or had opportunity to review the New Map that was the subject of the late-night email the evening before.

46.     The new Map changed previously introduced Bills in two ways:  by bringing the virtually all-white rural county of Cleburne from the First District into the Second District, which legislators representing Cleburne County protested, and countering that population increase by transferring a larger number of people (mostly Black and Hispanic) in the suburban communities south of I-30 south of the river, into the Fourth District.  Simply stated, the Second District was altered to meet the population standard by moving 41,385 people out of southern Pulaski County into the First and Fourth Districts and bringing 25,015 people, nearly all of them white, from Cleburne County into the Second District.  A  map showing the

21

extent of intrusion of District One and District Four into District Two is attached hereto as **Exhibit No. 3.**

47.     Representative Nelda Speaks and Senator Jane English, who had introduced several of the earlier bills and maps, were given the task of handling the New Map and Bill, could not explain what the New Map and Bill did by way of dividing counties and cities. They said the New Map and Bill had been "given" to them—by whom, they didn't say.

48.     The dialogue between Sen. Trent Garner and the Bill's sponsor, Sen. Jane English in the October 6, 2021 Senate Committee meeting is evidence of these facts:

>    **Sen. Garner**: But to be clear though, the map you drew this morning that we're amending did have Lincoln County in the Fourth. Is that correct?
>
>    **Sen. English:** Yeah.
>
>    **Sen. Garner:** OK, and what precincts are you changing out of Sebastian? What's the changes in the population number? What's the difference? Did you change Pulaski County?
>
>    **Sen. English**: I don't know. I just know there's about two counties --- I mean precincts and …
>
>    **Sen. Garner:** Senator, you can't say you don't know.
>
>    **Sen. English**: I don't have that information.

49.     Senator English and other members of the leadership in the Legislature anticipated litigation over this redistricting plan, and were aware of the argument that lack of <u>intent</u> to racially jerrymander – may be a potential defense. As a result, they claimed that they deliberately failed to consider the impact of their actions on minority race voters. They claimed to ignore race, believing that by doing so, a redistricting plan could not be overturned regardless of the impact on an affected minority. That majority also refused to even discuss race as a factor in determining a reapportionment plan, notwithstanding that it is a legitimate and legal factor for consideration, and efforts of other legislators – particularly Black legislators – to discuss that factor.

50.     During the October 6 discussion of the New Map in the Senate Committee, Senator Clarke Tucker (Pulaski County) pointed out that, according to the Bureau of Legislative Research, the portions of Pulaski County being cracked from the Second to the First District were composed of 34 percent white, 58 percent Black, and 4 percent Hispanic, and those cracked from the Second to the Fourth District were 30 percent white, 46 percent Black and 22 percent Hispanic. The Bill's sponsor, Sen. Jane English, replied that "I don't think we've looked at any maps at all across the state to decide whether something was African-American or white or whatever the case may be."

51.     That claim of not having given <u>any</u> consideration to the impact of the

redistricting on Blacks and other minority voters, voting blocks, or communities of

common interest, was echoed frequently by Senator Jason Rapert, Chairman of the

Senate Committee on State Agencies and Government Affairs. For example, in

response to comments being made and questions asked by Senator Tucker

regarding the racial "cracking" of Second District minority communities between

the First, Second and Fourth Districts during the Senate Committee meeting on the

afternoon of Tuesday, October 5, 2021, Senator Rapert stated:

> Senator Tucker, we said it many times – we're not using racial
> demographics to draw maps, so if you're going to always revert back
> to discussion of that, you're de facto using racial demographics to
> draw maps.

52.     Other members of the Legislature correctly responded that, not only is

it <u>permissible</u> to consider race in adjusting reapportionment maps, but it is

<u>necessary</u> to do so in order to protect against the very result that occurred here. The

frequent and constant denial of the promotors of the "New Map" that race was not

a factor brings to mind Shakespeare's famous line in *Hamlet*: "The lady doth

protest too much, methinks."

53.     A review of the transcripts of the meetings of the Senate and House

Committees, and of the general sessions where The Acts and the Maps were

adopted, are devoid of <u>any</u> discussion of traditional districting principles or any

discussion of other compelling justification for their adoption. No discernable

rationale for The Acts and Maps, aside from population parity, were provided in the Committee meetings or general sessions.

54.     A legislative body does not accidentally and randomly adopt a reapportionment law that, with such surgical precision, extends two "fingers" of irregular configuration into a congressional district, and extracts fourteen (14) precincts occupied by long-established neighborhoods containing a large minority population with commonly-known interests and history of voting for Blacks or other candidates favoring Black interests, and extract (crack) them to two adjoining congressional districts with completely different interests, where their votes will be diluted and ineffectual. As Isaac Bashevis Singer, a 1978 Nobel laureate for literature, observed: "We know what a person thinks, not when he tells us what he thinks, but by his actions."

55.     Attached to this Complaint as **Exhibit No. 4** is a chart showing that three (3) precincts with 4,958 Black and 2,884 White voters were moved by the Acts from the Second District to the First District, and that eleven (11) precincts with 16,301 Black and 8,236 White voters were moved from the Second District to the Fourth District.

56.     Furthermore, to ensure that the removal of some 21,000 Black voters from the Second District would result in the election of the incumbent White Congressman, the Acts adjusted for the loss of that 21,000 Black voters by

25

transferring approximately 24,000 persons from Cleburne County, formerly in the First District, into the Second District's extreme northern border.

57.     Cleburne County, named for the Confederate General Patrick Cleburne, has only approximately 70 Black residents in a population of 24,711 persons, according to the official 2020 census. Cleburne County ranked 70th of Arkansas's 75 counties in the diversity of its population, according to the U.S. census, while Pulaski County ranked first in the diversity of its population.

58.     The reason for the singling out of these precincts becomes obvious when one reviews the voting history of those precincts in the Second District Congressional elections for the years 2016, 2018 and 2020. That voting history is contained in **Exhibit No. 1** attached to this Complaint.  The precincts highlighted in yellow are those moved by The Acts from the Second District into the First District.  Those highlighted in green are moved into the Fourth District.

59.     Consistently, in the Congressional elections that occurred during the 2016 to 2020 time frame, the voters in those precincts who were "cracked" from the Second to the First District consistently voted for Black candidates or those sympathetic to Black concerns in the 60 to high-70 percent ranges. Those voters whose precincts were cracked from the Second into the Fourth District, with only two exceptions, voted for the Black candidates or those sympathetic to Black concerns in the 70 to 95 percent range.

26

60.     The impact of this "cracking" of the Black voting block in southern Pulaski County was apparent in the recent 2022 Congressional election. Whereas incumbent Congressman French Hill received 58%, 52% and 55.4% of the vote in the 2016, 2018 and 2020 elections respectively, he received 60% of the vote in 2022.

61.     The Panel's Memorandum Opinion and Order of October 24, 2022, recognized that "outright admissions of impermissible racial motivation are infrequent," but also added that the Plaintiffs must state facts that show a *discriminatory intent* on the part of the sponsors of the 2021 Redistricting law, not merely the discriminatory *effects* on the racial minority (citing *Hunt v. Cromartie,* 526 U.S. 541, 547 (1999)) (Order, p. 4). However, where the circumstances leading to the *discriminatory impact* on the minority are devoid of any other reason, and strongly lead to the conclusion that racial discrimination was the motivation, such impact should be *prima facie* evidence of *discriminatory intent*.

62.     *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511, 61 USLW 4818(1993) was a case in which the U.S. Supreme Court reviewed the dismissal by a three-judge District Court of a complaint for failure to state a claim to declare invalid a redistricting act. The defendants argued, as they will here, that the legislature did not consider race in drawing the districts, but drew the districts to avoid race, and in doing so, as in this case, produced a district with very

27

irregular boundaries. Justice O'Connor, writing for the Court, stated that "This Court never has held that race-conscious state decisionmaking is impermissible in *all* circumstances." It concluded, based on the facts of that case, that redistricting legislation that is so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting, without regard for traditional districting principles and without sufficiently compelling justification, *states a claim for illegal discrimination* under the Equal Protection clause of the Fourteenth Amendment.

63.     The *Shaw v. Reno* opinion applies in this case. Here, the redistricting of the southern portion of District Two into Districts One and Four is so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of diluting their votes, and it must be called what it is – racial gerrymandering. Furthermore, The Acts were developed completely without regard for traditional districting principles and without any sufficiently compelling justification.

64.     The *Shaw v. Reno* court also acknowledged that outright admissions of impermissible racial motivation are infrequent. That is because, their actions to the contrary, no legislator likes being exposed as, referred to or thought of as a racist. Notwithstanding the majority's refusal to discuss the racial composition of the various districts, that reality was voiced by some members of the Arkansas

28

General Assembly House and Senate – by both White and Black legislators –
during the debate on Acts 1114/1116, in which the following statements were
made:[3]

### State Agencies and Governmental Affairs Committee
### Arkansas House of Representatives
### Tuesday, Oct. 5, 2021

Rep. Tosh (Chairman): We've got one person signed up to speak
against the bill. Mrs. Whitfield, are you in the audience? …

Whitfield: I'm Dr. Annika T. Whitfield. Thank you for giving me this
opportunity. Yes, I'm concerned about the congressional districts for
many different reasons. As you can see, there's not a lot of diversity
on this committee [17 Whites and 1 Black], but in our state at least
17% are African Americans disproportionately concentrated in certain
areas.

What I don't understand is why Little Rock would be carved out as
one of the districts that would not be made whole—why there are
specific areas in the city of Little Rock that would be pulled away
from the rest of the city, that are more concentrated with African
Americans in that area but which are pulled out of the Second
Congressional District and put into the Fourth.

I think that it shows the inequity that we see even in this committee.
But sadly they are the inequities that we've been seeing in our nation.
So I would ask that you would rise above trying to separate people

---

[3]     The following statements are excerpts from official recordings of hearings
before the Arkansas Senate and House Committees on State Agencies and
Governmental Affairs ("the Committees") and during discussion in the general
sessions held on October 5 to October 7, 2021. Those recordings are available at
https://www.arkleg.state.ar.us/Calendars/Attachment?committee=500&agenda=
4721&file=Exhibit+D+-+RedistrictingPowerPointSA2021.pdf.

that are African American—that you would rise above trying to continue to discriminate, and that you would provide equity for the entire area.

I don't understand why you would carve out part of the area to go into District One, and then you take another part to go to District Four, but the rest of Pulaski County and parts of Little Rock are to stay in the Second Congressional District. So I would really like to get a better understanding as to why that was done and how we can overcome it.

65.    The record of the proceedings before that Committee shows that, rather than respond to Dr. Whitfield's question about why the legislature was extracting two heavily Black areas from Congressional District 2, it simply ignored the question and proceeded to vote for the Bill.

**House Session – Oct. 6, 2021**

**Rep. Jamie Scott**: Colleagues, today I'm asking that we look beyond intent, that we look at the impact of what we do here. The impact is not unclear; it is not unknown. We know what these maps do. We know what the breakdowns are. I'm asking you all to not ignore something you know to be so wrong.

This map cuts and distorts Pulaski County into three congressional districts. … The Supreme Court has repeatedly found that racial packing and cracking is unconstitutional. When they made this decision they didn't look at intent. They looked solely at the impact, and that's what I'm asking you to do today. We are not without good options. Yet we speak of this option as the only one that we have. We speak as if the amendments have fixed something, but they haven't. We have a choice in this body. We will see the racial impacts for what they are or we will ignore them, because it's very convenient for us to do so. Well, that's a choice for each of you, but I urge you to

30

reconsider and do the right thing.

I just want to say that I've spent years down here building relationships with each of you. I've gone out of my way. I'm a black woman in this body. I represent this community. You can't ignore my color. You see my heart because you've gotten to know me. I represent these communities and they don't have a voice. I'm their voice here. This is going to really impact the people that I serve every day. I'm asking you to reconsider.

**Rep. Fred Love**:  I want us just to take a step back, because whenever you talk about race it really goes to the core. … First, nobody wants to be intentionally accused of actually disenfranchising or doing anything for race, but, as Representative Scott said and as Representative Ennett said, you cannot ignore what's going on here. If we would just take a step back and look at the communities that this map is impacting, you would see the disparate impact, and you would know that race cannot be ignored when you look at this.

What I'm asking you to consider voting down this amendment because we can do better. Race *can* be taken into account. We don't have to look at it as a negative thing, but actually looking at it from a human standpoint—looking at the communities and how there will be disparately impacted. I ask you just take a step back and look at this map and truly understand that this is impacting real communities. They're real African-American communities. Let's go back to the drawing board and do better. Thank you,

**Rep. Joy Springer**: Thank you, Mr. Speaker. Members, I come before you today and I'm coming because of my mentor, John W. Walker. Had he been here, he would have been appalled at what's taking place here today. He would say the record is clear. This bill has clear tactics of gerrymandering, cracking and packing. This bill makes the case to show that the limits that the United States Supreme Court has already placed on congressional redistricting is really valid here.

31

The districts have been manipulated based solely on race. … So the record is clear. This is a clear case of gerrymandering based upon race. Thank you.

**Rep. Megan Godfrey**: I represent a racially and ethnically diverse legislative district and, as a white representative, that's a responsibility I take very seriously. It's a priority of mine to continually consider and seek out the diverse voices of my community, to take their concerns seriously, and to be under the mentorship of those who can help me see my blind spots.

When we as white representatives hear from our colleagues and constituents of color who are telling us we've missed the mark, we need to listen. Our intention is irrelevant here. It is clear we must consider our impact. We continue to hear that the communities of color and Arkansas will be hurt by this map. Therefore, I will be voting no, even though it won't impact my own community in northwest Arkansas. What matters to me and what should matter to all of us more than the narrow interests of our own districts in our own politics and our own limited experiences is that all Arkansas voices be taken seriously. Vote no, please.

**Rep. Monte Hodges:** Yes, I'm going to talk about *race*. I'm going to talk about reality, and racism is reality. … This is about lives. This is about people. This is about doing the right thing. … I believe this session is my first time out of my five terms speaking against a bill. But I told you and I told you repeatedly during the session that to be silent is consent. I feel compelled to come speak against this bill.

We all know what's going on here. It's no secret. Southeast Pulaski County is being split into *three* different congressional districts. *Before we came down here to draw these maps, we all knew who lived in the southeast corner of Pulaski County. We all knew who lived in south Little Rock, Rose City, Wrightsville and College Station.* It's people who look like me—not as good looking as me [laughter].

In fact, according to the census data, the precincts that this map moves to the First and Fourth districts are 65% and 70% nonwhite respectively. This means that neighbors, churchgoers, classmates and coworkers living in the same communities are going to have completely different representation. I live in Blytheville, Mississippi County. I can tell you we don't need the same things that people in Rose City do. This map completely ignores their needs.

That part of Pulaski County has its own judicial subdistrict because of the racial makeup of those precincts. This is so they will have fair and diverse representation on the bench. This map will do the exact opposite. It will dilute and diminish their representation. …

Any partisan advantage you gain by this map is worth little compared with the negative effects that this will have on the black communities in Pulaski County. So ask yourself, is it worth it to have a little partisan gain at the sake of those communities? Is it worth it to deafen the voice of the people who look like me? I will be voting no. I believe we can do better. I ask you to vote no as well. Thank you.

**Rep. Nicole Clowney**: We had a colleague earlier stand up here and say that he was tired of racism being injected—allegations of racism—being injected into this debate. I actually hadn't heard anybody make allegations of racism. I heard us talking about race, so I do just want to talk about race very quickly as it pertains to this bill.

There are two slices of Pulaski County that are being discussed as being kind of carved out, one to the First and one to the Fourth. Those districts are 65% nonwhite and 70% nonwhite, respectively. Representative Tollett stood down here and talked about the importance of keeping row-crop farmers together, condensing their political power. Representative Pilkington did the same thing. That is what we all do.

We want folks who have the same interests to be kept together. I am sorry that conversations about race may feel inconvenient to some

33

members of this body, but I guarantee you that the impacts of race and racism are even worse for our colleagues of color, who are telling us quite clearly not what the *intent* of this bill is but rather what it *does*. I would ask you to consider that and vote no.

**Rep. Tippi McCullough**: None of us wanted our county split up. I think we're better than this. None of us want our city split up. I think we did have maps and I think we could have maps that achieve all of those goals, that work out for the best for all of us.

I think there was mention made of Pulaski County people maybe not showing up at these meetings or emailing or whatever. It's been hard enough for *us* to follow the calendar and to be up here and to break for 30 minutes, and *then it not being posted online in time for anybody to get here*. To try to get somebody to get here is nearly impossible, especially people who have families and who are working and trying to live their lives and trusting us with those matters.

I also could not sit in my seat today and listen to anyone accuse my friends and my colleagues—your colleagues—of cheap political tricks and to dismiss their perspectives and their lived experiences. It is ridiculous. Often when we hear that something's not about race, *it's about race*. I just suggest that we listen to the folks who know what they're talking about. Thank you.

### House of Representatives General Session - October 7, 2021

**Rep. Fred Love**: I got up to speak against the bill yesterday in regards to its impact. I was very intentional in my comments because, as the day went on, race was talked about. When we have conversations on race as I said, they were going to be sensitive, and here we were discussing race. We said, you know, people said people were racist, and people said this. *Nobody said any of those things*. This map adversely impacts African Americans.

Now, I did not know that my house was drawn into the Fourth Congressional District. *If we were talking about communities that have likenesses and share likenesses, parts of Little Rock do not belong in the Fourth Congressional District*. The interests are totally different.

If there is conversation in regards to race in Little Rock, south of [Interstate] 630 does mean that race comes into play. For those who don't know about how 630 was constructed, it did actually go straight through the African-American business district, destroying, in essence, the African-American business district. So anybody who knows anything about the sensitivity of race, Interstate 630 is actually that line of demarcation. Now, as I said, that doesn't go to me saying what the intent of this map is, but the *impac*t of this map is that it's going to disenfranchise African-American communities. Period! I did not say, Mrs. Speaks, just because you proposed this map that you are a racist. I did not say that. But I want you to go to the impact of this map. So when we discuss racial, let's not interject these different feelings, because it's all about the impact of things that can occur. … It's going to disenfranchise African-American communities, regardless of their intent. That's why I stand here and ask you to vote against this map. It is going to disenfranchise—not the intent. So I wanted to make that clear. Thank you.

**Senate General Session - October 7, 2021**

**Sen. Joyce Elliott (Pulaski County)**:  [W]e've heard a great deal about … the issue of race. People who are listening and people in this body need to be very, very clear that *just as we deliberately— deliberately as we should—consider the other criteria, we absolutely can and should do consider race as a part of what we're doing*.

To say things like "I don't see race and we didn't consider race" is against everything that we are allowed to do, according to the courts. So that comes down to a choice, because in the map that we have

<u>we've made a choice to crack</u>. We're not supposed to pack these districts, and we're not supposed to crack these districts when it comes to minority groups. (underlining added)

This map does absolutely what it is not supposed to do. *It doesn't mean that you sat there and said, "Well, let's pull out all the African American folks and take them out." You don't have to say it out loud, as has been pointed out so many times as the impact of what you do*.

But we absolutely can and should think about these districts the way ten other Southern states that were part of the Confederacy—ten other Southern states—have done exactly what we get all flummoxed about, even thinking about, doing. That is *to draw a district that would include a possibility and, an opportunity to put minority groups together that they might have an opportunity to elect somebody the way the other ten Confederate states have done*, who represents large portions of the minority in this state.

*For us to continue to hide behind the guise of "I don't know anything about racial impact—I don't know anything about it all" says "we don't want to deal with it."* It is not racism to ask us to think about this. The courts have deliberately said that we can and we should. I want you to understand that. However you vote is how you vote, but I do not want this notion to continue that we don't have the right to do this. We have been very clear and very comfortable about considering every other criteria. This is one of them. Thank you.

**Sen. Clarke Tucker (Pulaski County**): [T]he way this bill has been presented in committee and on the floor is that the First District had lost population and the Second District had gained population. Then why would it make sense to take an entire county, Cleburne County, out of the First District and put it into the Second District?

The answer seems fairly obvious to me, and that's to account for the portion of Pulaski County that's being moved from the Second District

into the First District and, of course, we know that a portion of Pulaski
County is also being moved from the Second into the Fourth. I want to
talk for a moment just about exactly who this map moves from the
Second to the First and from the Second to the Fourth.

First of all, Precinct 54 is being moved from the Second to the First.
That's a part of North Little Rock, so this map does split the city of
North Little Rock into two congressional districts. Second of all,
Precincts 103 and 124 in Pulaski County are part of the city of Little
Rock, and they're being moved to the Fourth Congressional District,
so this map does split the city of Little Rock into two congressional
districts in addition to splitting Pulaski County three ways.

The population that's being moved from Pulaski County to the First
District is 34 % white, 58 % African American and 4 % Hispanic. Of
the population that's being moved from Pulaski County to the Fourth,
27 % is white, 49 % is African American and 27 % is Hispanic. Now
let's contrast that to the rest of the population of Pulaski County that's
staying in the second Congressional District. That's 52 % white, 34 %
African American and 7 % Hispanic.
…
They're separated from the majority of their county. They're isolated
in that way. They're a small piece of the county isolated from the rest
of the congressional district, so they're left on their own to fend for
themselves. … Not every project that we do, but on a lot of projects
we work with members of Congress to make sure that they get done in
the best way possible. When we have three congressional districts, it's
going to make that process more complicated and more cumbersome.

So I believe this map hurts Pulaski County as a whole, but it hurts
even more the portions that are being split off into the First and Fourth
congressional districts. And all for what?

**Sen. Linda Chesterfield (Pulaski County**) [a Plaintiff herein]: Mr.
Chair, ladies and gentlemen of the Senate. It has been said that the

road to hell is filled with good intentions. The people I represent feel
that this is a hellish map. It is prejudiced. It is hyperpartisan, and it's
petty.

I know surely the fact that in the last congressional race in the Second
Congressional District a black woman launched a credible race
against the incumbent. How dare she? How dare the folks in my
Senate district support her overwhelmingly. How dare they be proud
to see someone who looks like them and has a history like theirs vie
for one of the highest positions in this country. How dare they want
their state to join the other former Confederate states in having black
representation. *That desire and that hope is being squashed here
today by the map that you are presenting for our consideration. The
state Senate district I represent is being punished—punished for being
majority black and Hispanic, punished for being Democratic.* The
Republican Party is the majority in every single instance in this state,
yet they insist on being poor winners. "So we're going to make sure
that the Senate district I represent in Pulaski County has its voice
diminished."
…
Having grown up in this state, I have stopped being surprised by the
way people of color are treated. But I can still be disappointed. I
would ask that you not vote for a map that is prejudiced, hyperpartisan
and petty.

66.     The Bills approved by both houses of the legislature were still being

corrected while they were being adopted on Wednesday by both houses, and also

while many legislators, Republicans and Democrats, were still trying to determine

what the bills did. Each house adopted the other's bill Thursday and sent it to

Governor Asa Hutchinson, who refused to sign either of them. His comments, and

those of Little Rock Mayor Frank Scott, Jr., are quoted herein.

67.     As a complicating factor, the census numbers used in preparing the

redistricting in Acts 1114 and 1116 were far off base. On May 19, 2022, the

Bureau of the Census announced that an analysis of the census showed that eight

states had significant undercounts. Arkansas had the highest undercount at 5.04

percent.  The Bureau said its analysis had no way of determining which parts of a

state had undercounts or overcounts or what ethnic or racial populations were

undercounted.

68.     Based on the historical difficulties of counting minorities in census, it

is a certainty that the minority portions of the population were those undercounted.

This undercounting undermines the factual and legal justifications for the

Legislature's expressed priority to comply with *Wesberry v. Sanders'* mandate for

tight population parity to the sacrifice of minority voting rights and protection.

69.     There are legislators and others in positions of authority who will

freely engage in "cracking" or "packing" racial groups into limited geographical

areas, but very few of them are willing to admit that racial voter discrimination is

their motivation or a tool to achieve political goals. In fact, they go to great effort

to conceal that motivation. No rationale or explanation was offered by the sponsors

of HB 1982 and SB 743 for the "carving out" of the areas of eastern and southern

Pulaski County into Congressional Districts One and Four, respectively, other than

it was claimed to be necessary to achieve numerical equality between the Districts.

However, other Plans and maps were proposed that achieved that purpose equally as well or better than HB 1982 and SB 743 without splitting the heavily Black populated areas of Congressional District Two.

70.     The majority-Black communities that were "cracked" by the Arkansas Reapportionment Law of 2021 can be preserved and allow Black voters to have the opportunity to elect candidates of their choice, and yet allow the State to achieve balanced, proportional congressional districts without dividing such community into three Congressional Districts. Attached as exhibits to this Complaint are the following bills that were introduced in the redistricting session of the General Assembly in 2021, but not considered, that would achieve equal or better equalization of population in the respective districts, but not require the "cracking" of Pulaski County:

SB 720 by Senator Mark Johnson  (**Exhibit No. 5**);

SB 727 by Senators Clarke Tucker, Joyce Elliott and Linda Chesterfield (**Exhibit No. 6**);

HB 728 by Senators Joyce Elliott, Linda Chesterfield, Clarke Tucker and Keith Ingram and Representatives Tippi McCullough, Jamie Scott, Denise Ennett and Trent Garner (**Exhibit No. 7**);

HB 1966 by Representative Stephen Meeks (**Exhibit No. 8**);

HB 1968 by Representative David Whitaker (**Exhibit No. 9**);

HB 1978 by Representative Fred Love (**Exhibit No. 10**);

HB 1980 by Representatives Vivian Flowers, Reginald Murdock and Monte Hodges (**Exhibit No. 11**).

Other plans can also be devised to achieve numerical equality without breaking up the Second Congressional District as did The Acts.

71.     Although none of the Bills or plans introduced into the 2021 reapportionment session produce a majority minority district where Blacks would be *assured* of a member of Congress of their race, all <u>except</u> the Acts adopted by the Legislature would give them the promise of electing a congressman of their choice in the foreseeable future. Recent elections, including those in the Second Congressional District, suggest strongly that many Whites will support and vote for a Black candidate, and a racial majority is not required for that to happen.

72.     This Court and many others, including the Supreme Court, have recognized that, in reapportionment cases where racial discrimination is practiced, there are few "smoking guns" in the form of written or oral statements by the sponsors of racial gerrymandering admitting that they intend to discriminate. Those whose voting rights and opportunities are impinged upon are left to show intent by circumstantial evidence, such as showing the impact of the gerrymandering and the lack of rationale to support it. In this case, even without the benefit of what discovery might produce, there is evidence showing strong racial bias in the gerrymandering of a large Black voting block that was in the Second District, and that was perceived as a threat to the continued reelection of a white incumbent

41

congressman. As John Locke observed: "The actions of men are the best interpreters of their thoughts."

73.     This allegation is supported by the words of two political leaders who are very familiar with Arkansas voting laws and practices. When The Bills reached the desk of Governor Asa Hutchinson, he announced that he refused to sign either Bill into law because he had serious reservations that the changes in the districts made in the Bills violated minority voting rights, stating on October 13, 2021:

> I am concerned about the impact of the redistricting plan on minority populations. While the percentage of minority populations for three of the four congressional districts do not differ that much from the current percentages, the removal of minority areas in Pulaski County into two different congressional districts does raise concerns.

74.     Governor Hutchinson recalled that, in 1990, he represented the NAACP in challenging that year's Congressional redistricting plan.  Although he was not successful in doing so, he said that he "learned from that experience the real concern of the minority population about their equal opportunity to have an effective voice in Congressional elections," adding, "Fair and equal representation is necessary for the integrity and essence of our democratic process."

75.     Nevertheless, in deference to the legislators who sponsored and voted for the bills, he stated that he would allow them to become law without his signature rather than vetoing them, stating: "This will enable those who wish to challenge the redistricting plan in court to do so."

76.     The Hon. Frank Scott, Mayor of the City of Little Rock, and a

Black, and evidence of the electability of Black citizens in central Arkansas, was

very specific in his criticism of the "cracking" of the Black voters in the southern

portion of Little Rock and Pulaski County from the Second District to the First and

Fourth Districts, stating:

> I am deeply concerned about the *gerrymandering along racial lines*
> happening in our community, which was *designed to dilute the voices
> of the residents of Little Rock*. This plan sent to the Governor today
> for his signature separates the communities south of I-30 from the rest
> of the city, and those neighborhoods are predominantly Black and
> Hispanic. *It is essential that we respect communities of interest in
> districting, and there is no more fundamental community of interest
> than a city like Little Rock*. Additionally, it is illogical to split
> Arkansas' capital city into two congressional districts. I am hopeful
> our state's judicial system will correct this flawed attempt at
> redrawing the boundaries." (Italics added)

77.     On January 14, 2022, the congressional redistricting plan and maps

approved by the Arkansas General Assembly in HB 1982 and SB 743 and

unsigned by the Governor went into effect ninety days after adjournment *sine die*

of the General Assembly, and became Acts 1114 and 1116.

78.     The dilution of minority voting power taken from the Second District

as a result of the 2021 congressional redistricting is a setback for the 800,000

people of ethnic and racial minorities in Arkansas, who until the enactment of The

Acts, had some hope that their interests in such national policies as education,

health care, earnings and wages, and social justice could find some representation

in Washington through at least one member of Congress. That right of all minorities is protected by the Fourteenth and Fifteenth Amendments and the language of Section 2 of the Voting Rights, but it is now marginalized by The Acts.

79.   In enacting Acts 1114/1116, and allowing them to become law, the State of Arkansas has placed illegal and unconstitutional barriers to the legitimate and natural growth of the state's Black population to translate to increased political influence at the federal level.

80.   The 2020 census data make clear that minority voters in Arkansas are sufficiently numerous and geographically compact in one geographic area of Arkansas that they could prevail in congressional elections. Historical data from recent elections, including those in the Second Congressional District, the presidential elections of 2008 and 2012, when the Democratic nominee was a Black man, and the election of Frank Scott, Jr., a Black man as Mayor of Little Rock, illustrate that claim.

81.   The intent behind the division of the Black population in the southern area of Pulaski County under Acts 1114/1116 was to divide, or "crack," the Black voters, so that the impact of Black voting will be spread among three districts, rather than concentrated in one (the Second Congressional District), to discourage the incentive of the Black voters of the area to vote, and to reduce the significance

of their votes.

### *Applicable Law*

82.    "Federal law impose[s] complex and delicately balanced requirements regarding the consideration of race" in congressional redistricting. *Abbott v. Perez*, 138 S. Ct. 2305, 2314, 201 L.Ed.2d 714 (2018). On the one hand, the Equal Protection Clause "restrict[s] the use of race in making districting decisions." *Id.* More particularly, "[t]he Equal Protection Clause forbids 'racial gerrymandering,' that is, intentionally assigning citizens to a district on the basis of race without sufficient justification." *Id.* (quoting *Shaw v. Reno,* 509 U.S. 630, 641 (1993)). On the other hand, the Equal Protection Clause "also prohibits intentional 'vote dilution,'" which is "invidiously . . . minimiz[ing] or cancel[ing] out the voting potential of racial or ethnic minorities." *Abbott*, 138 S. Ct. at 2314 (quoting *Mobile v. Bolden,* 446 U.S. 55, 66–67 (1980) (plurality opinion)).

83.    "When a voter sues state officials for drawing . . . race-based lines, [Supreme Court precedents] call for a two-step analysis. *First*, the plaintiff must prove [at a hearing on the merits] that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Cooper*, 137 S. Ct. at 1463 (emphasis added) (internal quotation marks omitted). "The racial predominance inquiry concerns the actual considerations that provided the essential basis for the lines drawn, not *post hoc*

justifications the legislature in theory could have used but in reality did not."

*Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 799 (2017). *Although "a*

*conflict or inconsistency between the enacted plan and traditional redistricting*

*criteria is not a threshold requirement or a mandatory precondition" to establish*

*racial predominance, such "conflict or inconsistency may be persuasive*

*circumstantial evidence" of it*. *Id.*  As alleged in this Complaint, traditional

redistricting principles "includ[e] compactness, contiguity, respect for political

subdivisions or communities defined by actual shared interests, incumbency

protection, and political affiliation." *Alabama Legislative Black Caucus v.*

*Alabama*, 575 U.S. 254, 272 (2015) (citation and internal quotation marks

omitted).

84.    The size of any disparities in a rule's impact on the members of

different racial or ethnic groups is an important factor to consider. Even neutral

regulations may well result in disparities in rates and impact of voting, and the

ability of minorities to elect representatives of their choice. *Brnovich v.*

*Democratic National Committee,* 141 S.Ct. 2321, 210 L.Ed.2d 753 (2021).

85.    Recent decisions of the United States Supreme Court in *Shelby*

*County v. Holder*, 570 U.S. 529,  133 S.Ct. 2612, 186 L.Ed.2d 651 (2013), *Rucho*

*v. Common Cause,* 139 S.Ct. 2484, 204 L.Ed.2d 931 (2019), and last year's

*Brnovich v. DNC*, *supra*, have made the subject more difficult to analyze.

86.     To make it even more difficult, the U.S. Supreme Court in *Rucho v.*

*Common Cause, supra*, determined that gerrymandering of political boundaries for

<u>partisan</u> purposes is not justiciable, although doing so for racial purposes remains

justiciable.  Race-based gerrymandering is "the drawing of legislative district lines

to subordinate racial adherents of one political party and entrench a rival party in

power," *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S.Ct.

2652, 2658, 192 L.Ed.2d 704 (2015), and strikes at the heart of this foundational

constitutional principle.

87.     Application of the restrictions imposed by the Equal Protection Clause

is complicated. The problem, of course, is in distinguishing the purpose of the

gerrymandering in particular cases, and that *in some cases the racial and partisan*

*purposes may overlap*. The Supreme Court acknowledged this dilemma in *Abbott*

*v. Perez*, 138 S. Ct. at 2314, stating: *"[B]ecause a voter's race sometimes*

*correlates closely with political party preference, it may be very difficult for a*

*court to determine whether a districting decision was based on race or party*

*preference.*" *Id.* (citations omitted) (Italics added).

88.     The evidence developed to this point strongly indicates that the

predominant factor in the adoption of the Reapportionment Bills in this case was to

"crack" a large number of the minority voters from the Second District into the

First and Fourth District to dilute their voting power in the Second District, and to

ensure the continued reelection of a White Congressman who happens to be a Republican. It would be no less egregious if he were a member of another political party. The effect on the minorities here involved and their constitutional rights would be identical.

89.     The constitutional provisions and statutes that are relied upon by the Plaintiffs herein are set forth and discussed in the following paragraphs.

### The Equal Protection Clause of
### The Fourteenth Amendment to the U.S. Constitution

90.     The Equal Protection Clause of the 14th Amendment to the U.S. Constitution, provides in relevant part that:

> … No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State … deny to any person within its jurisdiction the equal protection of the laws.

91.     This provision has, from its adoption to the present day, been cited by the U.S. Supreme Court as a source of the right of racial and ethnic minorities to be protected from the arbitrary and capricious actions of state legislators in "packing" and "cracking" such minorities into districts where their effectiveness to elect representatives of their choice or to simply merit the attention of officeholders is reduced or eliminated. "The purpose of segregating voters on the basis of race is not a lawful one," *Vieth v. Judeliner*, 541 U.S. 267, 286, (2004). "A purpose to discriminate on the basis of race receives the strictest scrutiny under the Equal

Protection Clause, while a similar purpose to discriminate on the basis of politics

does not." (*Id*, at 293).

92.    The recent case of *Abbott v. Perez*, *supra*, confirms the applicability

of the Equal Protection Clause to racial dilution claims. In an opinion written by

Justice Alito for the Court's plurality, it was stated:

> The Equal Protection Clause forbids "racial gerrymandering," that is,
> intentionally assigning citizens to a district on the basis of race
> without sufficient justification. *Shaw v. Reno,* 509 U.S. 630, 641, 113
> S.Ct. 2816, 125 L.Ed.2d 511 (1993). *It also prohibits intentional
> "vote dilution"—"invidiously ... minimiz[ing] or cancel[ing] out the
> voting potential of racial or ethnic minorities.*" *Mobile v. Bolden,* 446
> U.S. 55, 66–67, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) (plurality
> opinion). (Italics added)

93.    In *Shaw v. Reno*, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511, 61

USLW 4818 (1993), the Supreme Court, speaking through Justice O'Connor,

found that the appellants had stated a claim under the Equal Protection Clause by

alleging that the reapportionment legislation, though race-neutral on its face,

*rationally cannot be understood as anything other than an effort to separate voters*

*into different districts on the basis of race, and that the separation lacks sufficient*

*justification*, explaining:

> Where members of a racial minority group vote as a cohesive unit,
> practices such as multimember or at-large electoral systems can
> reduce or nullify minority voters' ability, as a group, "to elect the
> candidate of their choice." *Ibid.* Accordingly, the Court held that such
> schemes violate the Fourteenth Amendment when they are adopted
> with a discriminatory purpose and have the effect of diluting minority

voting strength. See, *e.g., Rogers v. Lodge,* 458 U.S. 613, 616–617, 102 S.Ct. 3272, 3274–3275, 73 L.Ed.2d 1012 (1982); *White v. Register,* 412 U.S. 755, 765–766, 93 S.Ct. 2332, 2339–2340, 37 L.Ed.2d 314 (1973).

…

The difficulty of proof, of course, does not mean that a racial gerrymander, once established, should receive less scrutiny under the Equal Protection Clause than other state legislation classifying citizens by race. Moreover, it seems clear to us that proof sometimes will not be difficult at all. *In some exceptional cases, a reapportionment plan may be so highly irregular that, on its face, it rationally cannot be understood as anything other than an effort to "segregat[e] ... voters" on the basis of race. Gomillion, supra,* 364 U.S., at 341, 81 S.Ct., at 127. (Emphasis added)

The Court concluded that:

[A] plaintiff challenging a reapportionment statute under the Equal Protection Clause may <u>state a claim</u> by alleging that the legislation, though race-neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification.

94.     In the present case, Plaintiffs are stating a claim, based in part upon the Equal Protection Clause of the Fourteenth Amendment, against the 2021 Arkansas Reapportionment Bills adopted by the Arkansas General Assembly because:

(i) the legislative history of those Bills shows that they *totally ignore* the traditional redistricting principles of compactness, contiguity, and

respect for political subdivisions or communities defined by actual shared interests recognized in *Alabama Legislative Black Caucus v. Alabama*, *supra,* and other precedent; and

(ii)   the "cracking" of the fourteen (14) minority-populated precincts that were surgically excised from District Two into Districts One and Four cannot rationally be understood as anything other than an effort to separate voters into different districts on the basis of race. Such action lacks sufficient justification as voter numerical equality could easily have been achieved by numerous other plans, and no other justification was provided for the Arkansas Reapportionment Bills.

95.   The evidence alleged in this Complaint shows that racial considerations – although unspoken and ignored – predominated over others, and thus the "cracking" of the Second District must withstand strict scrutiny. The burden thus <u>shifts</u> <u>to</u> <u>the</u> <u>State</u> to prove that its race-based sorting of voters serves a compelling interest and is narrowly tailored to that end." *Cooper v. Harris,* 137 S. Ct. 1455 at 1464, 197 L.Ed.2d 837 (2017). "[T]he <u>impact </u>of the official action— whether it 'bears more heavily on one race that another,' *Washington v. Davis,* … 426 U.S. at 242, 96 S.Ct., at 2049 - may provide an important starting point." *Arlington Heights v. Metropolitan Housing Dev. Corp., supra*, at 266, 97 S.Ct., at 564.  Sometimes a clear pattern, unexplainable on grounds other than race,

emerges from the effect of the state action even when the governing legislation appears neutral on its face. *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Guinn v. United States*, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915); *Lane v. Wilson,* 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939); *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).

### The Fifteenth Amendment to
### The U.S. Constitution

96.     The 15th Amendment to the U.S. Constitution has as its purpose the rights of minorities to vote and to have those votes counted on an equal basis, providing:

> The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

97.     In the Supreme Court's decision in *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), the Court explained the purpose and effect of the Fifteenth Amendment thusly:

> The Court's early decisions under the Fifteenth Amendment
> established that it imposes but one limitation on the powers of the
> States. It forbids them to discriminate against Negroes in matters
> having to do with voting. See *Ex parte Yarbrough*, 110 U.S. 651, 665,
> 4 S.Ct. 152, 159, 28 L.Ed. 274; *Neal v. Delaware*, 103 U.S. 370, 389–
> 390, 26 L.Ed. 567; *United States v. Cruikshank*, 92 U.S. 542, 555–
> 556, 23 L.Ed. 588; *United States v. Reese*, 92 U.S. 214, 23 L.Ed. 563.

The Amendment's command and effect are wholly negative. "The Fifteenth Amendment does not confer the right of suffrage upon any one," but has "invested the citizens of the United States with a new constitutional right which is within the protecting power of Congress. That right is exemption from discrimination in the exercise of the elective franchise on account of race, color, or previous condition of servitude." *Id.*, at 217–218.

The Court's more recent decisions confirm the principle that racially discriminatory motivation is a necessary ingredient of a Fifteenth Amendment violation (citing *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed. 2d 110 (1960).

98.    In *Perkins v. City of West Helena, Ark.*, 675 F.2d 201 (8th Cir. 1982), the Eighth Circuit Court of Appeals discussed the *Bolden* decision regarding its Fifteenth Amendment protection against vote dilution:

Plaintiffs' claim of racially discriminatory vote dilution is …cognizable under the Fifteenth Amendment. *Washington v. Finlay*, 664 F.2d 913, 919 (4th Cir. 1981); *Lodge v. Buxton*, supra, 639 F.2d at 1373; *United States v. Uvalde Consolidated Independent School District*, 625 F.2d 547, 552 (5th Cir. 1980), cert. denied, 451 U.S. 1002, 101 S.Ct. 2341, 68 L.Ed.2d 858 (1981). But see *McMillan v. Escambia County, Florida*, 638 F.2d 1239, 1242 (5th Cir.), cert. dismissed, —- U.S. ——, 102 S.Ct. 17, 71 L.Ed.2d —— (1981).

Although the four members of the *Bolden* plurality concluded that the Fifteenth Amendment only prohibits official action denying blacks the right to register and vote,  City of *Mobile v. Bolden, supra*, 446 U.S. at 64-65, 100 S.Ct. at 1498-99; *a majority of the Court apparently concluded that the Fifteenth Amendment protects more than this mechanical right. Five justices indicated that the Fifteenth Amendment also protects against vote dilution that limits the effective*

> *- not merely technical - access of blacks to the political process.*
> See id. at 80, 84, 94, 103, 126-129, 100 S.Ct. at 1506, 1509, 1514,
> 1518, 1532-1534 (Blackmun, J., concurring in result); Stevens, J.,
> concurring in judgment); (Brennan, White and Marshall, JJ.,
> dissenting).
> 675 F.2d at 205-206) (Italics added)

99.    The Fifteenth Amendment, which commands that the right to vote

shall not be denied or abridged on account of race or color, and gives Congress the

power to enforce that command, is not designed to punish for the past; its purpose

is to ensure a better future.   *Shelby County, Ala. v. Holder*, U.S.2013, 133 S.Ct.

2612, 570 U.S. 529, 186 L.Ed.2d 651. The Fourteenth and Fifteenth Amendments

were written into Constitution to insure to Blacks, who had recently been liberated

from slavery, the equal protection of the laws and right to full participation in

process of government.   *Rice v. Elmore*, C.C.A.4 (S.C.) 1947, 165 F.2d 387,

certiorari denied 68 S.Ct. 905, 333 U.S. 875, 92 L.Ed. 1151.


### *The Federal Voting Rights Act of 1965, as Amended*
### *52 U.S.C. §10301*

100.   The Federal Voting Rights Act, of 1965, 52 U.S.C. § 10301, was

enacted expressly for the purpose of remedying attempts to deprive minorities of,

not only their right to vote, but to have their votes counted in an equal measure and

importance as that of other voters.

101.   Section 2(a) of the Voting Rights Act ("VRA") provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

102.   Reapportionment is a "procedure" that can be applied by a State in a manner that results in the abridgement of the right of any citizen to vote on account of race or color.

103.   Included in the Section 2 prohibition of practices that deny the exercise of the right to vote is *vote dilution* through reapportionment. *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) ("*Gingles*").

104.   Section 2(b) of the Voting Rights Act provides the evidence by which a citizen may show that he or she has been subject to a violation of Section (a) of the VRA:

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the *political processes* leading to nomination or election in the State or political subdivision are *not equally open to participation by members of a class of citizens protected by subsection (a)* in that its members have <u>less opportunity</u> than other members of the electorate … <u>to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be  considered.</u> … .

105.    The reapportionment of congressional districts are "political processes leading to nomination or election," because the process of drawing congressional district lines ideally require the legislature to consider the numerous reapportionment factors discussed above, including the racial and ethnic composition of neighborhoods. The division of those neighborhoods and communities of interest to reduce the effectiveness of their votes, rather than pursuing the reapportionment goals of preservation of communities of interest and the preservation of counties and other political subdivisions, means that those citizens and their candidates have less opportunity to participate in the political process and elect representatives of their choice.

106.    Further, Section 2(b) specifically describes "the extent to which members of a protected class have been elected to office in the political subdivision" as one circumstance which may be considered. As alleged in this Complaint, no Black or other minority has ever been elected to Congress from the State of Arkansas, although minority candidates for the Second District congressional seat had been slowly increasing their votes in recent elections until the imposition of the Arkansas Reapportionment Act, under which the minority candidate's vote significantly declined.

107.    The facts surrounding the adoption of the 2021 Reapportionment Bills as alleged in this Complaint state a claim that, under those alleged facts, the Bills are a violation of Subsection (a) of Section 2 of the VRA.

108.   Further, Plaintiffs are not required to prove that the Legislature's discriminatory action was based <u>solely</u> on racial considerations. In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), the Supreme Court held that, in an Equal Protection Clause challenge to a reapportionment plan, a plaintiff is not required to prove that the challenged action rested *solely* on racially discriminatory purposes, stating:

> Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant" or "primary" one. (Footnote omitted) In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. *But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose has been <u>a motivating factor</u> in the decision, this judicial deference is no longer justified.* (Footnote omitted) (Italics added)
> 429 U.S. at 265

109.   The procedure for establishing violations of the foregoing Constitutional and statutory provisions is embodied in Section 2(b) of the VRA, describing the evidence required to establish a violation of Section 2(a) of the Act. That Section 2(b) provides:

> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not

equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."
Codified as 52 U.S.C. § 10301(b).

110.   Thus, a violation of Section 2 of the VRA is established if "it is shown that the political processes leading to nomination or election" in the jurisdiction results in the members of a minority group having "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b). The <u>intent</u> behind the "political processes" in question is not relevant; it is the <u>result</u> of the voting qualification, or prerequisite to voting, or standard, practice, or procedure in denying the minority group's opportunity to participate and to elect representatives of their choice that is the issue.

111.   "Less opportunity to participate in the election process and to elect representatives of their choice" results from "cracking" or "packing" minority voters. To illustrate, the dilution of Black voting strength "may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters" – cracking – "or from the concentration of blacks into districts where they constitute an excessive majority"—packing. *Thornburg v. Gingles*, 478U.S. 30, 46

58

n.11 (1986).

112.   The Senate Report on the 1982 amendments to the Voting Rights Act identified several nonexclusive factors that courts should consider when determining whether, under the totality of circumstances in a jurisdiction, the operation of the challenged electoral device results in a violation of Section 2. *See, Cottier v. City of Martin,* 551 F.3d 733 (8th Cir. 2008); *Bone Shirt v. Hazeltine,* 461 F.3d 1011 (8th Cir. 2006).

113.   These "Senate Report Factors" include:

(a)   the history of official voting-related discrimination in the state or political subdivision;

(b )   the extent to which voting in the elections of the state or political subdivision is racially polarized;

(b)   the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority-vote requirements, or prohibitions against bullet-voting;

(c)   the exclusion of members of the minority group from candidate-slating processes;

(d)   the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

(e)   the use of overt or subtle racial appeals in political campaigns; and,

(f)    the extent to which members of the minority group have been elected to public office in the jurisdiction.

114.    The Senate Report itself and the cases interpreting it have made clear that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Whitfield v. Democratic Party of State of Ark.*, 890 F.2d 1423 (8th Cir., 1989) (in concurrence by Bright, J.).

### Article 2, Section 3 Of The Constitution Of The State Of Arkansas

115.    Article 2, Section 3 of the Constitution of the State of Arkansas that, like the Equal Protection Clause of the 14th Amendment to the U.S. Constitution, provides broad protections to all citizens of Arkansas in their basic civil rights, stating:

The equality of all persons before the law is recognized, and shall ever remain inviolate; nor shall any citizen ever be deprived of any right, privilege or immunity; nor exempted from any burden or duty, on account of race, color or previous condition.

116.    The Arkansas Supreme Court has held that, in interpreting provisions of the Arkansas Constitution that are similar in wording and purpose to provisions in the United States Constitution and its amendments, Arkansas courts will give the State Constitution provisions the interpretation given by the Federal courts to the comparable Federal Constitution provisions. *Protect Fayetteville v. City of Fayetteville*, 2019 Ark. 28, 566 S.W.3d 105; *Mullinax v. State*, 327 Ark. 41, 938

S.W.2d 801 (1997); *Stout v. State,* 320 Ark. 552, 898 S.W.2d 457 (1995).

117.   This Court has ancillary jurisdiction of Plaintiffs' claim under Article 2, Section 3 of the Arkansas Constitution. That provision combines recognition of the equality of <u>all</u> persons – White, Black or any other color, or previous condition of servitude; guarantees that no citizen, regardless of color or creed, shall be deprived of any right – which includes the right to equality in, not only the casting of votes, but in the significance of those votes.

118.   In *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252**,** 97 S.Ct. 555**,** 50 L.Ed.2d 450 (1977), the Supreme Court held that, where a Federal three-judge court must hear a claim of which it has federal jurisdiction (in that case, a Fifteenth Amendment claim), once convened, "the jurisdiction of the District Court so constituted ... extends to every question involved, whether of state or federal law, and enables the court to rest its judgment on the decisions of such of the questions as in its opinion effectively dispose of the case." *Sterling v. Constantin,* 287 U.S. 378, 393–94, 53 S.Ct. 190, 193, 77 L.Ed. 375 (1932); *U.S. v. Georgia Public Service Commission,* 371 U.S. 285, 287–88, 83 S.Ct. 397, 399, 9 L.Ed.2d 317 (1963).

119.   Article 2, §3 of the Arkansas Constitution should be given the same interpretation as that given by the Federal courts to the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

**Historical Facts Demonstrating
Racial Discrimination In Arkansas -
"Senate Report Factors"**

120.   The length of time and the severity of the history of racial

discrimination that has occurred in Arkansas was noted in opinions written by the

Hon. Richard S. Arnold, the late Chief Judge of the U.S. Court of Appeals for the

Eighth Circuit, and an Arkansas native. Judge Arnold wrote the opinions for three-

judge District Courts assembled to hear claims of VRA violations in *Smith v.

Clinton*, 687 F. Supp. 1310, 1317 (E.D. Ark. 1988) and *Jeffers v. Clinton*, 730 F.

Supp. 196 (E.D. Ark. 1989). Judge Arnold wrote:

> The Court takes *judicial notice* that there is a history of racial
> discrimination in the electoral process in Arkansas. See *Perkins v.
> City of West Helena,* 675 F.2d 201, 211 (8th Cir.), *aff'd mem.,* 459
> U.S. 801, 103 S.Ct. 33, 74 L.Ed.2d 47 (1982). We do not believe that
> this history of discrimination, which affects the exercise of the right to
> vote in all elections under state law, must be proved anew in each case
> under the Voting Rights Act.
>
> We further find that the history of discrimination has adversely
> affected opportunities for black citizens in health, education, and
> employment. (footnote omitted) The hangover from this history
> necessarily inhibits full participation in the political process.
>
> *Smith v. Clinton*, 687 F. Supp. 1310, 1317 (E.D. Ark. 1988)

121.   Courts may differ on whether something as significant, long-standing,

varied and subtle as racial discrimination may be judicially noticed. Furthermore,

time blurs the memory, and many people alive today were born after these events

and are not acutely aware of them. Therefore, some recitation of examples of such

past and on-going discrimination is provided in this Complaint.

122.    Arkansas's past discrimination against its Black citizens, including its numerous attempts to deny Black voters an equal opportunity to participate in the political process, is extensive and well documented. The consequences of the state's historic discrimination persist to this day as well, as Black Arkansans continue to experience socioeconomic hardship and marginalization.

### *Violence and Discrimination As An Exercise of White Supremacy*

123.    In the years following the Civil War, lynching was a common means of white supremacists maintaining authority over Blacks. The number of lynchings perpetrated against blacks increased in the 1890s, when Jim Crow segregation statutes were implemented. Indeed, lynching remained a part of life in Arkansas as the state moved into the twentieth century. The ratio of black victims compared to whites rose steadily, peaking in the 1920s. The nature and methods of lynchings also became more gruesome and terrifying. A March 1904 lynching in St. Charles (Arkansas County) represented a particularly horrific example, in which thirteen black victims were murdered in a four-day frenzy of violence.

124.    Although some scholars alleged that Jim Crow laws actually reduced lynching by separating black and white groups, and thus limiting the potential for interpersonal violence, the more modern scholarly interpretation of this relationship holds that Jim Crow statutes actually facilitated racial violence by

reducing the political power of African Americans; this explains the increase of lynching, especially anti-black lynching, in the 1890s. In addition, newspaper accounts of lynching at the time were rife with tropes that served to dehumanize the victim or exaggerate the dignity of the mob that perpetrated the murder, among other things. (Source: *Encyclopedia of Arkansas History and Culture*, Feb. 19, 2022)

125.   Lynching was sanctioned by some Arkansas leaders and public officials, who inflamed racial passions as a means of achieving their own political or economic ends. Former governor Jeff Davis (who was born in Sevier County in 1862 and served as attorney general and then as governor of the state from 1901 to 1907) was quite willing to defend the practice of lynching. When President Theodore Roosevelt visited Arkansas in 1905, Davis famously remarked, "[W]e have come to a parting of the way with the Negro. If the brutal criminals of that race…lay unholy hands upon our fair daughters, nature is so riven and shocked that the dire compact produces a social cataclysm," which resulted in a rebuke from Roosevelt.  Thus, lynching represented not only a way of asserting white supremacy but also a political tool wielded by demagogues. (Source: Encyclopedia of Arkansas, February 19, 2022).

126.   On the evening of September 30, 1919, the notorious Elaine Massacre erupted, which marked the deadliest racial episode in Arkansas history. The

lynchings and murders that occurred in Elaine arose out of white fear and distrust of a black union organization in Phillips County. A shooting at a church in Hoop Spur (Phillips County) sparked the conflict; the presence of about 100 sharecroppers attending a meeting of the Progressive Farmers and Household Union of America quickly spurred massive violence by whites against blacks throughout the county. Although the exact death toll remains unknown, historians have estimated that hundreds of black citizens were killed, while five whites died in the incident. (*Ibid*.)

127.   Lynching of Blacks did not stop despite the active opposition of Governor Thomas C. McRae and the persistent work of many churchwomen. Indeed, the 1920s embraced two of the most sadistic examples of lynching to be found in Arkansas history, or in American history.

128.   On January 26, 1921, Henry Lowry, a Black man who lived in Nodena (Mississippi County) fled the state after killing a White plantation owner in an argument at settlement time. Caught in Texas, Lowry was extradited to Arkansas. A mob from Arkansas stopped the train just outside of Memphis, and took Lowery by car to Nodena. The widely reported execution was described in gruesome detail by the *Memphis Press*:

> With the negro chained to a log, members of the mob placed a small pile of leaves around his feet. Gasoline was then poured on the leaves, and the carrying out of the death sentence was under way. Inch by inch the negro was fairly cooked to death. Every few minutes fresh

leaves were tossed on the funeral pyre until the blaze had passed the negro's waist. As the flames were eating away his abdomen, a member of the mob stepped forward and saturated his body with gasoline. It was then only a few minutes until the negro had been reduced to ashes.

129.    Six years later, perhaps the most notorious isolated lynching in Arkansas history occurred. On May 4, 1927, thirty-seven-year-old black Little Rock resident John Carter was accused of striking a local white woman and her daughter and asking for whiskey. This followed close upon the earlier killing of a young white woman in Little Rock, although not by Carter. Enraged whites scoured the area in search of Carter. He was found late in the day, hanged from a telephone pole, and repeatedly shot. Later, his body was burned and dragged through the streets of Little Rock to the corner of 9th and Broadway streets—the heart of the city's black community and five blocks south of the present location of the Richard S. Arnold Federal Courthouse – where a pyre was built from pews ripped from a nearby Black church and Carter's body was burned there before a large, celebrating crowd. An all-White Grand Jury conducted a brief investigation, but no one was ever arrested for any of the crimes against Carter. (*Ibid*.)[4]

---

[4] Four blocks in the other direction on Broadway from the Federal Courthouse, at the Robinson Concert Hall, the Arkansas Symphony Orchestra gave a momentous concert on February 26, 2022, featuring *Ethiopia's Shadow in America* by the great American classical composer Florence Price, a Black woman, Little Rock native and music teacher at Shorter College, who wrote the piece in 1932. Five years earlier, she and her husband, who lived a short distance from where Carter's body was violated and incinerated, packed their belongings and, like many other Blacks,

130.   Discrimination bordering on violence was common in Arkansas. On March 5, 1959, twenty-one boys burned to death inside a dilapidated dormitory at the Negro Boys Industrial School at Wrightsville, twelve miles south of Little Rock. They were locked inside for the night with no adult around when a fire, apparently caused by ancient wiring, broke out before dawn. A few stronger children managed to break windows and pry through bars to escape. State officials, including the board appointed by governors to monitor the little school, had repeatedly ignored reports of the dangerous conditions at the school, which bore no comparison to the training school for White boys at Alexander. The training school, which housed youngsters who were abandoned or had gotten into minor scrapes, was little more than a slave farm where boys worked in the fields, received little education, slept in squalor and drank from a fetid well.

131.   Police in Arkansas have arrested pickets and boycotters of businesses that did not hire blacks, and for offenses such as spitting on the sidewalk. Blacks were also arrested at the lunch-counter sit-ins in Little Rock in the early '60s, and the State Police clubbed Philander Smith College students who came to the Capitol during a legislative session in 1965 to eat in the Capitol cafeteria, which state officials had made a private club, called the Capitol Club. U.S. District Judge J.

───────────────────

fled Arkansas to Chicago, where her musical career blossomed.

Smith Henley subsequently ruled that a private club in a public building violated the Equal Protection Clause of the Fourteenth Amendment.

132.   Violence, or the threat of violence, continues to be used as a means of racial superiority and discrimination in Arkansas and other states.

### *"Sundown Towns"*

133.   Between 1890 and the present, thousands of towns across the United States drove out their black populations or took steps to forbid or discourage African Americans from living in them. Thus were created "sundown towns," so named because many marked their city limits with signs typically reading, "Nigger, Don't Let The Sun Go Down On You In Alix"—an Arkansas town in Franklin County that had such a sign around 1970.

134.   By 1970, when sundown towns were at their peak, more than half of all incorporated communities outside the traditional South probably excluded African Americans, including probably more than a hundred towns in the northwestern two-thirds of Arkansas. By 1930, three Arkansas counties had no African Americans at all, and another eight had fewer than ten, all in the Arkansas Ozarks. By 1960, six counties had no African Americans (Baxter, Fulton, Polk, Searcy, Sharp, and Stone), seven more had one to three, and yet another county had six. All fourteen were probably sundown counties; eight have been confirmed. (Source: Encyclopedia of Arkansas, February 19, 2022)

*Electability of Black Political Candidates*

**Federal Offices**

135.    No Black persons have ever been elected or appointed to the United States Senate or the United States House of Representatives from the State of Arkansas. The 2021 congressional redistricting plan, in removing a significant number of Black voters from the Second District, drastically diminishes the prospect of a Black being competitive for a Congressional seat in the foreseeable future.

136.    As noted above, in the November 2020 general election for Second District congressman, State Senator Joyce Elliott, a Black educator and State Senator from Senate District 31 (constituting a portion of Pulaski County), received 44.6 percent of the votes to the White incumbent congressman French Hill's 55.3 percent. See **Exhibit No.** 1.  The Second District, with its substantial Black voting population, has been in recent years the only electorally competitive congressional district in the state, where the cohesive Black voting population and other ethnic minorities and their policy concerns were a major consideration for congressional candidates of both parties.

## State Constitutional Offices

137.   No Black person has ever been elected to the Office of Governor of the State of Arkansas.

138.   No Black person has ever been elected to the Office of Lieutenant Governor of the State of Arkansas.

139.   No Black person has ever been elected as a Chief Justice or Associate Justice of the Arkansas Supreme Court.

140.   No Black person has ever been elected to the Office of Attorney General of the State of Arkansas.

141.   No Black person has ever been elected to the Office of Secretary of State of the State of Arkansas.

142.   No Black person has ever been elected as Treasurer of the State of Arkansas.

143.   No Black person has ever been elected as Auditor of the State of Arkansas.

144.    No Black person has ever been elected as Land Commissioner of the State of Arkansas.

## History of Black Voting in Arkansas

145.   The Arkansas legislature in 1891 adopted an election law that imposed strict procedures for illiterate men to vote, and most Blacks and many

White men were functionally illiterate. According to the law, each time an illiterate person came to vote the precinct had to be cleared of voters and observers so that election judges could help the man fill out his ballot. The humiliation kept most Black men from the polls. The law was part of the Jim Crow laws enacted in the 1890s to restore segregation to all facets of life after the freedoms imposed during Reconstruction.

146.   In 1893, Arkansas joined most other Southern states in requiring the payment of a one-dollar poll tax to vote in any election. It was a substantial burden, because the average annual wage in Arkansas was $548, and far less for Blacks. To vote, a Black man had to produce a current receipt that he had paid the tax. A practice in many parts of the state, well into the second half of the 20th century, was for major landowners or other community leaders, such as the doctor, the mill owner, or commissary owner, to purchase poll taxes for their tenants or patients or regular customers and cast their votes—for whomever the purchaser favored for public offices. It helped produce lopsided votes, nearly always for Democratic politicians favored by the county political machines and usually detrimental to the interests of the Black voters.

147.   The Arkansas Democratic Party early in the 20th century declared voting in its primaries to be restricted to White people of voting age. For all practical purposes, until late in the century, except for a few counties in northwest

Arkansas, all public offices were filled in the Democratic primaries, which meant that except for presidential elections and ballot issues such as initiated acts and constitutional amendments, Blacks had no voice in determining public policy. They could purchase a poll tax receipt and vote in general elections, where most officeholders had already been decided in the Democratic primaries.

148.   Starting with *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944), which declared white-only primaries illegal, the United States Supreme Court began to dismantle the voting impairments for minorities. Governor Homer M. Adkins (formerly a Ku Klux Klan leader in Pulaski County) declared: "If I cannot be nominated by the white voters of Arkansas, I do not want the office."

149.   One study reflected that in 1940 only 3 percent of Black adults (women were eligible to vote by then) had paid poll taxes and were eligible to vote in general elections. The percentage had increased to 21 percent in 1948, when Blacks could vote in Democratic primaries and to only 33 percent in 1958, the year after the historic confrontation between the state and federal governments at Little Rock over judicially ordered racial integration of the schools.

150.   The country ratified the 24th Amendment in 1962, prohibiting states from imposing a poll tax as a requirement for voting in federal elections. In 1964, Arkansas ratified a State constitutional amendment, put on the ballot by initiative,

prohibiting poll taxes and establishing a system of permanent voter registration for all elections in the state. People could register to vote and retain their voting eligibility for life in federal, state or local elections. The amendment prohibited the legislature or local governments from adding requirements for voting beyond the registration.

151.   That lasted until 2016, when the legislature proposed and voters ratified a constitutional amendment that altered the voter-registration law to permit the state to establish requirements for people to produce photo identifications at the polls to cast a ballot—an intimidating requirement for Blacks and the aged, especially women, who often had no driver's license or passport and who had to endure intimidating procedures to cast a ballot at the polling precinct and then to get the ballot counted.

152.   Owing to the poll tax, white primaries and other discriminatory procedures, no Black person was elected to the Arkansas Senate or House of Representatives from 1894 until after the reapportionment in 1971, which for the first time created districts where Blacks were in the majority or near parity with Whites. That redistricting followed the U.S. Supreme Court's "one-man, one-vote" decision in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) and the 1970 census. The first minority legislators took office in 1973. That redistricting, led by Governor Dale Bumpers and Attorney General Ray Thornton,

set out specifically to create majority-minority districts.

153.   In 1981, Arkansas passed a statewide legislative apportionment plan under the Voting Rights Act. Black voters subsequently filed a suit in federal court in 1989 alleging that the state's plan violated the act, noting that no black legislator had been elected from a non-majority-Black district despite Blacks being 16 percent of the state's population.

154.   In 1989, a federal court in *Jeffers v. Clinton* agreed and ordered several racial "majority-minority" districts for the Arkansas House of Representatives and Arkansas Senate to be redrawn so that the minority populations would have a better opportunity to elect their preferred candidate. This new plan created seven more majority-Black House districts and two more majority-Black Senate districts. As a result, more Black candidates have been elected to House and Senate offices in Arkansas.

155.   In a 2012 Voting Rights Act case, the U.S. Attorney General stated that there was evidence of voting discrimination in jurisdictions not covered by the Voting Rights Act formula, including northern Florida, Tennessee, and Arkansas. In 2012, the *Jeffers v. Beebe* lawsuit challenged Arkansas's reapportioned state Senate district border lines because of alleged racial gerrymandering and violations of the Voting Rights Act.

156.   Arkansas's history of racial discrimination in voting has been thoroughly documented by historians and scholars. Indeed, "[t]he history of the state['s] segregation practice and laws at all levels has been rehashed so many times that the Federal Court, in *Jeffers v. Clinton*, took judicial notice of it.

157.   Arkansas, like other states of the Confederacy, has a long history of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception.

### Use of Racial Appeals in Political Campaigns

158.   In addition to Arkansas's history of discrimination against minorities in voting, political campaigns in the state have often relied on both overt and subtle racial appeals—both historically *and* during recent elections.

a.  In 1867, voting was held in the State of Arkansas on whether to adopt a constitution that Congress would approve and thus bring the state back into the union, Albert Pike opposed it, writing: "When our vote is worth no more than an ignorant negroe's [sic], it is not worth picking out of the gutter."

b.  In 1891, the State adopted the "Australian ballot", which served as a literacy test, giving rise to the limerick:

> The Australian ballot works like a charm
> It makes them think and scratch,
> And when a negro gets a ballot

He has certainly got his match.

c. In 1892, the State of Arkansas required proof of payment of a poll tax in order to vote.

d. In 1906, the State of Arkansas enacted a law providing that only Whites could vote in the Democratic primary.

e. In 1927, the U.S. Supreme Court gave Blacks the right to vote in Democratic primaries (*Nixon v. Herndon*, 273 U.S. 536, 47 S.Ct. 446 (Mem), 71 L.Ed. 759 (1927)

f. However, when Arkansas Blacks made an effort to exercise their voting rights, the state Supreme Court, in *Robinson v. Holman*, 181 Ark. 428, 26 S.W.2d 66 (1930) ruled that although party primaries were legal elections, the state had no control over private bodies such as the Democratic Party.

g. In 1940, Congressman William F. Norrell, a Democrat and former Ku Klux Klan leader in eastern Arkansas stated at a campaign rally:

> It matters not how great the financial need of white men and women and how much their need for employment, Southern people in their indignation will never bring themselves to permit such an outrage as to allow white men, women, and girls to be interviewed and supervised by Negroes.

h. In 1942, in a campaign for a vacant congressional seat against Democrat Brooks Hays, his opponent, Lieutenant Governor Bob Bailey, claimed that Hays favored racial equality, saying: "Well, we don't want any nigger votes, do we?"

i. In 1942, Blacks try to vote in the Democratic primary and are turned away.

j. 1946: Arkansas Governor Homer Adkins stated: "The Democratic Party in Arkansas is a white man's party." An oath for party

membership required all persons to swear to support the permanent separation of the races.

k.  In the case of *Branton v. State*, 214 Ark. 861 (1949), Wiley Branton of Pine Bluff, later to be a renowned civil rights attorney, was convicted of the crime of handing out mimeographed sheets at Jefferson County's Mount Zion Church listing the candidates in the upcoming election. A state law prohibited the distribution of ballots other than at the polls. The Arkansas Supreme Court held, over the dissent of Chief Justice Griffin Smith, that these sheets constituted ballots, although none of them were ever presented at the polls. A Grand Jury had been impaneled to investigate Black efforts to get out the vote before the election and concentrated on Branton. The U.S Supreme Court declined to hear the appeal. The $300 fine was raised from the local Black community. The law was repealed in 1969 and this was apparently the only prosecution under it.

l.  In 1949, Ed McCuiston, state director of Negro education, showed that $4,250,000 had been diverted from Black schools to Whites in the previous year, and that West Memphis was spending $144.51 per White student and only $19.51 for each Black student.

m.  Following the U.S. Supreme Court's 1954 ruling in *Brown v. Board of Education,* nineteen U.S. senators and eighty-one congressmen, including all members from Arkansas, signed the "Southern Manifesto" denouncing the U.S. Supreme Court's decision and urging Southern states to resist it. The reaction to the decision in Arkansas is well-and-universally known. Arkansas Governor Orval Faubus on September 2, 1957, called out units of the Arkansas National Guard to prevent nine Black children from entering Central High School. He later closed the city's public high schools for the 1958–59 school year to prevent Black children from entering the schools under court orders.

n.  In 1956, the voters adopted Amendment 44 to the Arkansas Constitution, known as "the interposition amendment" written by

State Senator Jim Johnson, a state legislator and future Justice of the Arkansas Supreme Court, which declared that integration was illegal, and instructing state officials to interpose the state's authority between the people and the federal government and take all steps necessary to block the enforcement of *Brown v. Board of Education in Arkansas*. Thirty-three years later (1988), the Arkansas Legislature proposed a constitutional amendment officially repealing Amendment 44, although it had already been declared null and void. The repealing amendment (Amendment 69) barely passed in 1990, with 273,527 for, and to 263,261 against.

o.  State lawmakers segregated everything from public schools to hospitals and graveyards. Black Arkansans were also precluded from sitting on juries, which effectively denied Black litigants equal justice under the law. Moreover, Black Arkansans were excluded from the most desirable manufacturing jobs, which limited their employment opportunities to primarily unskilled, low-paying labor. And in times of economic hardship, Black employees were the first to lose their jobs.

p.  More recently, Arkansas today remains as one of three states that does not have a Hate Crimes law, notwithstanding that it is home to 14 groups designated by the Southern Poverty Law Center as hate groups such as the Knights of the Klu Klux Klan.

q.  An Arkansas legislator has sponsored bills in the Arkansas General Assembly that would prohibit the teaching of critical race theory, which is a concept that seeks to critically examine the history of racial relations in the U.S., and the intersection of race and law. The current State Attorney General has issued an opinion stating that the teaching of critical race theory violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

r.  In August 2021, four Black inmates of the Washington County, Arkansas detention center who had contracted Covid-19 were given high doses of ivermectin, an anti-parasitic drug commonly used on livestock, without their consent, resulting in their having negative

reactions such as vision problems, diarrhea, and stomach cramps, raising specters of the infamous Tuskegee Syphilis experiments conducted on Black men in the mid-1900s by American government officials.

### Ongoing Effects of Arkansas's History of Discrimination

159.   Decades of Jim Crow and other forms of state-sponsored Discrimination – followed by continued segregation of public facilities well into the latter half of the 20th century, in defiance of federal law – has resulted in persistent socioeconomic disparities between Black and White Arkansans. These disparities hinder the ability of Black voters to participate effectively in the political process.

160.   Black Arkansans, for instance, have higher poverty rates than white Arkansans. According to the U.S. Census Bureau 28.9 percent of Black Arkansans have lived below the poverty line in the past 12 months, compared to 13.43 percent of White Arkansans.  Arkansas Report:"Talk Poverty," The Center for American Progress 2022.

161.   Relatedly, Black and Hispanic Arkansans have a lower per capita income than white Arkansans. The Census Bureau data for 2020 shows that White Arkansans had an average per capita income of $30,250 over the past 12 months, compared to $18,986 for Black Arkansans, and $18,867 for Hispanic Arkansans. Source: U.S. Census Bureau's American Community Survey, published by

America's Health Rankings: United Health Foundation, Ed. 2021.

162.    Arkansas educational attainment by Race is also telling. The Arkansas population was 3,042,017 in 2020 with persons identifying as White as 1,542,183. Of those, 89 percent have completed high school and 25 percent have a bachelor's degree. 235,207 identify as Black. Of those, 84 percent have completed high school and 16 percent have a bachelor's degree. 109,930 identify as Hispanic. Of those, 58 percent have a high school education and 10 percent have a bachelor's degree. State of Arkansas: Analysis of Impediments to Fair Housing Choice, Prepared for AEDC, November 6, 2016.

163.    Arkansas's poverty rate correlates with education. 27.14 percent of those in poverty have less than an 8th grade education, 15.64 percent have less than a high school education, 12.14 percent have some college, and only 4.69 percent of those who have a bachelor's degree or greater live in poverty. (Id.)

164.    Black Arkansans also have lower homeownership rates than white Arkansans. 55.3 percent of Black Arkansans live in renter-occupied housing compared to 28.9 percent of White Arkansans. And Black Arkansans also spend a higher percentage of their income on rent than white Arkansans. The percent of income spent on rent is 51 percent for Black Arkansans compared to 48 percent for White Arkansans. (Id.)

165.    These disparities impose hurdles to voter participation including working multiple jobs, working during polling place hours, lack of access to childcare, lack of access to transportation, and higher rates of illness and disability. All of these hurdles make it more difficult for poor and low-income voters to participate effectively in the political process.

166.    Racism in Arkansas continues to this day. On November 10, 2022, the Arkansas State Senate divided into congressional district caucuses to choose members from the districts for the important Legislative Council and Joint Audit committees. The redistricting moved the Plaintiff, Sen. Linda Chesterfield of Little Rock into the 4th Congressional District caucus for the first time. In that caucus, she and Sen. Stephanie Flowers**,** a Democrat from Pine Bluff, ranked 1 and 2 in seniority. Both are Black, and seniority normally determines who gets the first choice. However, the 4th District caucus (11 members, of which nine are White Republicans and two –Chesterfield and Flowers  -- are Black) decided to change the seniority rule and allow only Republicans to get seats on the committees. Sen. Chesterfield stated on the floor of the Senate that she'd earned the right to be on Legislative Council by her service, but "Obviously that is not appreciated in this body. … Individuals with whom I've worked across the aisle have decided to engage in rank racism in their decision-making." Her speech drew no response from senators, and they proceeded on to selection of their parking spaces.

## CAUSES OF ACTION

### COUNT I
Defendants' Violation of the Equal Protection Clause of
The Fourteenth Amendment
To the Constitution of the United States

167.   Plaintiffs affirm, ratify and reallege all allegations contained in the

previous paragraphs, and incorporate all allegations contained in the subsequent

paragraphs.

168.   The "Equal Protection Clause" of the Fourteenth Amendment to the

United States Constitution provides:

> No State shall … deny to any person within its jurisdiction the equal
> protection of the laws.

169.   The harms that flow from racial sorting in drawing boundaries for

electoral districts, for purposes of a racial gerrymandering claim under the Equal

Protection Clause, include being personally subjected to a racial classification as

well as being represented by a legislator who believes his primary obligation is to

represent only the members of a particular racial group. *Bethune-Hill v. Virginia*

*State Bd. of Elections*, 580 U.S. 178, 137 S.Ct. 788, 197 L.Ed.2d 85 (2017), on

remand 326 F.Supp.3d 128.

170.   The Arkansas General Assembly's 2021 Congressional Redistricting

Plan had the discriminatory intent and effect of racially gerrymandering or

"cracking" communities of Black voters in order to reduce, eliminate and impair

the potential and effectiveness of such communities of voters to elect candidates and pass issues that they favor.

171.   The adoption of such Plan resulted in the intended consistent and permanent impairment and marginalization of Black citizens in their participation in Federal congressional political process, and enhanced the consistent and permanent potential for continued success in electing White candidates to Congress from the Second Congressional District.

172.   The adoption of the 2021 Plan intentionally deprived and denied the Plaintiffs and other Blacks in Arkansas the equal protection of the laws as guaranteed under the "Equal Protection Clause" of the Fourteenth Amendment. Any opposite conclusion would approve the achievement by the State of any impairment of voting rights whatever so long as it was cloaked in the garb of the realignment of political subdivisions. "It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence." *Gomillion v. Lightfoot*, 364 U.S. 339, 344, 81 S.Ct. 125, 129,  5 L.Ed.2d 110 (1960).

173.   The 2021 Arkansas Reapportionment Plan should thereby be voided, and the Arkansas General Assembly be ordered to reconsider such Plan and adopt one in keeping with constitutional and legal requirements. Alternatively, the court should select or devise another redistricting plan that meets constitutional

standards.

## COUNT II
### Defendants' Violation of the Fifteenth Amendment
### To the Constitution of the United States

174.   Plaintiffs affirm, ratify and reallege all allegations contained in the

previous paragraphs, and incorporate all allegations contained in the subsequent

paragraphs.

175.   The Fifteenth Amendment to the United States Constitution provides:

> The right of citizens of the United States to vote shall not be
> denied or abridged by the United States or by any State on
> account of race, color, or previous condition of servitude.

176.   This amendment nullifies onerous procedural requirements which

effectively handicap exercise of the franchise by the colored race, although the

abstract right to vote may remain unrestricted as to race.   *Lane v. Wilson*,

U.S.Okla.1939, 307 U.S. 268,59 S.Ct. 872, 83 L.Ed. 1281 (1939) See, also, *Davis*

*v. Schnell*, 81 F.Supp. 872 (D.C.Ala.1949), affirmed 336 U.S. 933, 69 S.Ct. 749,

93 L.Ed. 1093. The Fourteenth Amendment, this Amendment and 42 U.S.C.A.

§1971, forbid any distinction in the voting process based upon race, irrespective of

whether such distinction involves actual denial of the vote.   *U.S. v. Bibb County*

*Democratic Executive Committee*, 222 F.Supp. 493 (M.D.Ga.1962).

177.   A state government may not with impunity divide politically cohesive, geographically compact minority population between two single-member districts in which the minority vote will be consistently minimized by white bloc voting merely because minority population does not exceed single district's population divided by two. *Armour v. State of Ohio,* 775 F.Supp. 1044 (N.D.Ohio 1991).

178.   The racially motivated drawing of redistricting lines, intended to minimize or cancel voting strength of racial minority, violates both the Equal Protection Clause of Fourteenth Amendment and the Fifteenth Amendment. *Illinois Legislative Redistricting Commission v. LaPaille*, 786 F.Supp. 704 (N.D.Ill.1992), motion to amend denied 792 F.Supp. 1110, affirmed 506 U.S. 948, 113 S.Ct. 399, 121 L.Ed.2d 325; *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).

179.   The Arkansas General Assembly's 2021 Congressional Redistricting Plan had the intended and deliberately discriminatory purpose and effect of racially gerrymandering or "cracking" communities of Black voters in order to reduce or eliminate the potential and effectiveness of such communities of voters to elect candidates and pass issues that they favored.

180.   As such, the adoption of the 2021 Acts abridge the rights of the Plaintiffs and other Blacks in Arkansas as citizens of the United States that their vote not be denied or abridged by the United States or by any State on account of

race, color, or previous condition of servitude as provided by the Fifteenth

Amendment to the U.S. Constitution.

181.   The 2021 Arkansas Reapportionment Plan should thereby be voided,

and the Arkansas General Assembly be ordered to reconsider such Plan and adopt

one in keeping with constitutional and legal requirements. Alternatively, the court

should select or devise another of redistricting plan that meets constitutional

standards.

**COUNT III**
**Acts 1114 and 1116 Violate**
**Section 2 of the Voting Rights Act**

182.   Plaintiffs affirm, ratify and reallege all allegations contained in the

previous paragraphs, and incorporate all allegations contained in the subsequent

paragraphs.

183.   Section 2 of the Voting Rights Act prohibits the enforcement of any

"standard, practice, or procedure" that "results in a denial or abridgement of the right

of any citizen of the United States to vote on account of race or color, or"

membership in a racial or language minority group. 52 U.S.C. § 10301(a).

184.   Arkansas's congressional district boundaries, as currently drawn,

"cracks" minority populations with the intent and effect of diluting their voting

strength, in violation of Section 2 of the Voting Rights Act.

185.   Black voters in Arkansas, including in and around this area, are politically cohesive. Elections in this area reveal a clear pattern of racially polarized voting that allows blocs of white voters usually to defeat Black voters' preferred candidates.

186.   The totality of the circumstances establishes that the enacted congressional map had the intent and has the effect of denying Black voters an equal opportunity to participate in the political process and elect candidates of their choice, in violation of Section 2 of the Voting Rights Act.

187.   By engaging in the acts and omissions alleged herein, Defendants have acted and continue to act to deny Plaintiffs' rights guaranteed by Section 2 of the Voting Rights Act. Defendants will continue to violate those rights absent relief granted by this Court.

188.   The 2021 Arkansas Reapportionment Plan should thereby be voided, and the Arkansas General Assembly be ordered to reconsider such Plan and adopt one in keeping with constitutional and legal requirements. Alternatively, the court should select or devise another redistricting measure that meets constitutional standards.

**COUNT VI**
**Defendants' Violation of Article II, Section 3**
**of the Constitution of the State of Arkansas**

189.    Article II, Section 3 of the Constitution of the State of Arkansas

provides:

> The equality of all persons before the law is recognized, and shall ever
> remain inviolate; nor shall any citizen ever be deprived of any right,
> privilege or immunity; nor exempted from any burden or duty, on
> account of race, color or previous condition.

190.    This provision of the Arkansas Constitution is similar in wording

and purpose as the equal protection clause of the Fourteenth Amendment to the

United States Constitution. Thus, the decisions of the Federal courts in interpreting

that clause of the Fourteenth Amendment should largely be applicable to the

interpretation of Article II, Section 3 of the Arkansas Constitution.

191.    The Arkansas General Assembly's 2021 Congressional Redistricting

Plan had the discriminatory intent and effect of racially gerrymandering or

"cracking" communities of Black voters to reduce or eliminate the potential and

effectiveness of such communities of voters to elect candidates and pass issues that

they favored.

192.    The adoption of such Plan was intended to and has resulted in the

consistent and permanent impairment, depravation and degradation of Black

citizens in their participation in Federal congressional political process and

enhanced the consistent and permanent potential for continued success in electing

88

White candidates to Congress from the Second Congressional District.

193.   The adoption of the 2021 Plan denied the Plaintiffs and other Blacks in Arkansas the equal protection of the laws as guaranteed under the "Equal Protection Clause" of the Fourteenth Amendment and the Fifteenth Amendment to the U.S. Constitution, and Article II, Section 3 of the Constitution of the State of Arkansas.

194.   The 2021 Arkansas Reapportionment Plan should thereby be voided, and the Arkansas General Assembly be ordered to reconsider such Plan and adopt one in keeping with constitutional and legal requirements. Alternatively, the court should select or devise a proposed redistricting measure that meets constitutional standards.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court:

1.  Declare that Acts 1114 and 1116 of the 2021 Arkansas General Assembly violates:

> (a)  The "Equal Protection Clause" of the Fourteenth Amendment to the United States Constitution;
>
> (b) The Fifteenth Amendment to the United States Constitution;
>
> (c) Section 2 of the Voting Rights Act; and

(d) Article II, Section 3 of the Constitution of the State of Arkansas.

2. Enjoin Defendants, as well as their agents and successors in office, from enforcing or giving any effect to the boundaries of the congressional districts as drawn in Acts 1114 and 1116, including an injunction barring Defendants from conducting any congressional elections under the enacted map;

3. Enjoin any further congressional election in Arkansas until the State of Arkansas has adopted a Congressional Reapportionment Plan that meets constitutional standards; or, alternatively

4. The Court select or devise a proposed redistricting measure that meets constitutional standards.

5. Grant such other or further relief the Court deems appropriate, including but not limited to an award of Plaintiffs' attorneys' fees and reasonable costs.

Respectfully submitted,

Richard H. Mays
Ark. Bar No. 61043
Attorney for Plaintiffs
**RICHARD MAYS LAW FIRM PLLC**
2226 Cottondale Lane – Suite 210
Little Rock, AR 72202
Tel: 501-891-6116
E-mail: rmays@richmayslaw.com
        njackson@richmayslaw.com

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a copy of the above and foregoing First Amended Complaint has been served upon counsel of record for the Defendants by the Court's ECF system.  Counsel for Plaintiffs is unaware of any attorney or party to this action who require service by other means.

Date:  December 2, 2022

                                        <u>/s/    *Richard H. Mays*    </u>
                                            Richard H. Mays