# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# CENTRAL DIVISION

JACKIE WILLIAMS SIMPSON, *et al.*,　　　　　　　　　　　　　　PLAINTIFFS,

v.　　　　　　Case No. 4:22-cv-00213-JM (three-judge court)

JOHN THURSTON, in his official
capacity as the Arkansas Secretary of
State,　　　　　　　　　　　　　　　　　　　　　　　　　　　　　DEFENDANT.

**Defendant's Brief in Support of Motion to Dismiss First Amended Complaint**

**TABLE OF CONTENTS**

Introduction .................................................................................................................. 1

Argument ..................................................................................................................... 1

    I.   Plaintiffs' new complaint still fails to adequately plead facts showing that the General Assembly engaged in intentional racial discrimination in adopting the 2021 Congressional map. .................................................................. 1

    II.  The Court should clarify that it dismissed Plaintiffs' Voting Rights Act claim with prejudice. ......................................................................................... 8

Conclusion ................................................................................................................. 10

INTRODUCTION[1]

Plaintiffs challenged Arkansas's Congressional map before the General Assembly while it was being debated, and they lost. Now they challenge it here. The Court dismissed the bulk of their lawsuit, concluding that intentional race-based vote dilution is the only sort of claim Plaintiffs could conceivably bring, even if they lacked sufficient factual allegations in their first complaint. Redistricting is an exercise of political judgment that often leads to fraught political battles. Plaintiffs' original complaint did not plausibly allege that the General Assembly's adoption of the 2021 Congressional map was based on race, rather than ordinary politics.

That remains true. The allegations in Plaintiffs' latest complaint speak of a fraught, sometimes bitter political battle. But they still don't come close to establishing racial discrimination. Plaintiffs have had ample opportunity to muster factual allegations to support their claims, and they have failed to do so. The Court should dismiss this entire case with prejudice.

ARGUMENT

I. **Plaintiffs' new complaint still fails to adequately plead facts showing that the General Assembly engaged in intentional racial discrimination in adopting the 2021 Congressional map.**

The Court gave Plaintiffs the opportunity to replead the vote-dilution claims they brought under the Fourteenth and Fifteenth Amendments to the U.S. Constitution, and Article II, section 3 of the Arkansas Constitution.[2] Plaintiffs attempt to replead. But their latest additional allegations fare no better. Still "[m]issing here are facts plausibly showing that race motivated the

---

[1] For the sake of brevity, Defendant incorporates by reference the Background and Legal Standard sections in its original motion to dismiss briefing. (Doc. 12.)

[2] The Court noted that "members of this panel disagree about whether Fifteenth Amendment vote-dilution claims exist." Order at 7. For the reasons explained in the prior motion to dismiss briefing, Defendant continues to maintain that they do not. For purposes of its prior decision the Court "assume[d] that vote-dilution claims can come in both a Fourteenth and Fifteenth Amendment package" and that both claims have the same elements." *Id.* at 7-8. The Court further

1

General Assembly's decision, much less that it was the predominant factor behind it." Memorandum Opinion and Order dated October 24, 2022, at 4 ("Order"). The Court should therefore dismiss Plaintiffs' vote-dilution claims with prejudice.

As before, "[t]here is no 'smoking gun' here." *Id.* Plaintiffs still do not allege any facts directly showing that the General Assembly had any motivation in adopting the 2021 Congressional map other than achieving population equality. Likewise, Plaintiffs' allegations still fail to "plausibly connect[] the map's alleged discriminatory *effects* to the *intent* of those who adopted it." *Id.* Plaintiffs continue to argue that the Court "should draw favorable inferences from several allegations in the complaint." *Id.* But the Court has correctly rebuffed this tactic.

Plaintiffs' latest allegations fall into the same general categories that the Court previously identified as failing to nudge their claims across the Rule 12(b)(6) standard. First, Plaintiffs originally argued that the Court should infer animus from "the General Assembly's decision not to choose a different map from the twenty-six others it considered." *Id.* Now, they ask the Court to draw the same inference based on seven maps they claim would "achieve equal or better equalization of population in the respective districts, but not require the 'cracking' of Pulaski County." (First Amended Complaint ¶ 70) ("FAC.")

But those maps remain nonstarters. As the Court previously explained, the maps proposed by Sen. Tucker (SB 727, FAC Ex. 6), Sen. Elliot (SB 728, FAC Ex. 7), and Rep. Flowers (HB 1980, FAC Ex. 11), "are nonstarters because they would have invited a challenge under the

---

acknowledged that "Arkansas courts have traditionally viewed equal protection the same as federal courts, meaning that, if the federal vote-dilution claims survive, so does the one under state law." *Id.* at 8 (cleaned up). Because the same intentional-discrimination standard applies to all three claims, Defendant will address them collectively.

2

"one-person, one-vote" principle." Order at 4.[3] The same is true for Rep. Whitaker's map (HB 1968, FAC Ex. 8), which boasts a 1.37% variance, and Rep. Love's map (HB 1978, FAC Ex. 10), with its 0.81% variance.

Rep. Meeks' map (HB 1966, FAC Ex. 8) does substantially worse on population equality than the adopted map, with a 0.32% variance. Moreover, Rep. Meeks' map changes the state's longstanding political geography by combining large northwest Arkansas counties, namely, Benton and Washington, with counties as far east as Izard and Cleburne. (FAC Ex. 8.) Plaintiffs offer no reason to think that those, and other numerous substantial changes that Rep. Meeks' map made to the previous layout of Arkansas's Congressional map would have been acceptable to the members of the legislature. *Cooper v. Harris*, 137 S. Ct. 1455, 1472 (2017) (Alito, J., concurring in part) ("When a new census requires redistricting, it is a common practice to start with the plan used in the map and to change the boundaries of the prior districts only as needed to comply with the one-person, one-vote mandate and to achieve other desired ends.").

But even were than not true, Plaintiffs still "do not explain how the rejection of" any of these "other maps shows a discriminatory purpose." Order at 5. Rather, it is entirely consistent with the General Assembly's responsibility "to exercise the political judgment necessary to balance competing interests" in the redistricting process. Order at 3 (cleaned up).

Next, Plaintiffs continue to rely on "after-the-fact comments of Governor Asa Hutchinson and Little Rock Mayor Frank Scott, Jr." Order at 4. Still absent are any "allegations that either

---

[3] Sen. Johnson's map (SB 720, FAC Ex. 5) lacks any population information from which one could discern compliance with one-person-one vote. Plaintiffs do not specifically allege that SB 720 would better achieve population quality than the map adopted by the General Assembly. And though Plaintiffs claim as a general matter that all the maps they list "would achieve equal or better equalization of population in the respective districts" than the adopted map, that simply isn't true, as *none* of the maps the attach as exhibits do better than the adopted map's 0.09% deviation.

3

one worked with the General Assembly on reapportionment or otherwise knew why it selected one map over the others." *Id.* (*See* FAC ¶¶ 73-76.) The Court should thus continue to disregard these allegations.

New to Plaintiffs' amended complaint are allegations related to contemporaneous statements made by members of the General Assembly during the redistricting debate. But rather than show that the legislature had a racial motive, they prove exactly the opposite. Consider:

- The adopted map's sponsor Sen. "English and other members of the leadership . . . claimed that they deliberately failed to consider the impact of their actions on minority race voters. . . . That majority also refused to even discuss race as a factor in determining a reapportionment plan . . . ." (FAC 49);

- In response to remarks from Sen. Tucker regarding the racial breakdown of the portions of Pulaski County that were split into the First and Fourth districts, Sen. "English, replied that I don't think we've looked at any maps at all across the state to decide whether something was African-American or white or whatever the case may be." (FAC 50);

- In response to similar comments made by Sen. Tucker, Sen. Rapert stated: "Senator Tucker, we said it many times – we're not using racial demographics to draw maps, so if you're going to always revert back to discussion of that, you're de facto using racial demographics to draw maps." (FAC 51);

- All of this underscores Plaintiffs' conclusion that "[n]o discernable rationale for the Acts and Maps, aside from population parity, were provided in the Committee meetings or general sessions." (FAC 53);

4

The allegations in Plaintiffs' amended complaint show that, at every turn, members in the majority disclaimed any reliance on race in their districting decisions. Indeed, not only do those statements fail to show that race was the predominant factor in the General Assembly's redistricting decisions, they fail to show that race played any role.

Plaintiffs also excerpt committee testimony from those critical of the adopted map's alleged racial impact. But those statements do not impute a racial motive to the adoption of the Congressional map:

- Eschewing any notion that the supporters of the adopted map were motivated by race, Rep. Jamie Scott urged the legislature to "look beyond intent," and instead "look at the impact of what we do here." (FAC at 30.)

- Rep. Love similarly did not opine that the adoption of the Congressional map was racially motivated. To the contrary, he implored members in the majority to consider racial reasons for modifying the map. (FAC at 31 ("Race *can* be taken into account. We don't have to look at it as a negative thing.").)

- Rep. Hodges highlighted what he believed to be partisan motivations behind the map. "Any partisan advantage you gain by this map is worth little compared with the negative effects that this will have on the black communities in Pulaski County. So ask yourself, is it worth it to have a little partisan gain at the sake of those communities?" (FAC at 33.)

- Rep. Clowney: "I actually hadn't heard anybody make allegations of racism. . . . [T]he impacts of race and racism are even worse for our colleagues of color, who are telling us quite clearly not what the intent of this bill is but rather what it does." (FAC at 33-34.)

- Rep. Love later reiterated that no one was accusing the majority of racist intent: "When we have conversations on race as I said, they were going to be sensitive, and here we were discussing race. We said, you know, people said people were racist, and people said this. *Nobody said any of those things.*" (FAC at 34.) "Now, as I said, that doesn't go to me saying what the intent of this map is, but the impact[.] . . . I did not say, Mrs. Speaks, just because you proposed this map that you are a racist. I did not say that. But I want you to go to the impact of this map. . . . It's going to disenfranchise African-American communities, regardless of their intent." (FAC at 35.)

- Sen. Elliot's criticism was not that the drafters considered race in designing the Congressional map; rather, she criticized the majority for not taking race into account: "[J]ust as we deliberately . . . consider the other criteria, we absolutely can and should [] consider race as a part of what we're doing. To say things like 'I don't see race and we didn't consider race' is against everything that we are allowed to do, according to the courts." (FAC at 35.) Indeed, Sen. Elliot went on to clarify that she wasn't imputing a racial motivation to any of the bill's supporters, but only commenting on its effects: "This map does absolutely what it is not supposed to do. It doesn't mean that you sat there and said, 'Well, let's pull out all the African American folks and take them out.'" (FAC at 36.)

- Sen. Chesterfield criticized the map as "hyperpartisan." (FAC at 38.) She was not shy about imputing partisan motivations to the legislature: "The state Senate

6

district I represent is being punished—punished for being majority black and Hispanic, punished for being Democratic. The Republican Party is the majority in every single instance in this state, yet they insist on being poor winners." (*Id.*)

The allegations in the amended complaint concerning the debate over redistricting can be summed up as follows. The bill's Republican sponsors and supporters disclaimed any reliance on race in drawing the Congressional districts. The bill's Democrat detractors variously criticized the map for splitting the cities of Little Rock and North Little Rock into multiple districts, an alleged racially dilutive impact as a result of the population-balancing splits in southeast Pulaski County, and an alleged partisan motivation. (*See* FAC ¶ 65.) But what is missing is any implication that race was the predominant motive behind the map.

Plaintiffs' allegations remain, at their core, about political, not racial, gerrymandering. Speaking of the southeastern splits, Plaintiffs claim that "[t]he reason for the singling out of these precincts becomes obvious when one reviews the voting history of those precincts in the Second District Congressional elections for the years 2016, 2018 and 2020." (FAC ¶ 58.) Plaintiffs allege a "history" of these precincts consistently voting for what they describe "Black candidates or those sympathetic to Black concerns"—an apparent euphemism for Democrats. (FAC ¶ 59.) Indeed, were there any doubt as to Plaintiffs' meaning, it dispelled by Plaintiffs' references to the voting patterns in the relevant areas. (FAC ¶ 59 (reporting between 60-95%).)

Ultimately, Plaintiffs' amendment does not cure any of the deficiencies the Court previously identified. Because they have no evidence that race was a factor at all in the General Assembly's map-drawing process, let along the predominant one, Plaintiffs fall back on arguing that the Court should infer intent from the map's alleged effects. (*See* FAC ¶¶ 61, 95.) But as this Court already held, "[e]ven if the new map is consistent with racially motivated redistricting,

7

it does not plausibly establish this purpose on its own." Order at 6 (cleaned up).  Indeed, the most logical inference from the allegations in Plaintiffs' complaint is that the legislature was motivated by achieving "population parity" (FAC ¶ 53) or partisanship. (FAC ¶ 58.)  And "[i]f a partisan" or other "motive is predominant, then a racial motive cannot be." Order at 6.

The Court has already once correctly determined that Plaintiffs have failed to meet their burden to allege sufficient facts to proceed.  Re-pleading has not changed that.  Dismissal is warranted.

## II. The Court should clarify that it dismissed Plaintiffs' Voting Rights Act claim with prejudice.

Plaintiffs' new complaint retains their Voting Rights Act claim.  (FAC at 86.)  In its Order, the Court recognized Plaintiffs' concession that "that there is no way they can state a claim under § 2 of the Voting Rights Act." Order at 12.  On the basis of that merits determination, the Court declined to reach the alternative argument that Section 2 does not contain a private right of action.  *See id.* at n.3.  Despite the finality of the Court's determination, Plaintiffs have attempted to replead that claim.

It appears that the numbering of Plaintiffs' original complaint may have led to some confusion as to whether their VRA claim was dismissed.  The Court dismissed Counts I, II, and III of the original complaint, while deferring a ruling on Counts IV, V, and VI.  *See* Order at 15.  But Plaintiffs' original complaint contained seven counts and labeled two separate claims as "Count VI," rather than Count VI and VII. (*See* original complaint at 57 (VRA claim); *id.* at 58 (state constitutional claim).)  The Court gave Plaintiffs another chance to plead their state-law claim.  *See* Order at 8 & n.4.  Not so for their VRA claim.  *Id.* at 12.  But due to the way the counts were labeled, the Court did not explicitly list Plaintiffs' VRA claim among the dismissed counts in its conclusion.

8

9

The Court should clarify that its prior ruling "that there is no way they can state a claim" under the VRA, Order at 12, was a dismissal with prejudice.

.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' First Amended Complaint with prejudice.

Dated:  December 16, 2022                     Respectfully submitted,

                                                LESLIE RUTLEDGE
                                                  Arkansas Attorney General
                                              NICHOLAS J. BRONNI (2016097)
                                                  Solicitor General
                                              DYLAN L. JACOBS (2016167)
                                                  Deputy Solicitor General
                                              OFFICE OF THE ARKANSAS
                                                  ATTORNEY GENERAL
                                              323 Center Street, Suite 200
                                              Little Rock, Arkansas 72201
                                              (501) 682-2007
                                              (501) 682-2591 (fax)
                                              Dylan.Jacobs@arkansasag.gov

                                              *Counsel for Defendant*