### IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION


**JACKIE WILLIAMS SIMPSON,** *et al.*                                          **PLAINTIFFS**

**v.**                         **Case No. 4:22-cv-00213-JM (three-judge court)**

**JOHN THURSTON, in his official
capacity as the Arkansas Secretary of
State**                                                       **DEFENDANT**


### PLAINTIFFS' BRIEF IN SUPPORT OF
### RESPONSE TO
### <u>DEFENDANT'S MOTION TO DISMISS</u>


   The Defendant's Motion to Dismiss the Plaintiff's First Amended Complaint is based upon one dominant theme: simply ***deny*** that race was a factor in the Arkansas 2021 Reapportionment Plan, just as the majority leadership of the Arkansas General Assembly simply denied that they considered race in surgically carving out two majority Black residential areas of southern Pulaski County from Congressional District 2 of Arkansas – where a steadily-growing combination of Black and White voters was making the re-election of the incumbent Congressman uncomfortably close. The majority leadership's insistence on ignoring race in the reapportionment process was too quickly and frequently raised, and the objective circumstantial evidence that race <u>was</u> a factor in the jerrymandering of that portion

1

of the Second District into the First and Fourth Districts is too obvious to give

credibility to such denials.

In the case of *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 51,

61 USLW 4818 (1993), Justice Sandra Day O'Connor, speaking for a

majority of the Supreme Court, wrote:

> The right to vote freely for the candidate of one's choice is of the
> essence of a democratic society...." *Reynolds v. Sims,* 377 U.S., at
> 555, 84 S.Ct., at 1378. For much of our Nation's history, that right
> sadly has been denied to many because of race. The Fifteenth
> Amendment, ratified in 1870 after a bloody Civil War, promised
> unequivocally that "[t]he right of citizens of the United States to vote"
> no longer would be "denied or abridged ... by any State on account of
> race, color, or previous condition of servitude." U.S. Const., Amdt.
> 15, § 1.

The forthcoming year will be the thirtieth anniversary of the writing of that

Opinion, and the 153rd year after the ratification of the Fifteenth Amendment to the

United States Constitution. Yet, the right of many Black and other minority

citizens of this country to vote freely for the candidate of their choice is still sadly

being denied, although often in more subtle ways than in earlier years. As the

majority opinion in *Shaw* observed:

> But "[a] number of states ... refused to take no for an answer and
> continued to circumvent the fifteenth amendment's prohibition
> through the use of both subtle and blunt instruments, perpetuating
> ugly patterns of pervasive racial discrimination."
> [I]t soon became apparent that guaranteeing equal access to the polls
> would not suffice to root out other racially discriminatory voting
> practices. Drawing on the "one person, one vote" principle, this Court
> recognized that "[t]he right to vote can be affected by a *dilution* of

2

voting power as well as by an absolute prohibition on casting a
ballot." *Allen v. State Bd. of Elections,* 393 U.S. 544, 569, 89 S.Ct.
817, 833, 22 L.Ed.2d 1 (1969) (emphasis added)
509 U.S. at 640

There is only one question presented to this Panel by the Defendant's

Motion to Dismiss. That question is whether the Plaintiffs have <u>alleged</u> sufficient

factual matter, accepted as true, 'to state a claim to relief that is plausible on its

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868

(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955,

167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the *reasonable inference* that the

defendant is liable for the misconduct alleged." *Id*. Detailed allegations are not

required to survive a Rule 12(b)(6) motion to dismiss, but "Threadbare recitals of

the elements of a cause of action, supported by mere conclusory statements, do not

suffice." *Id.*

As the Court and the parties in this case have recognized in previous filings,

"[i]inquiries into congressional [and other legislative bodies'] motives or purposes

are a hazardous matter." *United States v. O'Brien*, 391 U.S. 367, 383, 88 S.Ct.

1673, 20 L.Ed.2d 672 (1968). When the issue is one of "mixed intent,"

"[e]valuating the legality of acts ... can be complex .... When the actor is a

legislature and the act is a composite of manifold choices, the task can be even

more daunting." *LULAC*, 548 U.S. at 418, 126 S.Ct. 2594 (opinion of Kennedy, J.).

In this setting, Plaintiffs have been tasked with showing facts giving plausibility to the claim that, despite their "Who? Me?" denials, the 2021 Reapportionment Plan was motivated in significant part by the intent of the majority and its leadership to gerrymander ("crack") the two areas of southern Pulaski County into two other congressional districts, where their political effectiveness would be neutered, and leaving the remnants of the formerly strong racial voting block in District Two isolated politically from their friends, neighbors, and associations. Would this have happened if the 22,000 Blacks in the gerrymandered area had been affluent Whites?

The remarkable aspect of this case is that, aside from the alleged desire to achieve a numerical balance between the four congressional districts, this neutering occurred without any legitimate explanation for the necessity of doing so, or of analyzing the traditional considerations for redistricting decisions. There was no rationale given by the two legislative committees (the Senate State Agencies Committee and the House State Agencies Committee) or the legislative body as a whole, for the cracking of the two areas in question. Finally, there is no compelling government interest articulated by the sponsors, nor one obvious from the facts, for this incursion into the long-standing Black communities of southern Pulaski County.

The absence of such rationale is a factor that this Court can take into consideration in drawing a *reasonable inference* that the cracking was done because the communities involved consisted largely of Blacks, who, the voting records show, frequently vote the same way for candidates and on issues that are contrary to the majority's favored candidates and positions.

> "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," including (1) "[t]he *impact of the official action" as "an important starting point*"; (2) "the historical background of the decision"; (3) "[t]he specific sequence of events leading up to the challenged decision"; (4) *"[d]epartures from the normal procedural sequence"*; (5) "legislative or administrative history ..., especially ... *contemporary statements by members of the decisionmaking body*, minutes of its meetings, or reports." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 at 266–68, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *see also Miller v. Johnson*, 515 U.S. 900 at 913–14, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995)

> In *Cooper v. Harris,* 137 S.Ct. 1455, 197 L.Ed.2d 837, 85 USLW 4257

(2017) the Supreme Court addressed the issue now before the Court in this case, explaining:

> [T]he plaintiff must prove that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller v. Johnson,* 515 U.S. 900, 916, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). *That entails demonstrating* [*] *that the legislature "subordinated" other factors— compactness, respect for political subdivisions, partisan advantage, what have you—to "racial considerations." Ibid.* The plaintiff may make the required showing through "direct evidence" of legislative

intent, "*circumstantial evidence of a district's shape and demographics,*" or a mix of both. *Ibid.*
137 S.Ct. at 1464

Footnote No. 1 to the Court's opinion, which followed the above-quoted

passage, added the following instruction relevant to this case:

> A plaintiff succeeds at this stage *even if the evidence reveals that a legislature elevated race to the predominant criterion in order to advance other goals, including political ones*. See *Bush v. Vera,* 517 U.S. 952, 968–970, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (plurality opinion) (holding that *race predominated when a legislature deliberately "spread[ ] the Black population" among several districts in an effort to "protect[ ] Democratic incumbents"*); *Miller v. Johnson,* 515 U.S. 900, 914, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) (stating that the "use of race as a proxy" for "political interest[s]" is "prohibit[ed]").

The Defendant focuses on the redistricting maps proposed by various

legislators that were attached to the First Amended Complaint, and claims that

those maps do not help the Plaintiffs because they allegedly exceed the percentage

of deviation from the ideal number of citizens who are to be included in each

congressional district. The Defendant's focus on the maps is an effort to divert the

Court's attention to an irrelevant matter.

Those maps were included in the First Amended Complaint simply for

purposes of illustration of the ease with which district boundaries can be

manipulated by today's highly-sophisticated computers to achieve congressional

districts without breaking up counties, municipalities, and other units. Plaintiffs are

not proposing those precise maps, and for the purposes of responding to

6

Defendant's Motion, it is not necessary for Plaintiffs to propose any map. See *Cooper*, supra, 137 S.Ct. at 1380 ("The Equal Protection Clause prohibits the unjustified drawing of district lines based on race. An alternative map is merely an evidentiary tool to show that such a substantive violation has occurred; neither its presence nor its absence can itself resolve a racial gerrymandering claim." Footnote omitted)

The Defendants also attempt to discredit the many detailed references in the First Amended Complaint to the statements made by the various state representatives and senators during the discussion of the mysterious reapportionment plan (ultimately adopted) that was suddenly submitted from an unknown source to the chairmen of both the House and Senate Committees on State Agencies and Government Affairs on Monday, October 4, 2021 between 9:00 and 10:00 o'clock p.m. It was not until the following day that many of the members of the Legislature were aware of that "New Plan." (See Representative John Payton's comment: "I'm sure most of you probably didn't even see the map until 15 minutes ago, but this bill was rushed." First Amended Complaint, ¶43) From that point on, it was the only plan proposed or discussed by the Committees or the General Assembly.

Defendant emphasizes that, during the discussion of the "New Plan," the representatives and senators who challenged it did so based on the <u>impact</u> that it

would have on the Black communities in the "cracked" areas, but not on the intent of the Plan's sponsors. That is a cynical reading of the record of those discussions.

Most, but not all, of those who challenged the New Plan were Blacks, and those who advocated the New Plan were White. A reading of the record shows that the two sides were engaged in a delicate "verbal dance" to avoid (on the part of the Whites) being conceived as racists, and (on the part of the Blacks) as being conceived as accusing the Whites of being racists. As a result, the Blacks frequently prefaced their remarks as not accusing anyone of racism, but focusing on the impact of the New Plan on the Black communities that were involved.

Senator Joyce Elliott captured these circumstances that existed during the Senate General Session on October 7, 2021 when she said on the Senate floor:

> To say things like "I don't see race and we didn't consider race" is against everything that we are allowed to do, according to the courts. So that comes down to a choice, because in the map that we have we've made a choice to crack. We're not supposed to pack these districts, and we're not supposed to crack these districts when it comes to minority groups. (underlining added)
>
> This map does absolutely what it is not supposed to do. It doesn't mean that you sat there and said, "Well, let's pull out all the African American folks and take them out." *You don't have to say it out loud, as has been pointed out so many times as the impact of what you do.*
>
> *For us to continue to hide behind the guise of "I don't know anything about racial impact—I don't know anything about it all" says "we don't want to deal with it."*
>
> (Emphasis added)

8

The intent of an action determines to a large degree the impact of that action, and conversely, the impact is evidence of the intent of the person planning and executing the action.  The Supreme Court, in *Arlington Heights* and other cases cited above and in Plaintiffs' First Amended Complaint, has recognized that, in cases such as this, intent can be shown by the impact of the reapportionment.

The Defendant Thurston's basic position on the statements made by the legislators is that "The bill's Republican sponsors and supporters disclaimed any reliance on race in drawing the Congressional districts," so everybody, including this Court, should believe them and end the inquiry.

But the Supreme Court and other Federal courts have long dealt with racially discriminatory voting practices, and are aware of the temptation and proclivities of political parties to acquire and retain power, even at the loss of basic civil rights by others.  As noted above, those Courts have held that a reapportionment plan can be successfully challenged where the traditional, well-recognized factors for reapportionment, such as compactness, the maintenance of political subdivisions and geographic boundaries, partisan advantage and other such factors have been ignored or subordinated to racial considerations.

Again, in this case there was no rationale for adoption of the Gerrymandering of the 22,000 Black voters from the Second Congressional District provided by the sponsors or supporters of the New Plan other than

population equality. While that is certainly a goal of any proposal for reapportionment, it is by no means the only goal, and even the primary goal of population equality is subject to the protection of the rights of minorities under the Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment.

In the absence of any other rationale for the Plan, the sudden, last-minute appearance of the "New Bill;" its stealthy, careful and deliberate gerrymandered removal of the communities of 22,000 Blacks from the southern section of the Second District into the First and Fourth Districts; their replacement in the northern section of the Second District by an almost equal number of Whites in Cleburne County; and the dialogue between the proponents and opponents of the Plan in the Arkansas Legislature, give facial plausibility to the Plaintiffs' claims that allows the court to draw the *reasonable inference* that the Plan was based in large part on racial discrimination. *Cooper v. Harris, supra; Bush v. Vera,* 517 U.S. 952, 968–970, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996); *Arlington Heights*, 429 U.S. at 266–68, 97 S.Ct. 555; *Miller v. Johnson,* 515 U.S. 900, 916, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995)

The allegations of fact contained in the Plaintiffs' First Amended Complaint are more than "threadbare recitals of the elements of a cause of action" or "mere conclusory statements," but are detailed statements of fact from which this Court

can draw a reasonable inference that the Reapportionment Plan adopted by the

Arkansas General Assembly was motivated by an invidious discriminatory

purpose.

Plaintiffs have met the standard set by *Ashcroft* and *Twonbly,* and should be

allowed to proceed to discovery. If Plaintiffs fail to flesh out the "factual content"

of the allegations that they have made in clearing the hurdle of a motion to dismiss,

the Defendant will have ample opportunity to then challenge Plaintiffs' case again.

The Defendant's Motion to Dismiss should be denied.

Respectfully submitted,

Richard H. Mays
Ark. Bar No. 61043
Attorney for Plaintiffs
RICHARD MAYS LAW FIRM PLLC
2226 Cottondale Lane – Suite 210
Little Rock, AR 72202
Tel: 501-891-6116
E-mail: rmays@richmayslaw.com
        njackson@richmayslaw.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on the date of filing of this Plaintiffs' Brief in Support of Response to Defendant's Motion to Dismiss, a copy of the same was served upon counsel of record for the Defendant by and through the Court's electronic filing and service system, and by electronic mail addressed to:

> Dylan L. Jacobs, Esq.
> Deputy Solicitor General
> Office of the Arkansas Attorney General
> 323 Center Street, Suite 200
> Little Rock, AR 72201
> Dylan.Jacobs@arkansasag.gov

Dated:  December 26, 2022.                    */s/  Richard H. Mays*
                                              Richard H. Mays

12