IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

———————————————

No. 4:22-cv-213

———————————————

Jackie Williams Simpson, *et al.*

Plaintiffs,

v.

John Thurston, *et al.*

Defendants.

———————

Before STRAS, Circuit Judge, MARSHALL, Chief District Judge, and MOODY, District Judge.

———————

**Memorandum Opinion and Order**

PER CURIAM.

    We provided additional time to allow the plaintiffs to amend their complaint. Having reviewed the amendments, we grant the motion to dismiss. The allegations do not create a plausible inference that race was the "predominant factor" behind the adoption of Arkansas's new congressional map. *Easley v. Cromartie*, 532 U.S. 234, 241 (2001) (emphasis omitted) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 547 (1999)).

I.

The plaintiffs' theory in the amended complaint is the same as before: vote dilution. *See* U.S. Const. amends. XIV, XV; Ark. Const. art. 2, § 3.[1]  In their view, the map adopted by the Arkansas General Assembly following the 2020 Census "cracks" the black community by "dispers[ing] [them] into districts in which they constitute an ineffective minority." *Bartlett v. Strickland*, 556 U.S. 1, 14 (2009) (plurality opinion) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986)).

One of the key elements of a cracking claim is a "discriminatory purpose," *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481 (1997), which requires the complaint to allege facts creating a plausible inference that race was the "*predominant* factor" in the redistricting process, *Easley*, 532 U.S. at 241 (quoting *Hunt*, 526 U.S. at 547).  Both "circumstantial and direct evidence of intent" count. *Hunt*, 526 U.S. at 546 (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1997)).

The amended complaint contains some new allegations.  A few are "contemporary statements by members" of Arkansas's General Assembly—the body that passed the map. *Arlington Heights*, 429 U.S. at 268 (explaining that these statements "may be highly relevant" in assessing purpose).  The problem is that they mostly contradict the inferences of racial discrimination the plaintiffs ask us to draw.

Consider what the map's sponsor said.  In response to a question about race from another legislator, she explained, "I don't think we've looked at any maps at all across the state to decide whether something was African-American or white or

---

[1]As before, we assume without deciding "that vote-dilution claims can come in both a Fourteenth and Fifteenth Amendment package." [Mem. Op. & Order 7–8.]

-2-

whatever the case may be." [Am. Compl. ¶ 50.] Or consider the statement of another legislator, a committee chair, who declared that the General Assembly was not "using racial demographics to draw maps." [*Id.* ¶ 51.]

Indeed, even the opponents of the new congressional map did not think racial animus played a role. One said she "hadn't heard anybody make allegations of racism." [*Id.* ¶ 65.] Another summarized the opposition as focused on "the *impact* of this map," not its "intent." [*Id.*] The point is that these statements belie the notion that race played a role in drawing the map, much less a "*predominant*" one. *Easley*, 532 U.S. at 241 (quoting *Hunt*, 526 U.S. at 547).

To be sure, some opponents of the map spoke out in stronger terms. One legislator described it as "prejudiced," and another claimed that "[t]he districts ha[d] been manipulated based solely on race." [Am. Compl. ¶ 65.] The problem is that these two accusations of racial bias fail to create a plausible inference "that the legislature *as a whole* was imbued with racial motives." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) (emphasis added). At least not here, when the statements themselves are conclusory, and members of both parties have claimed the opposite was true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009); *see also Butts v. City of New York*, 779 F.2d 141, 147 (2d Cir. 1985) (explaining "that the speculations and accusations" of a law's opponents "do not support an inference of . . . racial animus").

The plaintiffs apparently recognize the problem. They urge us to draw a negative inference from the absence of racially charged rhetoric. [Am. Compl. ¶ 52.] Most legislators did not mention race, they claim, so they must have been trying to hide their true motive.

This argument does not work. After all, we have to presume that the General Assembly acted in "good faith." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) (quoting *Miller v. Johnson*, 515 U.S. 900, 915 (1995)). So even if legislators were

"*aware* of race when [they] dr[ew] [the] district lines," as the complaint suggests, we cannot simply leap to the conclusion that they were lying about their motives. *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017) (quoting *Shaw v. Reno*, 509 U.S. 630, 646 (1993)).

Nor can the remaining allegations establish a plausible vote-dilution claim. One is that the map "was rushed," [Am. Compl. ¶ 43,] but "the brevity of the legislative process" cannot, on its own, "give rise to an inference of bad faith—and certainly not an inference that is strong enough to overcome the presumption of legislative good faith." *Abbott*, 138 S. Ct. at 2328–29. Another is that the map came "from an unknown source . . . outside the Legislature." [Am. Compl. ¶ 39.] But even assuming the General Assembly "[d]epart[ed] from the normal procedural sequence" during the redistricting process, *Arlington Heights*, 429 U.S. at 267, nothing suggests that it did so "to accomplish a discriminatory goal," *Rollerson v. Brazos River Harbor Navigation Dist.*, 6 F.4th 633, 640 (5th Cir. 2021); *see Veasey v. Abbott*, 830 F.3d 216, 238 (5th Cir. 2016) (en banc) (discussing the "numerous and radical procedural departures" that might "lend credence to an inference of discriminatory intent"). And finally, a "history of racial discrimination" fails to establish discriminatory intent, [Am. Compl. ¶ 120,] at least when it is not "reasonably contemporaneous" with the adoption of the new map, *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987). *See Abbott*, 138 S. Ct. at 2324 ("[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion))).

All that remains, like before, is "discriminatory impact." [Am. Compl. ¶ 61 (emphasis omitted).] In our previous order, we noted that the complaint itself identified reasons for it besides race. The first was "achiev[ing] numerical equality between the [d]istricts." [Am. Compl. ¶ 69]; *see Wesberry v. Sanders*, 376 U.S. 1, 17–18 (1964) (discussing the one-person, one-vote principle). The other was pure "partisan gerrymandering," designed to bolster the Republican Party's electoral

prospects across Arkansas. [Am. Compl. ¶ 3]; *see Rucho v. Common Cause*, 139 S. Ct. 2484, 2506–07 (2019) (recognizing "that partisan[-]gerrymandering claims present political questions beyond the reach of the federal courts"). Neither is actionable, and both are "obvious alternative explanation[s]" that make a *predominant* racial motive implausible. *Iqbal*, 556 U.S. at 682 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007)).

II.

One last housekeeping item. Our previous order deferred ruling on "Count[] . . . VI" to allow the plaintiffs to file an amended complaint. [Mem. Op. & Order 15–16.] The original complaint, however, contained two Count VI's: a vote-dilution claim under the Arkansas Constitution and a claim under § 2 of the Voting Rights Act. [Compl. ¶¶ 144–56.] We now clarify that we intended to defer ruling on the state constitutional claim and dismiss the § 2 claim with prejudice. [*Compare* Mem. Op. & Order 8 n.2 ("[I]f the federal vote-dilution claims survive, so does the one under state law."), *with id.* at 12 ("[T]he plaintiffs have candidly admitted that there is no way they can state a claim under § 2 of the Voting Rights Act.").] Now, having fully considered the allegations in the amended complaint, we dismiss both claims with prejudice.

III.

Based on the foregoing, we hereby order that:

1.   The defendants' motion to dismiss the plaintiffs' first amended complaint is **GRANTED**.  All counts are dismissed with prejudice.

2.   The defendants' motion to dismiss with respect to Counts IV, V, and VI of the original complaint is **DENIED AS MOOT** given the filing of the amended complaint.

3.   The plaintiffs' motion to dismiss the State of Arkansas as a defendant is **GRANTED**.

IT IS SO ORDERED this 25 day of May, 2023.

_____